**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Case No. 1:25-cv-00910**

M.S., a minor child,
by and through her parents and natural
guardians, Lindsey Sodano and Justin Sodano

and

LINDSEY SODANO,
Individually and as the parent of M.S.

and

JUSTIN SODANO
Individually and as the parent of M.S.

       Plaintiffs,

vs.

WARREN COUNTY BOARD OF
    DEVELOPMENTAL DISABILITIES
810 Drake Road
Lebanon, Ohio 45036

and

MEGAN MANUEL
Warren County Board of Developmental
Disabilities
810 Drake Road
Lebanon, Ohio 45036

and

TONY HIDY
Warren County Board of Developmental
Disabilities
810 Drake Road
Lebanon, Ohio 45036

and

SARAH LINDEEN

**Plaintiff Demands Trial By Jury**

1

Warren County Board of Developmental
Disabilities
810 Drake Road
Lebanon, Ohio 45036

and

LAURA HATHAWAY
Warren County Board of Developmental
Disabilities
810 Drake Road
Lebanon, Ohio 45036

   Defendants.

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs M.S., by and through her parents and natural guardians, Lindsey Sodano and

Justin Sodano, Lindsey Sodano, individually and as the parent of M.S, and Justin Sodano,

individually, and as the parent of M.S., for their Complaint against the above-named

Defendant(s), Warren County Board of Developmental Disabilities, Superintendent Megan

Manuel, Service and Support Administration ("SSA") Director Tony Hidy, SSA Supervisor Sarah

Lindeen, and SSA Laura Hathaway, state and aver upon information and belief:

## NATURE OF THE CASE

1.  Plaintiffs bring this action to remedy violations redress for violations of rights secured by

the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First and

Fourteenth Amendments, the Americans with Disabilities Act (ADA), Section 504 of the

Rehabilitation Act, the Fair Housing Act, and the Medicaid Act.

## JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action

arises under federal law, and under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the

deprivation of constitutional and federal statutory rights under color of state law.

3.      This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief

under 28 U.S.C. §§ 2201–2202.

4.      All events giving rise to this action occurred in Warren County, Ohio, and all Defendants

reside or are employed in this district.

5.      Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to these claims occurred within this judicial

district and Defendants reside here.

## PARTIES

6.      Plaintiff M.S. is a qualified individual with disabilities under the ADA. She is a

seventeen-year-old minor with profound disabilities, including STXBP1-DEE and a traumatic

brain injury. M.S. is wholly dependent on direct care workers for all activities of daily living,

behavioral support, and seizure care.  (Sodano Affidavit)

7.      Plaintiff Lindsey Sodano is the mother and natural guardian of M.S. She resides in

Warren County, Ohio with her daughter M.S. and other family members. She is an agency-

employed direct care worker who provides a portion of M.S.'s authorized care hours. (Sodano

Affidavit).  Lindsey Sodano is a Plaintiff in this action both individually and as the parent of

Plaintiff M.S.

8.      Plaintiff Justin Sodano is the father and natural guardian of M.S.  He resides in Warren County, Ohio with his daughter M.S. and other family members. He is an agency-employed direct care worker who provides a portion of M.S.'s authorized care hours. Justin Sodano is a Plaintiff in this action both individually and as the parent of Plaintiff M.S.

9.      Defendant Warren County Board of Developmental Disabilities ("WCBDD") is a county agency responsible for administering Medicaid HCBS waiver services and implementing person-centered service plans. WCBDD is a political subdivision, a public entity under the ADA, and received federal funding under Section 504. WCBDD is a "person" under 42 U.S.C. § 1983.  At all relevant times, this Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983.

10.     Defendant Megan Manuel is the Superintendent of WCBDD.  She is responsible for agencywide policy and decisions regarding Medicaid services and supports.  She is a final policymaker as it pertains to the challenged matters set forth in this Complaint.  Megan Manuel is a "person" under 42 U.S.C. § 1983.  At all relevant times, she acted under color of law and is a state actor.

11.     Defendant Tony Hidy is the Director of Service and Support Administration. He supervises all service and support administrators (SSAs), oversees person-centered service plan development, and directs implementation of WCBDD's parent replacement policy.  He is a final policymaker as it pertains to the challenged matters set forth in this Complaint.  Tony Hidy is a "person" under 42 U.S.C. § 1983.  At all relevant times, he acted under color of state law within the meaning of 42 U.S.C. § 1983.

12.     Defendant Sarah Lindeen supervises the SSA assigned to M.S.  Sarah Lindeen is a "person" under 42 U.S.C. § 1983.  She is a final policymaker as it pertains to the challenged

matters set forth in this Complaint. At all relevant times, she acted under color of state law within the meaning of 42 U.S.C. § 1983.

13.     Defendant Laura Hathaway is the SSA responsible for M.S.'s person-centered service plan and is the person who initiated the provider replacement process at issue. Laura Hathaway is a "person" under 42 U.S.C. § 1983. At all relevant times, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

## FACTS

### I.      Plaintiff M.S. Is Medically Fragile and Has Extraordinary Care Needs Met by a Medicaid HCBS Waiver

14.     M.S. is a seventeen-year-old minor with an extremely rare and life-threatening neurogenetic disorder called STXBP1-DEE, which causes severe intellectual delay, severe tremor, gait abnormalities, profound autism, behavioral disturbances, seizures, and many other problems too numerous to list.

15.     M.S. has lived with her parents and family members her entire life.

16.     Her father, Justin Sodano, became one of her Medicaid waiver care workers in 2020. Her mother, Lindsey Sodano, became one of her Medicaid waiver care workers in 2022.

17.     In 2017, a non-family caregiver's negligence caused M.S. to sustain a skull fracture and brain hemorrhage, a traumatic brain injury which resulted in encephalomalacia (permanent loss of brain tissue) in the frontal lobes, with gliosis (scar tissue), consistent with partial brain death. She now lives with the effects of this traumatic brain injury in addition to her already-profound developmental disability.

18.     To meet her significant care needs, Defendant WCBDD granted M.S. a Medicaid 1915(c) Home and Community–Based Services (HCBS) waiver known as the Individual Options (IO)

waiver. The IO waiver operates under authority granted by 42 U.S.C. § 1396n(c) and is governed by a binding agreement between the Centers for Medicare and Medicaid Services (CMS) and the State of Ohio through the CMS-approved Individual Options Waiver Application. Administration of Medicaid in Ohio is vested in the Ohio Department of Medicaid (ODM) under R.C. 5162.03 and 42 C.F.R. § 431.10, which requires each state to designate a single Medicaid agency. ODM has delegated operational responsibility for HCBS waiver services for individuals with developmental disabilities to the Ohio Department of Developmental Disabilities (DODD) pursuant to R.C. 5123.04, R.C. 5123.19, and OAC 5160-44-01, which together establish ODM's and DODD's respective administrative duties for DD-related Medicaid waiver services. County boards of developmental disabilities, including Defendant Warren County Board of Developmental Disabilities (WCBDD), are required to locally administer HCBS waiver services under R.C. 5126.05, R.C. 5126.054, and OAC 5123-4-02, and must do so in conformity with the Medicaid Act, CMS-approved waiver terms, and all applicable federal and state regulations.

19.     M.S. has received care under a Medicaid HCBS waiver for approximately ten years.

20.     WCBDD has repeatedly acknowledged M.S.'s extraordinary care needs.

21.     Defendant WCBDD wrote in M.S.'s person-centered service plan that M.S. requires 1:1 supervision while awake, part-time 2:1 supervision during especially challenging tasks, seizure care, intimate personal care such as bathing and diapering, elopement prevention, and caregivers familiar with her complex medical and behavioral triggers, inter alia.

22.     WCBDD also documented in M.S.'s person-centered service plan that "temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

## II.     M.S.'s Parents, Justin and Lindsey Sodano, Are Longstanding, Qualified, and Approved Providers

6

23. Plaintiffs Justin and Lindsey Sodano have served as M.S.'s Medicaid HCBS waiver providers since 2020 and 2022, respectively, working as W-2 employees of a certified Medicaid provider agency.

24. Both parents completed all DODD-required training, CPR/First Aid, and additional continuing education training, and both have earned DODD's Competency/Longevity designation for caregivers with extra training and experience.

25. At no time has Defendant WCBDD ever indicated in any form or manner that either parent is unwilling, unable, unqualified, or unsafe to provide services.

26. Defendant WCBDD's own Discovery Assessment, part of its person-centered planning process, states that "the best thing that ever happened" to M.S. was "having her parents be her provider."

27. Defendant WCBDD has never amended that finding, never presented evidence contradicting it, and never alleged that the parents are unsafe or unqualified.

III. **Defendant WCBDD Announced Plans to Attempt to Replace the Parent Providers Without Cause and Ignored Repeated Requests for Due Process**

28. On November 18, 2025, Defendant SSA Hathaway informed Lindsey Sodano and Justin Sodano that WCBDD intended to initiate a provider search for the purpose of replacing M.S.'s current parent caregivers with "willing and able" strangers.  She did so by forwarding an email from Defendant SSA Supervisor Hidy, who stated:

> An administrative discussion took place regarding Ms. Sodano's inquiry [regarding any upcoming parent replacement search] with a determination that our agency will continue to follow the Ohio Department of Developmental Disabilities' guidance as indicated in the March 24, 2025, publication, Frequently Asked Questions: Ohio Administrative Code 5160-44-32 Home and Community-Based Medicaid Waiver Program Provider and Direct Care Worker Relationships.

(emphasis in original),

29.     The "Frequently Asked Questions: Ohio Administrative Code 5160-44-32 'Home and Community-Based Medicaid Waiver Program Provider and Direct Care Worker Relationships'" ("DODD FAQ") document Defendant Hidy states WCBDD will "continue to follow" states that when a parent of a minor child is working as that child's direct care worker: "DODD expects that each Board would re-engage the provider search process annually, to align with the annual planning requirements, as set forth 42 C.F.R. 441.301."

30.     Defendant SSA Hathaway said she would need to post the advertisement to attract replacement provider candidates "in the next week or so."

31.     On November 18, 2025, Plaintiff Lindsey Sodano emailed Defendants SSA Hathaway, SSA Supervisor Lindeen, SSA Director Tony Hidy, and Superintendent Manuel:

> Please let me know what will happen if I refuse to participate in this third unlawful provider replacement search. As you know, DODD's March 2025 Frequently Asked Questions document has zero basis in either state or federal law. There is no statute, administrative code, or federal regulation that authorizes county boards to attempt to replace a parent care worker without cause. Please advise on what [M.S.'s] appeal rights are.

32.     None of the Defendants responded.

33.     On November 24, 2025, Plaintiffs' counsel Richard Rosenthal sent correspondence to Defendants that included the following:

> Moreover, the Board has decided that it is not required to inform M.S. or her parent providers what the repercussions would be if M.S. refused to participate in a stranger provider replacement search. On November 18, 2025, my client asked you, Mr. Hidy, Ms. Lindeen, and Ms. Hathaway: *"Please advise on what [M.S.'s] appeal rights are*."[Emphasis Original.] The Board could not be bothered to answer this important and critical inquiry. The Board is well aware that Appendix F of the Individual Options Waiver, approved by the Centers for Medicare and Medicaid Services

(CMS), requires the Board to afford affected persons the right to an appeal. That language 100 percent gives M.S. and her parents the right to appeal:

"Applicants for Individual Options waiver enrollment and waiver enrollees who are affected by any decision made to approve, reduce, deny or terminate enrollment or to deny the choice of a qualified and willing provider or to change the level and/or type of waiver service delivered, including any changes made to the individual service plan, shall be afforded Medicaid due process. All waiver enrollees receive prior notice for any adverse action proposed. This notice includes the right to a state hearing and an explanation of the hearing procedures and is either generated manually by county boards or electronically by county departments of job and family services."

It is undisputed that WCBDD is legally required to comply with the requirements of the Individual Options waiver. To date, the Board has failed to provide M.S. and her parents with (1) an explanation of hearing procedures; (2) the right to a state hearing; (3) any statute or rule authorizing forced replacement of willing and qualified providers without cause; and (4) a response whatsoever to a simple and direct inquiry about appeal rights. Further, Attorney Rosenthal wrote to Defendants: "[W]e ask that the Board informs us, no later than by close of business on Wednesday, December 3, 2025, as to whether it intends to continue with its plan to replace M.S.'s choice of providers, her parents, and continue with the provider replacement search."

34.    Also on November 24, 2025, Defendant SSA Hathaway contacted Lindsey Sodano about scheduling an annual person-centered service planning meeting. Plaintiff Sodano responded by email to Defendants SSA Hathaway, SSA Supervisor Lindeen, SSA Director Tony Hidy, and Superintendent Manuel, asking again for M.S.'s due process rights:

Before we can schedule an ISP meeting, we still need clarification on issues that directly affect the ISP process. As you know, no one has responded to my November 18 email asking what will happen if M.S. refuses to replace her freely chosen providers, or what M.S.'s due process rights are regarding Mr. Hidy's decision to conduct a replacement provider search against her will.

Because those questions remain unanswered, my attorneys sent a formal letter yesterday to Ms. Manuel, Mr. Hidy, Ms. Lindeen, and you requesting written confirmation on whether WCBDD intends to

9

> proceed with the unlawful provider replacement search. This information is necessary to participate meaningfully in the ISP meeting, since the ISP must list her providers, number of hours for each provider, and which provider is responsible for each goal.
>
> Once WCBDD provides written clarification regarding (1) whether you intend to move forward with the replacement provider search, and (2) what M.S.'s appeal rights are under Appendix F of the IO Waiver, we will gladly work with you to schedule the annual ISP meeting.

35.     Defendant SSA Hathaway responded "these are not decisions that I can make" and did not provide the appeal rights requested.

33.     On December 2, 2025, in response to Attorney Rosenthal's letter, WCBDD's attorney Kathryn Horvath confirmed that WCBDD "has no intention of veering from its practice" of conducting parent replacement searches.

34.     Attorney Horvath did not include the requested information regarding M.S.'s appeal rights under Appendix F of the IO Waiver.

35.     Attorney Horvath stated: "If your client refuses the annual review, the Board is not permitted to authorize Mr. and Mrs. Sodano to continue to bill for Medicaid dollars as parent providers."

36.     Because they are W-2 employees of a care agency, Plaintiffs Justin and Lindsey Sodano have never billed for Medicaid dollars. Only a business entity that has a Medicaid provider agreement with the state can bill for Medicaid dollars. Individual employees of care agencies do not bill for services.

37.     On December 4, 2025, Attorney Rosenthal responded to Attorney Horvath asking for clarification:

> "Your response does not answer the question that has now been asked multiple times. What are the consequences for M.S. if she declines to participate in WCBDD's effort to replace her freely

> chosen, qualified, and willing providers? To date, neither you, nor the Board has answered what the repercussions are in the event they refuse to participate in the illegal provider search."

38. Additionally in his December 4, 2025, correspondence, Attorney Rosenthal asked again for the due process forms: "Additionally, please provide the due process appeal forms, so that M.S. can appeal this demand from the Board."

39. To date, there has been no response to Attorney Rosenthal's December 4, 2025 follow-up correspondence.

40. Plaintiffs still do not know what penalty Defendants intend to impose if M.S. declines to participate in a replacement provider search because the penalty Attorney Horvath listed (not being able to "continue" to "bill for Medicaid dollars") is not even possible.

41. Absent any clarification from Defendants regarding the confusing wording about who "bills for Medicaid dollars," Plaintiffs believe that if they do not submit to Defendant WCBDD's parent replacement search, Defendants will remove Plaintiffs Justin and Lindsey Sodano from M.S.'s service plan, resulting in M.S. losing the authorized hours of care her parents have been performing.

42. Plaintiff M.S. still does not know her appeal rights and hearing procedures.

## IV.     Replacement of Caregivers Creates Immediate, Irreparable Harm

43. Introducing unfamiliar caregivers into M.S.'s care would create immediate risks of increased seizures, regression, behavioral crisis, elopement, injury/falls, hospitalization, and death. (Sodano Affidavit)

44. M.S.'s traumatic brain injury occurred in 2017 when she was under the supervision of a non-parent caregiver at a disability respite event at the Mason Community Center in Mason, Ohio. Despite being warned about her condition and trained on her safety protocols, the

11

caregiver allowed M.S.to go on a tumble track trampoline without anyone holding her hands, resulting in her falling and landing on her head on the concrete floor. Nobody present, including the nurse on duty, called 911. (Sodano Affidavit)

45. The negligent caregiver accident is every parent's worst nightmare, and it has stayed with Plaintiffs every day since. Because of that trauma, Plaintiffs Lindsey and Justin Sodano have a well-founded fear that allowing any untrained or unfamiliar worker to perform M.S.'s care could cause another catastrophic injury or death. (Sodano Affidavit)

46. Defendant WCBDD's statement in M.S.'s person-centered service plan that "Temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile" appears in the section explaining this caregiver-caused accident.

47. In addition to the danger of severe injury, forced caregiver replacement would lead to exposure to unfamiliar workers during bathing, diapering, dressing, and menstrual care, and this poses acute medical and psychological danger, especially to a medically fragile, nonverbal minor teen girl.

48. On August 28, 2024, Plaintiff Lindsey Sodano contacted DODD senior leaders Director Kimberly Hauck, Deputy Director Lyndsay Nash, and Deputy Director Allan Showalter by email with the following question:

> Is there a limit to how many 'willing and able' strangers these young girls are expected to expose their bodies to during personal care tasks like bathing and diapering? Has DODD given any consideration to the comfort of the teenage waiver recipients?

49. DODD Deputy Director Allan Showalter's response to Lindsey Sodano's question was shocking: "We have not set limits on how many willing and able providers a family may use."

50. This means that technically, WCBDD could conceivably hire ten different strangers to replace one parent.

51. Any temporary strangers Defendant WCBDD might hire to replace M.S.'s parents might not have completed, cleared background checks. Ohio Admin. Code 5123-2-02(C)(7) allows direct care workers to perform all tasks of the direct care worker job without restrictions (i.e., changing diapers, bathing, dressing, menstrual care, etc.) for up to 60 days while waiting for their background check results: "A responsible entity may conditionally employ an applicant, for a period not to exceed sixty calendar days, pending receipt of information concerning the applicant's criminal records check."

52. Plaintiffs would not have the power to declare an inappropriate candidate "unable" to provide care during Defendants' parent replacement search, as the county board is the final judge of which applicants are "able." On February 20, 2024, Plaintiff Lindsey Sodano asked then-Director of DODD Kimberly Hauck to "provide guidance around the definition of 'able' and who is the final judge of 'able,'". (Now former) Director Hauck responded:

> An "able" provider is one who can meet the child's identified needs in his or her assessment and ISP. The team should collaboratively work to identify a willing and able provider. If the team does not agree, ultimately the county board will decide whether the provider can mee[t] the needs. If the individual or family do not agree with the county's assessment, they should reach out to our Waiver TA team, who will follow up with the county and the family to ensure the rule and process were implemented correctly.

53. Defendant WCBDD previously conducted two forced provider replacement searches, creating significant harm.

54. The first forced replacement search occurred throughout January of 2024. The process was chaotic, traumatic, and hostile to parental involvement. It lasted 28 days and involved 70-80 emails. It also demonstrates the type of harm Plaintiffs would face again if forced to repeat it. Some of the issues included:

a. SSA at the time Julie Miller told Plaintiffs that she could tell the many applicants to replace Justin and Lindsey Sodano had never even read the job description.

b. Lindsey Sodano contacted every applicant to ask some basic screening questions to find out if they were "able" to replace the parents, but most did not respond.

c. Despite Lindsey Sodano's protest that job applicants should respond to emails, WCBDD said that even though the applicants had not read the job description and did not respond to follow up messages, they still deserved in-person interviews for the job.

d. One candidate, Blissful Days Management, said they were interested in replacing Plaintiffs but only if the Sodanos pay a second Blissful Days staff member $15 per hour out of their own money. The SSA at that time, Julie Miller, said this was "inappropriate."

e. SSA Miller's superior, Defendant SSA Director Hidy, insisted on considering Blissful Days Management despite SSA Miller's declaration that the provider was "inappropriate."

f. Defendant SSA Director Hidy suggested splitting M.S.'s 1:1 and 2:1 care hours into separate, prescheduled shifts performed by different providers, which is not possible and would severely limit M.S.'s ability to go out into the community.

g. Defendant SSA Director Hidy also stated that the applicants themselves would be able to say whether they are "willing and able," effectively giving the applicants the power to hire *themselves* to replace Plaintiffs.

h. Lindsey Sodano had to ask DODD Director Kimberly Hauck to intervene with WCBDD on M.S.'s behalf.

55.     After a long and arduous process, Defendant Hidy eventually declared that there was no "willing and able" provider available to replace Plaintiffs, and Plaintiffs continued in their direct care worker jobs.

56.     A second provider replacement search then began in November of 2024.

57.     The incompetence of the applicants WCBDD put forward to replace Plaintiffs was shocking. For example, one applicant, ATES Healthcare Services, LLC, listed its business address as 123 Main Street, Anytown, USA. Its company phone number was listed as 1-800-123-4567. On its website, the description of the home health services ATES provides said, "I am a paragraph. Click here to add your own text and edit me. It's easy. Just click 'Edit Text' or double click me to add your own text and make changes to the font."

58.     The second provider replacement search ultimately did not produce a "willing and able" provider, and Plaintiffs again remained in their care worker roles.

59.     These replacement provider searches were disruptive, intrusive, destabilizing, and dangerous, demonstrating that any repeat of the process would cause immediate harm to Plaintiffs.

60.     A forced provider replacement search has the potential to cause M.S. to lose her Medicaid waiver services almost entirely. Defendants' parent replacement policy (as stated in the "DODD FAQ") includes the following question and answer:

> What if I don't want to choose the available provider? What about Free Choice of Provider?
>
> The rule specifies that a parent of a minor child/spouse can only be paid when there is no other willing and able provider or direct care worker. If a parent/spouse chooses not to use those willing and able providers, for whatever reason(s), the parent/spouse does not, therefore, become the paid provider for their minor child/spouse under this rule.

15

61.     For example, a series of ten unfamiliar men with no background checks could theoretically be both "willing" and "able" to change M.S.'s diapers, but if M.S. refuses to hire them because they make her feel uncomfortable, according to the WCBDD's parent replacement policy, M.S. would have rejected the willing and able providers "for whatever reason(s)" and her parents would not "become the paid provider."

62.     It is unclear how/whether Defendant WCBDD would enforce that portion of its parent replacement policy, since M.S.'s parents are *already* her paid providers and cannot "become" such. This is why Plaintiffs asked for specific clarification from Defendants about the penalty for not participating in the replacement provider search.

63.     However, even without a clear response from Defendants, considering both the language of WCBDD's parent replacement policy and Attorney Horvath's December 2 correspondence, M.S. has reason to fear that if she rejects a "willing and able" applicant "for whatever reason(s)", her parents would be barred from working, and she would lose the roughly 68 hours of care per week that her parents are currently filling.

64.     Losing 68 hours of her authorized care hours per week would be catastrophic for M.S., who requires this care to remain living in her home. This action would put M.S. at serious risk of institutionalization.

65.     The WCBDD parent replacement policy ("DODD FAQ") also puts forward a scheme to remove already-authorized services in minor children's person-centered plan and convert those Medicaid services into natural supports. It states:

> Services that a family does not want an outside provider to provide and would rather provide itself, without pay, are natural supports and should not be assessed as hours needed.

Under this policy, if a family objects to the "willing and able" stranger put forward by the county board to perform intimate care tasks such as diapering, bathing, toileting, menstrual care, or any other activity requiring exposure of the child's unclothed body, those tasks are automatically removed from the person-centered service plan and reclassified as "natural supports." As a result, parents must remain present at all times and perform these tasks themselves without compensation, even when the child requires constant, labor-intensive care and those tasks have already been authorized by the county board as necessary Medicaid waiver services. This structure eliminates already-approved Medicaid services for essential personal care activities, forcing parents into unpaid, continuous caregiving if they wish to protect their child from unwanted intimate physical contact with the "willing and able" provider judged "able" by the county board.

### V.     WCBDD's Plan is to Replace M.S.'s Caregivers with Temporary Care Workers Only Until She Turns Eighteen

66.     M.S. will turn eighteen in November 2026. (Sodano Affidavit)

67.     Defendant SSA Hathaway told Plaintiffs Justin and Lindsey Sodano that she would stop attempting to replace them once M.S. turns eighteen.

68.     Then, according to Defendants, her parents can be her providers. (Sodano Affidavit)

69.     M.S.'s care requires months to a full year of intensive, side-by-side training before a person can safely manage even a single full day alone. Her seizures, medical needs, behavioral triggers, elopement risk, communication patterns, and the effects of her traumatic brain injury are unpredictable, complex, and deeply individualized. (Sodano Affidavit)

70.     Defendant WCBDD seeks to replace M.S.'s highly experienced, qualified caregivers with temporary workers who will only serve for a short interim period, never to finish their training

because M.S. will immediately fire the forced temporary caregivers and rehire her parents in November of 2026 when Defendants' parent replacement policy expires for M.S.

71.     Any temporary replacement worker hired by Defendants to replace M.S.'s parents would still be in the early stages of training when M.S. reaches age eighteen.

72.     Defendant WCBDD state in M.S.'s person-centered service plan: "Temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

73.     The effect of Defendants' plan is that M.S.'s care will be turned over to untrained, temporary providers who "do not understand [M.S.'s risk profile]," putting her in danger until she can be safe again in November of 2026.

## VI.     Ohio Admin. Code 5160-44-32 Governs Parent Provider Eligibility and Contains No Parent Replacement Authority

74.     Ohio Admin. Code 5160-44-32(E)(1) describes the conditions under which a parent of a minor child may be hired as a direct care worker employed by a Medicaid-certified provider agency:

> (1) A parent of a minor child, or the spouse of an individual may only provide HCBS waiver services to an individual if both of the following conditions are met:
> (a) There is no other willing and able provider or direct care worker available to provide the HCBS waiver services to the individual.
> (b) ODM, ODA, DODD, or their designee has determined the health and safety needs of the individual can be ensured.

75.     The rule contains no requirement to reevaluate, remove, or replace a parent provider once the initial eligibility conditions have been met.

76.     No federal or Ohio statute or administrative rule authorizes county boards of developmental disabilities to replace a Medicaid waiver recipient's freely chosen, willing, and qualified providers without cause.

18

77.     In November 2023, DODD issued an online FAQ entitled "Frequently Asked Questions: Ohio Administrative Code 5160-44-32," which states, "How often does the Board need to re-engage in the provider search process? DODD expects that each Board would re-engage the provider search process every four to six months."

78.     This expectation to "re-engage the provider search process" appears nowhere in any statute or administrative rule.

79.     The DODD FAQ was not adopted through Ohio's rulemaking process and has no legal force.

80.     In December 2024, several Ohio families who had suffered repeated parent replacement searches, including M.S. and her mother, filed a mandamus action in the Supreme Court of Ohio challenging DODD's use of an online Frequently Asked Questions page to impose obligations not found in statute or rule.

81.     In its January 23, 2025, Motion to Dismiss the mandamus case, DODD represented to the Supreme Court of Ohio that the DODD FAQ is not legally binding:

      a.  "The words [requiring parent replacement] are advisory on their face."

      b.  "The FAQ does not use 'shall' or 'must.'"

      c.  "The word 'expect' is aspirational rather than mandatory."

      d.  "[The FAQ's] guidance is aspirational rather than mandatory."

      e.  "OAC 5160-44-32 does not set a timeframe" for reassessing provider availability.

82.     These statements constituted formal representations to the Supreme Court of Ohio.

83.     The Ohio Supreme Court denied DODD's Motion to Dismiss on March 26, 2025.

84.     DODD issued a new version of the DODD FAQ on March 24, 2025, changing the parent

replacement timeframe from "4 to 6 months" to "annually." This mooted the mandamus action,

which referred to the original "4 to 6 months" timeframe.

**VII.    WCBDD Has Adopted the Nonbinding DODD FAQ as its Formal Policy**

85.     On November 18, 2025, Defendant SSA Supervisor Hidy stated in an email that WCBDD

had determined it would adopt the nonbinding DODD FAQ as its parent replacement policy:

> An administrative discussion took place regarding Ms. Sodano's
> inquiry [regarding any upcoming parent replacement search] with a
> determination that our agency will continue to follow the Ohio
> Department of Developmental Disabilities' guidance as indicated in
> the March 24, 2025, publication, Frequently Asked Questions: Ohio
> Administrative Code 5160-44-32 "Home and Community-Based
> Medicaid Waiver Program Provider and Direct Care Worker
> Relationships". (Emphasis Original)

86.     The DODD FAQ adopted as policy by Defendant WCBDD includes the following:

> DODD expects that each Board would re-engage the provider search
> process annually, to align with the annual planning requirements, as
> set forth 42 C.F.R. 441.301;
>
> If a parent/spouse chooses not to use those willing and able
> providers, for whatever reason(s), the parent/spouse does not,
> therefore, become the paid provider for their minor child/spouse
> under this rule;
>
> and
>
> Services that a family does not want an outside provider to provide
> and would rather provide itself, without pay, are natural supports
> and should not be assessed as hours needed.

87.     Defendant WCBDD's Attorney Horvath reiterated Defendant WCBDD's reliance on the

DODD FAQ and also cited 42 C.F.R. § 441.301 in her December 2, 2025, correspondence.

88.     42 C.F.R. § 441.301 sets forth requirements for person-centered planning for waiver

recipients. It does not require or allow annual provider replacements, disruption of care for minor

20

children, or similar. It does not mention forcibly replacing any waiver recipients' willing and qualified providers whatsoever.

89.     WCBDD's parent replacement policy, as outlined in the DODD FAQ page, imposes obligations not found in any Ohio statute, rule, or federal regulation.

90.     WCBDD seeks to replace M.S.'s providers contrary to its own person-centered planning determinations that "having her parents as her provider" is the "best thing that ever happened" to M.S., and contrary to M.S.'s person-centered preferences.

<u>**FIRST CAUSE OF ACTION**</u>
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Procedural Due Process**

91.     Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

92.     The Fourteenth Amendment prohibits any state actor from depriving a person of a protected liberty or property interest without due process of law.

93.     To state a procedural due process claim, a plaintiff must show: (1) a protected interest; (2) government deprivation of that interest; and (3) the absence of constitutionally adequate notice and a meaningful opportunity to be heard.

94.     Plaintiffs possesses a protected interests in receiving benefits, which include the continued receipt of medically necessary Medicaid HCBS services, in the stability and continuity of her chosen and qualified caregivers as reflected in her person-centered service plan, and in her bodily safety and in-home supports, interests long recognized as protected liberty and property interests under the Due Process Clause.

95.     Defendants deprived Plaintiffs of their protected interest by mandating that they undergo a parent replacement provider search, and if Plaintiffs refuse to attempt to replace themselves

with strangers, the parents will lose their job and the child will lose the majority of her care hours as a result.

96.     Plaintiffs have a right to the benefits accompanying the IO Waiver, and this mandatory illegal provider stranger replacement search critically disrupts M.S.'s existing HCBS services and threatens the continuity of her trained caregivers.

97.     Initiating this forced provider replacement constitutes a deprivation of M.S.'s protected interests because it disrupts her established service delivery, destabilizes the continuity and method of her Medicaid services, places her at immediate risk of losing long-standing trained caregivers, and imposes new obligations and burdens on her representative as a condition of receiving HCBS services.

98.     Defendants have wholly deprived Plaintiffs of their rights under the Fourteenth Amendment by failing to provide an opportunity to contest the deprivation in a meaningful time and manner.

99.     Not only does the Fourteenth Amendment mandate due process to be provided to Plaintiffs, the CMS-approved Individual Options Waiver, which has the force of federal law and contract, expressly requires prior written notice and appeal rights before any adverse action affecting services, the choice of a qualified and willing provider, or any change to the individual service plan. Appendix F mandates that waiver enrollees receive written notice containing their right to a state hearing and an explanation of hearing procedures before any such adverse action:

> [W]aiver enrollees who are affected by any decision made to approve, reduce, deny or terminate enrollment or to deny the choice of a qualified and willing provider or to change the level and/or type of waiver service delivered, including any changes made to the individual service plan, shall be afforded Medicaid due process. All waiver enrollees receive prior notice for any adverse action proposed. This notice includes the right to a state hearing and an explanation of the hearing procedures and is either generated

                    manually by county boards or electronically by county departments
of job and family services.

100.    CMS approval binds Ohio and all its delegate agencies, including county boards of developmental disabilities and their employees.

101.    Federal Medicaid regulations require that prior notice include the effective date of the proposed action, the specific reasons for the action, the legal authority supporting it, and clear instructions for requesting a hearing.

102.    Defendants were repeatedly asked on November 18, November 24, and December 4, 2025, to identify the applicable appeal rights or provide the required written notice. Defendants failed to respond and did not provide any form of written notice.

103.    Defendants also failed to identify whether a hearing was available, how a hearing could be requested, whether services would continue unchanged pending appeal, or any legal authority permitting forced caregiver replacement.

104.    Defendants therefore deprived M.S. of her protected interests without the procedures required by the Fourteenth Amendment, federal Medicaid law, HCBS regulations, or the IO Waiver.

105.    Because Defendants acted under color of state law and because the procedural protections at issue are mandatory and clearly established, their actions constitute a violation of 42 U.S.C. § 1983.

106.    Plaintiff M.S. faces imminent and irreparable harm because, without notice and appeal rights, she has no meaningful opportunity to contest the forced replacement of her caregivers— an action that places her health, safety, and continued access to essential HCBS services at immediate risk.

107.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

108.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection Clause**

110.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

111.    The Equal Protection Clause prohibits the government from intentionally treating an individual differently from others who are similarly situated without a rational basis for doing so.

112.    To state a claim under the Equal Protection Clause, a plaintiff must show: (1) she is similarly situated to others; (2) she was intentionally treated differently; and (3) there is no rational basis for the difference in treatment.

113.    M.S. is similarly situated to all other recipients of the Individual Options (IO) Medicaid Waiver because all waiver enrollees, regardless of age, are entitled to the same federal fair hearing protections, including written notice of an adverse action, the right to request a state hearing, continuation of services during appeal, and clear instructions for exercising these rights.

114.    These procedural protections are mandatory, uniform, and apply equally to every IO Waiver recipient under the Medicaid Act, and the CMS-approved IO Waiver (Appendix F).

115.    Defendants intentionally treated M.S. differently from similarly situated waiver recipients by repeatedly failing to provide any notice of adverse action, refusing to identify her appeal rights, and failing to provide any mechanism for contesting the forced stranger caregiver search.

116.    On information and belief, no adult IO Waiver recipient is denied fair hearing rights when a county board seeks to change their waiver services. The withholding of those rights from M.S. is intentional and atypical.

117.    Defendants have no legitimate or rational basis for denying M.S. the procedural protections required under federal law. Administrative preference, misunderstanding of legal obligations, or reliance on a non-binding online FAQ page cannot justify disparate treatment.

118.    As a result of Defendants' disparate treatment, M.S. has been deprived of the ability to contest an adverse action that threatens the continuity of her medically necessary HCBS services and exposes her to imminent physical and emotional harm.

119.    Defendants acted under color of state law, and their refusal to provide M.S. the same procedural protections afforded to similarly situated waiver recipients violates the Equal Protection Clause and is actionable under 42 U.S.C. § 1983.

120.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

121.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection Clause**

122.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

123.    The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally treating similarly situated individuals differently without a rational basis for doing so.

124.    To state an Equal Protection claim, a plaintiff must demonstrate: (1) differential treatment compared to similarly situated individuals; (2) that the differential treatment was intentional; and (3) that the treatment is not justified by a legitimate governmental interest.

125.    The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally treating similarly situated individuals differently without a rational basis for doing so. To state an Equal Protection claim, a plaintiff must demonstrate: (1) differential treatment compared to similarly situated individuals; (2) that the differential treatment was intentional; and (3) that the treatment is not justified by a legitimate governmental interest.

126.    Plaintiff M.S. is an enrolled participant in Ohio's Individual Options (IO) Medicaid Waiver, and is similarly situated to all other IO Waiver recipients with respect to her right to select any qualified and willing provider of her HCBS services.

127.    Under federal Medicaid law, including 42 U.S.C. § 1396a(a)(23), all waiver recipients, including both adults and minors, possess the same federal right to freedom of choice of qualified and willing providers.

128.    Ohio law distinguishes only at the initial authorization stage by imposing additional conditions before a parent of a minor child may be hired as an HCBS provider. Once a parent meets those conditions and is approved, the law does not authorize counties to treat minors with parent providers differently from: (a) adults with parent providers; (b) minors with non-parent providers, or (c) adults with non-parent providers.

26

129.    WCBDD's ongoing, age-based provider replacement policy has no basis in state or federal law and imposes burdens on Plaintiff that are not applied to any other similarly situated waiver recipients.

130.    Despite this uniform federal entitlement, Defendants have imposed a unique and burdensome provider replacement requirement on only one group: disabled minors whose freely chosen HCBS providers are their qualified and willing parents.

131.    Disabled adults receiving IO Waiver services who choose a qualified and willing parent as their provider are not subjected to any forced provider replacement policy.

132.    Disabled minors receiving IO Waiver services who choose non-parent caregivers (whether unrelated strangers or family friends) are not subjected to any forced provider replacement policy.

133.    Only disabled minors who choose their qualified, willing parents as their HCBS providers are forced by Defendants to undergo an involuntary annual parent provider replacement search, threatened removal of their care workers, and threat of losing their Medicaid waiver services if they refuse any "willing and able" stranger.

134.    M.S. therefore belongs to the only classification that is burdened by forced provider removal, coerced exposure to unfamiliar applicants, and threat of losing needed Medicaid services, all because her chosen qualified providers are her parents and because she is under the age of eighteen.

135.    This differential treatment is intentional, as reflected in Defendants' statements and the plain age-based structure of Defendants' parent replacement policy.

136.    The disparate treatment bears no rational relation to any legitimate governmental purpose. Defendants cannot articulate a legitimate interest in removing only parent providers for

minors but not for adults; forcing disabled children, but not disabled adults or stranger-served children, to undergo destabilizing caregiver turnover; violating federal free choice of provider protections solely because the chosen caregiver is a parent.

137. The policy is also irrationally overinclusive and underinclusive. It is overinclusive because it strips minor waiver recipients of safe, qualified parent providers regardless of performance, safety, or preference. It is underinclusive because it leaves untouched similarly situated adults receiving services from a parent, adults receiving services from a non-parent, and children receiving services from non-parent providers, even where the purported governmental justifications would apply equally.

138. Defendants' age- and relationship-based classification for its forced provider replacement policy thus constitutes arbitrary line-drawing that fails even the most deferential rational basis review.

139. Defendants acted under color of state law in implementing and enforcing this discriminatory parent replacement requirement, compelling M.S. to submit to a mandatory stranger search and threatening to remove her long-standing HCBS providers if she does not submit, solely because she is seventeen and her chosen providers are her parents.

140. As a direct result of this intentional and unlawful disparate treatment, M.S. faces immediate and irreparable harm, including the loss of continuity of care, heightened medical risk, emotional trauma, destabilization of her HCBS supports, violation of her person-centered planning rights, and elevated risk of institutionalization.

141. Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment and is actionable under 42 U.S.C. § 1983.

142.     As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have

suffered harm including monetary damages, emotional distress, loss of authority over intimate

caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing

intrusion of the State into core parental decision-making.

143.     Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive

damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Deprivation of Property and Liberty Interests in Continued Employment**
**(On behalf of Plaintiffs Justin and Lindsey Sodano)**

144.     Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

145.     The Due Process Clause of the Fourteenth Amendment prohibits state actors from

depriving a person of (1) a constitutionally protected property interest, or (2) a constitutionally

protected liberty interest, without due process of law.

146.     A § 1983 claim for deprivation of property or occupational liberty requires showing:

(1) the plaintiff possesses a recognized property or liberty interest; (2) the defendants, acting

under color of state law, deprived that interest; and (3) the deprivation occurred without

constitutionally adequate notice or opportunity to be heard.

147.     Plaintiffs Lindsey and Justin Sodano are long-standing W-2 employees of Peace of Mind

Care ("POMC"), a certified Medicaid provider agency.

148.     By taking actions that will necessarily and foreseeably result in the destruction of

Plaintiffs' employment relationship with a private employer, Defendants are depriving Plaintiffs

of a constitutionally protected property interest in continued employment. Courts recognize a

protected property interest where state actors intentionally interfere with or destroy a private employment relationship without cause or process.

149.     Plaintiffs also possess a constitutionally protected liberty interest in pursuing their chosen occupation as Medicaid direct support professionals. Government action that arbitrarily forecloses a person's ability to practice their occupation violates the Fourteenth Amendment's guarantee of occupational liberty.

150.     Plaintiffs' continued employment at POMC is entirely dependent on providing services to M.S., because POMC does not have any alternative clients requiring their specialized training, and because Plaintiffs' expertise is uniquely tailored to M.S.'s rare combination of STXBP1-DEE and traumatic brain injury.

151.     Defendants acting under color of state law, have announced their intention to attempt to remove Plaintiffs from their daughter's case and replace them with temporary "willing and able" strangers. This action is not based on cause, misconduct, deficiency, or safety concerns, but solely because M.S. is a minor under Defendants' parent replacement policy.

152.     If Defendants remove Plaintiffs from M.S.'s case, POMC will have no choice but to terminate Plaintiffs' employment. This termination is the direct, foreseeable, and unavoidable result of Defendants' actions.

153.     Even in theory, Plaintiffs could not take other client assignments at POMC because any temporary worker assigned to M.S. would require prolonged training and side-by-side supervision from Plaintiffs due to M.S.'s unique medical and behavioral needs. Reassignment is functionally impossible.

154.    Defendants' conduct will, as a matter of certainty, prevent Plaintiffs from continuing to work in their chosen occupation, because Plaintiffs cannot be reassigned and cannot maintain employment at POMC if removed from M.S.'s case.

155.    Despite depriving Plaintiffs of their continued employment and their liberty to pursue their occupation, Defendants have provided no written notice, no explanation, no charges, no opportunity to respond, and no hearing of any kind.

156.    Defendants' actions are especially arbitrary because WCBDD's parent replacement requirement ends automatically on November 7, 2026, when M.S. turns 18. At that time, according to Defendants, Plaintiffs will again be eligible providers. Defendants' policy therefore destroys Plaintiffs' employment solely for a short interim period, without any legitimate governmental purpose.

157.    Defendants' actions lack any rational justification, do not further any safety or service-related objective, and instead impose irrational, capricious, and harmful interference with Plaintiffs' employment and livelihood.

158.    Defendants acted under color of state law, and their actions have, and continue to, deprive Plaintiffs of property and liberty interests without due process of law, in violation of the Fourteenth Amendment.

159.    As a direct and proximate result of Defendants' conduct, Plaintiffs face imminent termination from their jobs, loss of income, destruction of their professional reputations, and deprivation of their right to practice their occupation free from arbitrary governmental interference.

160.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate

caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

161.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Parental Liberty Interest**
**(On Behalf of Plaintiffs Justin and Lindsey Sodano Only)**

162.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

163.    To state a claim for violation of the Fourteenth Amendment parental liberty interest under § 1983, a plaintiff must show: (1) They are fit parents with a fundamental right to make decisions concerning the care, custody, control, and upbringing of their child; (2) The government intentionally interfered with or usurped that right; (3) The interference was not justified by a compelling governmental interest, or was not narrowly tailored to achieve any legitimate interest; (4) The deprivation occurred under color of state law.

164.    Plaintiffs Justin and Lindsey Sodano are fit, loving, and long-standing caregivers responsible for the full care, custody, medical support, and intimate daily living needs of their nonverbal, profoundly disabled seventeen-year-old daughter, M.S. The fundamental liberty interest of parents to direct the care, custody, and control of their children has been repeatedly affirmed by the Supreme Court for more than a century.

165.    This constitutional right includes the authority to decide who may enter the family home, who may touch or undress a minor child, and who may perform intimate bodily caregiving, particularly where the child cannot communicate, consent, or protect herself.

166.    Parental liberty right is clearly established and enforceable under 42 U.S.C. § 1983.

167.    Defendants WCBDD Superintendent Manuel, SSA Director Hidy, SSA Supervisor Lindeen, and SSA Hathaway, acting under color of state law, have adopted and enforced a parent replacement policy that directly infringes upon this fundamental liberty interest. The policy requires parents of minor waiver recipients to submit to repeated searches for non-parent replacement caregivers and to accept unfamiliar strangers Defendant labels "willing and able" to perform intimate caregiving inside their home, even when no concerns exist regarding the long-standing parent caregivers' safety, qualifications, willingness, or performance.

168.    Defendants' policy also penalizes parents for refusing to expose their child's body to a stranger. Defendants' parent replacement policy instructs that any intimate caregiving task the family "does not want an outside provider to provide" must be reclassified as an unpaid "natural support," causing such services to be removed from the child's Medicaid person-centered service plan. This coerces parents into surrendering their constitutional right to decide who may provide intimate bodily care in order to preserve their child's medically necessary Medicaid benefits.

169.    Defendants further condition M.S.'s continued access to essential Medicaid HCBS services on her parents' willingness to replace M.S.'s current providers with strangers to undress, diaper, bathe, menstruation-manage, and physically manipulate their disabled minor child. This constitutes a direct intrusion on parental authority concerning safety, privacy, bodily integrity, and control over who may touch their child in the most intimate ways.

170.    The extremity of the intrusion is underscored by the statement of DODD Deputy Director Alan Showalter, who acknowledged that there is no limit to the number of unfamiliar "willing and able" strangers who may be hired to replace a child's parents as caregivers. Under Defendants' policy, any number of outside caregivers may be hired, and parents must either accept these strangers into their home to perform intimate caregiving tasks or give up their

33

child's essential Medicaid services. This admission confirms that the parent replacement scheme is not a narrow, safety-based measure, but an open-ended system of compelled state intrusion into the family home and core caregiving decisions.

171.    No compelling governmental interest justifies overriding the decisions of fit parents regarding intimate bodily caregiving for their profoundly disabled minor child. Defendants' policy is not narrowly tailored, is not related to any legitimate health or safety concerns, and is irrational given that the replacement requirement ends automatically at age eighteen, demonstrating its arbitrariness and lack of legitimate purpose.

172.    Defendants' actions substantially interfere with Plaintiffs' ability to protect their child's bodily privacy, physical safety, dignity, medical routines, emotional security, and the integrity of the family unit. These actions violate their fundamental parental liberty interest and are actionable under 42 U.S.C. § 1983.

173.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

174.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourteenth Amendment
### Bodily Integrity and Bodily Autonomy

175.    Plaintiffs incorporate all preceding paragraphs as though fully rewritten herein.

176.    The Fourteenth Amendment prohibits any State from depriving a person of liberty without due process of law. U.S. Const. amend. XIV, § 1. Among the liberties protected is the

fundamental right to bodily integrity and bodily privacy, rights that are deeply rooted in this Nation's history and tradition, implicit in the concept of ordered liberty, and clearly established for purposes of § 1983.

177.    To state a claim for violation of bodily integrity under the Fourteenth Amendment, a plaintiff must show: (1) a protected liberty interest in bodily integrity; (2) governmental action imposing unwanted, invasive, or nonconsensual physical contact or exposure; (3) the governmental action is arbitrary, shocks the conscience, or is not narrowly tailored to any legitimate or compelling state interest; and (4) the action was taken under color of state law and proximately caused constitutional injury.

178.    Plaintiffs possess a fundamental liberty interest in bodily integrity and bodily privacy of M.S., including the right for M.S. to be free from nonconsensual intimate bodily touching, exposure, and invasion.

179.    Because M.S. is profoundly disabled, nonverbal, incontinent, and dependent on others for all intimate activities of daily living (including bathing, toileting, diapering, menstrual care, dressing, and hygiene), these tasks require frequent exposure of her naked body and intimate physical contact. Her bodily privacy is therefore uniquely vulnerable and requires heightened constitutional protection.

180.    Defendants, acting under color of state law, adopted and enforced a parent replacement policy that requires minors with disabilities to submit to repeated searches for non-parent care workers and to replace their existing caregivers with strangers who will perform intimate bodily care, even though no safety concerns exist regarding the existing caregivers (the parents) and even though these intimate tasks involve exposure of private areas and deeply invasive contact.

35

181.    Under Defendants' policy, if the family declines a proposed "willing and able" stranger "for whatever reason," the parent is automatically disqualified from serving as the child's caregiver, and the child loses the previously authorized Medicaid waiver care hours previously performed by the parent. This forces the family to choose between (a) accepting strangers performing intimate bodily care, or (b) losing medically necessary HCBS services.

182.    Defendants further enforce a policy stating: "Services that a family does not want an outside provider to provide and would rather provide itself, without pay, are natural supports and should not be assessed as hours needed." For a child like M.S., whose intimate care routinely involves nudity, genital-area cleaning, menstrual care, and diapering, this policy directly coerces acceptance of unwanted intimate bodily intrusions by strangers in exchange for Medicaid services.

183.    As a result of Defendants' policy, M.S. faces a direct and ongoing risk that unfamiliar adults will undress her, diaper her, bathe her, clean her genitals, perform menstrual hygiene, and conduct other highly invasive intimate caregiving. These exposures and physical intrusions would occur without her consent and contrary to her parents' judgment.

184.    Compelling a minor child to expose her unclothed body to strangers and subjecting her to intimate touching by unfamiliar adults constitutes a severe intrusion upon her fundamental right to bodily integrity and bodily privacy.

185.    Defendants' policy creates an even greater threat because DODD Deputy Director Alan Showalter confirmed that there is no limit to how many unfamiliar strangers may replace a parent caregiver. This means that Plaintiff M.S. is not merely facing a single unwanted intrusion, but a potentially unlimited series of unknown adults performing intimate tasks on her naked body.

186.    Such unbounded and repeating governmental intrusion into a disabled minor's most private bodily functions constitutes a profound and ongoing violation of her Fourteenth Amendment rights.

187.    Defendants' policy also conditions M.S.'s access to essential Medicaid services on surrendering her constitutional right to bodily integrity. A government benefit may not be conditioned on forfeiting a constitutional right.

188.    Defendants cannot demonstrate any compelling or legitimate governmental interest that justifies forcing intimate bodily care by strangers upon a profoundly disabled minor who is safe, stable, and thriving under the care of her long-standing, willing, and qualified parent care workers. The policy is therefore not narrowly tailored and fails strict scrutiny.

189.    Defendants' actions shock the conscience because they knowingly create a foreseeable risk of physical harm, emotional trauma, bodily violation, and destabilization for a medically fragile minor who cannot communicate distress, resist, or protect herself.

190.    As a direct and proximate result of Defendants' conduct, Plaintiff M.S. has suffered and will continue to suffer constitutional injury, emotional distress, physical vulnerability, and an ongoing threat of trauma associated with forced intimate bodily exposure and contact.

191.    Defendants' enforcement of the parent-replacement policy constitutes an unlawful deprivation of Minor Plaintiff's liberty interest in bodily integrity and bodily privacy and is actionable under 42 U.S.C. § 1983.

192.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

193.     Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive

damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourteenth Amendment
### Unconstitutional-Conditions Doctrine

194.     Plaintiffs re-allege and incorporate all preceding paragraphs as if fully rewritten herein.

195.     Under the unconstitutional-conditions doctrine, the government violates the Fourteenth

Amendment when it (1) conditions a public benefit on the surrender of a constitutional right, (2)

coerces the claimant into giving up that right to obtain or maintain the benefit, and (3) imposes a

condition that the State could not lawfully compel directly.

196.     Plaintiff M.S. is a Medicaid Home and Community-Based Services (HCBS) waiver

recipient whose Medicaid services, including approximately 68 hours weekly of direct care from

her parents, medically necessary for her to remain safely in the home and avoid

institutionalization.

197.     Defendants have adopted and enforced a parent replacement policy that conditions M.S.'s

continued access to Medicaid HCBS services on the surrender of multiple constitutional rights.

These include, but is not limited to, her fundamental right to bodily integrity and privacy, her

parents' fundamental right to direct her intimate care, her and her family's First Amendment

rights to free exercise of religious beliefs, her statutory right to free choice of qualified and

willing providers, and her constitutional rights to due process and equal protection.

198.     Under Defendants' policy, if M.S. or her parents decline the "willing and able" stranger

"for whatever reason," the parent is automatically disqualified from serving as the child's

caregiver and thus, with no care worker remaining, the child's authorized Medicaid services

38

cannot be used. This places M.S. in a coercive position: she must either surrender her constitutional rights or lose essential services.

199.    Defendants further enforce a second policy stating that any service the family prefers to perform itself rather than allow an outside provider to perform will not be counted as a Medicaid need, but will be reclassified as "natural supports." Applied to a child whose daily care requires intimate bodily exposure including diapering, cleansing of private areas, bathing, menstrual care, and dressing, this policy penalizes the exercise of constitutional rights by stripping away previously authorized HCBS services.

200.    As a result of these combined policies, Defendants force M.S. into an unconstitutional choice between two unlawful outcomes. She must either accept invasive bodily contact by unfamiliar adults selected to replace her current willing and qualified caregivers, thereby surrendering her constitutional bodily-integrity rights, or forfeit the Medicaid services essential to her survival, safety, and ability to remain at home.

201.    Conditioning Medicaid HCBS services on repeated exposure of a disabled minor's naked body and private areas to unfamiliar individuals is coercive, unconstitutional, and forbidden by the unconstitutional-conditions doctrine.

202.    The coercion is continuous and escalating. DODD Deputy Director Alan Showalter confirmed that the State imposes no limit on the number of unfamiliar strangers who may be sent to replace a parent caregiver. This means M.S. faces not a singular intrusion but a potentially unlimited series of forced exposures and intimate bodily contact. The burden on her constitutional rights is therefore extreme, ongoing, and unavoidable.

203.    Defendants lack any legitimate governmental interest, let alone a compelling one, that could justify conditioning a profoundly disabled minor's medically necessary care on the

surrender of constitutional protections involving bodily integrity, parental caregiving authority, religious exercise, and fundamental due process rights.

204.    By conditioning M.S.'s Medicaid services on the forfeiture of fundamental constitutional rights, Defendants impose an unconstitutional condition in violation of the Fourteenth Amendment.

205.    As a direct and proximate result of Defendants' unconstitutional conduct, M.S. faces immediate and ongoing constitutional injury, loss of essential HCBS services, exposure to physical risk, emotional harm, and the threat of repeated forced intimate bodily contact from successive unfamiliar adults.

206.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

207.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.


**EIGHTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Substantive Due Process**

208.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

209.    Under the Fourteenth Amendment, a substantive due process claim requires Plaintiffs to show: (1) that the plaintiff possesses a protected liberty interest such as bodily integrity or personal security; (2) that a government actor, through an affirmative act, created or increased a known and specific danger to the plaintiff (state-created danger doctrine); (3)  that the

40

government's action was arbitrary, oppressive, or "shocks the conscience"; and (4) the defendants acted under color of state law.

210.    Minor Plaintiff M.S., a seventeen-year-old with profound disabilities, has a clearly established liberty interest in bodily integrity, personal security, and freedom from government action that foreseeably places her in danger. Courts have repeatedly recognized these interests as fundamental.

211.    Defendants announced their intent to require Plaintiffs to undergo a process to remove M.S.'s long-standing, fully trained caregivers (her parents) and replace them with unfamiliar "willing and able" strangers to perform intimate tasks such as diapering, bathing, menstrual care, undressing, feeding, and seizure monitoring.

212.    Defendants know that M.S. is nonverbal, incontinent, medically fragile, dependent on others for all ADLs, unable to communicate pain or fear, and uniquely vulnerable to trauma and physical harm when exposed to untrained caregivers.

213.    Defendants further know from their own Discovery Assessment that "temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile" and that entrusting her care to unfamiliar workers creates a heightened likelihood of injury, seizures, elopement, regression, hospitalization, or death.

214.    Defendants also know that the provider replacement requirement applies only until M.S. turns eighteen, after which the policy immediately ends, making the forced transition not only dangerous but arbitrary and self-defeating, since the replacement caregiver would still be in early-stage training when the policy's age-based requirement expires.

215.    Defendants' actions constitute affirmative conduct that creates or increases a known, specific, and immediate danger to M.S., satisfying the state-created danger doctrine.

41

216.    Forcing a profoundly disabled minor to undergo intimate bodily care, medical monitoring, and daily physical assistance from strangers who do not know her triggers, seizure patterns, behavioral cues, or communication signals creates a significant and foreseeable risk of physical injury, emotional trauma, and medical destabilization.

217.    The forced replacement process, including mandatory interviews, stranger home visits, transition planning, and intentional removal of safe caregivers, constitutes affirmative, danger-enhancing state action.

218.    Defendants' conduct is arbitrary, conscience-shocking, and oppressive, because it:

- disregards Defendants' own documented warnings about danger from untrained caregivers,

- advances no legitimate governmental interest,

- imposes traumatic care worker transitions solely to satisfy an "aspirational" FAQ unsupported by law,

- knowingly subjects a medically fragile minor to foreseeable harm,

- disrupts the continuity of care essential to her health and functioning, and

- risks hospitalization or institutionalization.

219.    No legitimate governmental interest justifies forcing a high-risk minor into the hands of strangers for a few months until her eighteenth birthday simply to comply with an extra-legal "policy" that automatically terminates at that time.

220.    Defendants acted under color of state law by enforcing the DODD FAQ as though it were binding, overriding person-centered planning, ignoring the federal right to free choice of provider, and disregarding the substantive liberty interests protected by the U.S. Constitution.

221.    As a direct and proximate result of Defendants' actions, M.S. faces imminent and irreparable harm, including physical injury, emotional trauma, regression, medical destabilization, loss of personal security, and violation of her fundamental liberty interests.

222.    Defendants' conduct violates M.S.'s substantive due process rights under the Fourteenth Amendment and is actionable under 42 U.S.C. § 1983.

223.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

224.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**NINTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**First Amendment**
**Free Exercise of Religion**

225.    Plaintiffs incorporate by reference all preceding paragraphs as if fully rewritten herein.

226.    To state a claim under the First Amendment Free Exercise Clause, a plaintiff must show: (1) the existence of a sincerely held religious belief; (2) that a governmental policy or action substantially burdens the exercise of that religious belief; (3) that the burden is imposed by state action; and (4) if the policy is not neutral or generally applicable, that it fails strict scrutiny because the government lacks a compelling interest or has failed to use the least restrictive means.

227.    Plaintiffs are Unitarian Universalists.

228.    Their sincerely held religious beliefs include the inherent worth and dignity of every

person; respect for bodily autonomy; justice, equity, and compassion in human relations; the

right of conscience; and the moral obligation to safeguard vulnerable persons and speak for those

who cannot speak for themselves. These beliefs guide their daily conduct and caregiving.

229.    Plaintiffs sincerely believe they are religiously obligated to protect M.S.'s bodily privacy,

dignity, and autonomy. Because their daughter is profoundly disabled, nonverbal, and unable to

consent or resist, Plaintiffs believe that exposing her unclothed body or subjecting her to intimate

bodily contact by unfamiliar adults violates her dignity and their religious duty to protect her.

230.    Plaintiffs believe it is their religious responsibility to ensure that intimate bodily contact

occurs only in a manner consistent with their daughter's inherent worth and dignity.

231.    Defendants, acting under color of state law, have adopted and enforced a parent

replacement policy that substantially burdens Plaintiffs' exercise of religion by conditioning their

daughter's access to Medicaid HCBS services on Plaintiffs' willingness to replace M.S.'s trusted

care team with temporary workers who will enter their home and perform intimate bodily care on

their minor child. Plaintiffs' refusal, even when grounded in sincere religious objections, triggers

immediate punitive consequences under Defendants' policies.

232.    Under Defendants' policy, if Plaintiffs decline any "willing and able" stranger "for

whatever reason," including sincere religious objections, the parent is automatically removed as

a Medicaid provider and the child loses the authorized hours of care previously provided safely

by the parent. This coercive structure forces Plaintiffs to choose between violating their religion

or forfeiting medically necessary services for their daughter.

233.    Defendants further enforce a policy that "services that a family does not want an outside

provider to provide and would rather provide itself, without pay, are natural supports and should

not be assessed as hours needed." When Plaintiffs decline intimate bodily care by strangers on religious grounds, this policy then strips those services from the person-centered service plan. This directly penalizes Plaintiffs for adhering to their faith.

234.   Defendants' actions impose a substantial burden on Plaintiffs' religious practice by compelling them to either: (a) violate their religious obligation to protect their daughter's bodily autonomy, privacy, and dignity; or (b) sacrifice essential, medically necessary HCBS services that keep their daughter safe and out of institutional care. This unconstitutional "your religion or your services" choice violates established First Amendment doctrine.

235.   The coercive burden on religious exercise is amplified by the acknowledgment of DODD Deputy Director Alan Showalter that the State places no limit on the number of unfamiliar strangers it may send to replace a parent caregiver. Plaintiffs therefore face the threat of repeated, ongoing intrusions in violation of their religious beliefs, each time risking forced intimate bodily contact between their daughter and strangers.

236.   The burden on Plaintiffs' religious exercise is ongoing and severe. Plaintiffs are compelled to endure repeated replacement searches, justify their religiously motivated refusal to accept strangers for intimate care, and live under continuous threat that Defendants will force strangers into their home to perform invasive care contrary to Plaintiffs' religious beliefs.

237.   The First Amendment protects religiously motivated parental decision-making regarding children's care, upbringing, and well-being.

238.   Parents retain constitutional authority to make decisions grounded in religious conviction concerning their children's safety and daily care.

239.   Defendants' parent replacement scheme is not neutral or generally applicable. It involves individualized, discretionary determinations about when a parent may remain a direct care

worker, whether a parent may decline a candidate, and how Defendants will evaluate "willing and able" strangers.

240.    Defendants cannot satisfy strict scrutiny. There is no compelling interest in overriding the religiously grounded caregiving decisions of fit parents caring safely for a profoundly disabled minor child. Even if an interest existed, forcing intimate bodily care by strangers inside the family home is not narrowly tailored. Less restrictive alternatives such as allowing the parents to remain caregivers, are obvious, lawful, effective, and explicitly permitted under Medicaid law.

241.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered emotional distress, coercion, loss of religious autonomy, disruption of family life, and the ongoing threat that Defendants will force them to violate their religious obligations in order to maintain their daughter's medically necessary services.

242.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including monetary damages, emotional distress, loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.*

243.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

### TENTH CAUSE OF ACTION
### 42 U.S.C. § 3615
### FHA Preemption

244.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

245.    42 U.S.C. § 3615 provides that any state or local law, ordinance, re*gulation, policy, or administrative practice that "purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."

246.   This includes policies adopted by state agencies, county boards, or political subdivisions.

247.   To state a claim under § 3615, a plaintiff must show: (1) the defendant has adopted or enforced a policy, rule, or practice; (2) the policy requires or permits conduct that constitutes a "discriminatory housing practice" under 42 U.S.C. § 3604(f); and (3) the plaintiff is adversely affected because the discriminatory policy interferes with their right to remain in, use, or enjoy their dwelling.

248.   Defendant WCBDD has an official policy, that destabilize M.S.'s ability to live at home with her family instead of in an institution, it is invalidated by 42 U.S.C. § 3615.

249.   Defendants Warren County Board of Developmental Disabilities, its supervisory officials, and its service coordinators have adopted, implemented, and enforced the policies outlined in the "DODD FAQ" document, including the mandatory annual parent replacement search, the policy that refusal of a "willing and able" stranger "for whatever reason" disqualifies the parent provider, and the rule that eliminates already-authorized service hours when families decline outside providers, that operate as binding directives within the WCBDD's system.

250.   These policies permit and require conduct that constitutes discriminatory housing practices under the FHA, including discrimination that interferes with a disabled person's ability to use and enjoyment their home.

251.   By destabilizing the only in-home supports that keep Plaintiff M.S. safely housed in her dwelling, Defendants' policies materially burden her continued residence in her home on the basis of disability.

252.   Defendants' policies require the removal of M.S.'s long-term, highly trained caregivers solely because she is a disabled minor receiving HCBS services and her parents decline intimate bodily care by strangers. This differential treatment based on disability and age directly affects

M.S.'s ability to use and enjoy her dwelling, causes severe destabilization in her home environment, and places her at foreseeable risk of institutionalization or forced out-of-home placement, classic FHA injuries recognized by federal courts.

253.    The policies' discriminatory effects are not incidental or speculative. Replacing long-standing, stable, trained, willing, and qualified caregivers with temporary workers threatens M.S.'s capacity to remain safe and alive in her home, interferes with essential ADLs performed in the dwelling, creates dangerous gaps in care, and imposes unique burdens on her housing that nondisabled individuals or adult waiver recipients do not face. The FHA prohibits this type of discriminatory imposition on the terms and conditions under which a disabled person is able to reside in her home.

254.    Defendants have undermined the housing rights of disabled minor waiver recipients, and the challenged policy is expressly preempted and rendered invalid under 42 U.S.C. § 3615.

255.    Plaintiffs are entitled to declaratory and injunctive relief invalidating Defendants' discriminatory policies and preventing their enforcement.

256.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## ELEVENTH THROUGH FOURTEENTH CAUSES OF ACTION
### 42 U.S.C. § 1983
### Medicaid Act and CMS-Approved IO Waiver:
### Free Choice of Provider, Person-Centered Planning, HCBS Settings Requirements, and Medicaid Due Process and Hearing Rights

257.    Plaintiffs incorporate all preceding paragraphs as though fully rewritten herein.

258.    This combined cause of action asserts violations of four distinct, rights-creating components of the CMS-approved Individual Options (IO) Waiver (July 2025), which is authorized under 42 U.S.C. § 1396n(c) and is binding on all state and county entities

48

administering HCBS services. These four independently enforceable participant protections are: (a) Freedom of Choice of Qualified and Willing Providers; (b) Person-Centered Planning Requirements; (c) HCBS Setting Requirements Protecting Autonomy and Choice (including choice of "who provides" services); and (d) Medicaid Due Process and Hearing Rights.

259.    Under 42 U.S.C. § 1396n(c), a state may operate a 1915(c) HCBS waiver only if it provides assurances satisfactory to the Secretary of Health and Human Services that it will protect the health and welfare of participants and comply with all terms and conditions of the CMS-approved waiver. Ohio accepted these mandatory conditions in the IO Waiver, and all Ohio actors, including Defendant WCBDD, are bound to follow them.

## I.    Count Eleven: Freedom of Choice of Qualified and Willing Providers

260.    The IO Waiver repeatedly guarantees that "the free choice of provider processes are adhered to and emphasize the right of individuals to choose any qualified provider of home and community-based services." (IO Waiver, page 185). This is an explicit participant protection.

261.    Plaintiff M.S. selected Peace of Mind Care (POMC), a fully certified Medicaid provider, and her parents, who are long-standing, qualified, agency-employed caregivers, as her preferred HCBS providers.

262.    Defendants intend to attempt to remove POMC solely because M.S. is a minor and solely to implement a mandatory provider replacement policy, despite the fact that POMC and its employees are qualified, willing, and performing safely.

263.    A mandatory replacement provider search that removes a qualified and willing chosen provider is the direct opposite of the IO Waiver's requirement that participants choose their providers.

264.     Defendants' conduct forces a change not requested by M.S., not based on need, and not justified by safety, thereby violating the waiver's explicit guarantee of freedom of choice among qualified and willing providers.

II.      **Count Twelve: Person-Centered Planning Requirements**

265.     The IO Waiver also requires that "The service and support administrator (SSA) is responsible to develop and revise the ISP and to ensure that this process occurs with the active participation of the individual to be served, the guardian of the individual, as applicable… and the provider(s) selected by the individual. The SSA is also responsible to ensure the ISP addresses the results of the assessment process." This is an explicit participant protection.

266.     WCBDD authored M.S.'s Discovery Assessment and person-centered service plan. The plan expressly states that having her parent providers is "the best thing that ever happened to the person [M.S.]" and emphasizes their unique expertise and necessity for her health and welfare.

267.     The same assessment warns that "temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile," acknowledging severe risks associated with turnover.

268.     Despite these explicit findings, Defendants intend to override the person-centered plan without any assessed need, without any change in condition, without participant consent, and solely to satisfy an administrative preference for replacing parent providers.

269.     Rewriting or disregarding the plan for administrative reasons violates the IO Waiver's binding requirements that services reflect the participant's preferences, services be delivered as written, and any modification be justified by assessed need and the least intrusive alternative.

III.     **Count Thirteen: HCBS Setting Requirements Protecting Autonomy and Choice**

270.     The IO Waiver incorporates HCBS setting requirements ensuring that when services take place in a private home, "The private residence facilitates individual choice regarding services and supports, and who provides them." (page 175, IO Waiver) This is an explicit participant protection.

271.     M.S.'s home is an HCBS setting. She currently exercises her federally protected autonomy by choosing her long-standing caregivers.

272.     Defendants' policy, in which refusal to submit to a provider replacement search or refusal of a "willing and able" stranger "for whatever reason" results in automatic removal of the parent provider, coerces the family into accepting unwanted caregivers and nullifies M.S.'s right to choose who provides intimate care.

273.     Forcing a profoundly disabled minor to undergo bathing, diapering, menstrual care, and undressing by unfamiliar strangers is incompatible with the waiver's requirements that HCBS settings preserve autonomy, dignity, and participant control over who provides services.

274.     Defendants' approach replaces participant autonomy with government compulsion, violating core HCBS setting protections incorporated into the IO Waiver.

**Count Fourteen: Medicaid Due Process and Hearing Rights**

275.     Appendix F of the IO Waiver states the following appeal rights:

> Applicants for Individual Options waiver enrollment and waiver enrollees who are affected by any decision made to approve, reduce, deny or terminate enrollment or to deny the choice of a qualified and willing provider or to change the level and/or type of waiver service delivered, including any changes made to the individual service plan, shall be afforded Medicaid due process. All waiver enrollees receive prior notice for any adverse action proposed. This notice includes the right to a state hearing and an explanation of the hearing procedures and is either generated manually by county boards or electronically by county departments of job and family services.

51

276. Initiating a forced provider replacement search is an adverse action because it threatens to remove M.S.'s chosen caregivers, destabilizes her services, imposes new conditions for continuing Medicaid services, and alters the delivery and continuity of her care.

277. Despite repeated requests, Defendants failed to provide written notice, a statement of hearing rights, appeal procedures, and assurance that services would continue unchanged pending appeal.

278. By refusing to issue notice or hearing rights, Defendants have eliminated M.S.'s only lawful means for contesting the removal of her chosen providers.

279. These failures directly violate the IO Waiver's binding due process requirements and deprive M.S. of federally mandated procedural protections.

280. The above rights (provider choice, person-centered planning fidelity, autonomy and dignity in HCBS settings, and Medicaid due process) are binding conditions of Ohio's participation in the 1915(c) IO Waiver under 42 U.S.C. § 1396n(c).

281. These are individually enforceable federal rights that can be vindicated under 42 U.S.C. § 1983.

282. Defendants acted under color of state law in adopting and enforcing the parent-replacement policy, disregarding the person-centered plan, coercing unwanted caregivers, and denying federally required hearing rights.

283. As a direct and proximate result, Plaintiffs face loss of essential services, destabilization of care, risk of institutionalization, coerced bodily intrusion by strangers, and denial of meaningful process to contest these harms.

284. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## FIFTEENTH CAUSE OF ACTION
### 42 U.S.C. § 12132
### Americans with Disabilities Act Title II - 42 U.S.C. § 12132
### Section 504 of the Rehabilitation Act - 29 U.S.C. § 794
### Disability Discrimination

285.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

286.    To establish a Title II ADA claim, a plaintiff must show she is a qualified individual with a disability; she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against; and the exclusion, denial, or discrimination occurred by reason of disability.

287.    To state a claim under Section 504, a plaintiff must show: (1) She is a person with a disability; (2) She is otherwise qualified to participate in the program; (3) The program or activity receives federal financial assistance; (4) She was excluded from participation in, denied benefits of, or subjected to discrimination; (5) The exclusion or discrimination occurred solely by reason of disability.

288.    Plaintiff M.S. is a qualified individual with a disability under the ADA and §504. She has profound developmental disabilities, is medically fragile, is fully dependent on others for all activities of daily living, and is eligible for and receives Medicaid HCBS services under Ohio's Individual Options Waiver.

289.    Defendant WCBDD is a public entity subject to Title II of the ADA.

290.    Defendant WCBDD is also subject to Section 504 because it administers Medicaid waiver services funded in part by federal financial assistance flowing from the United States Department of Health and Human Services through the Ohio Department of Medicaid. WCBDD's HCBS activities therefore constitute programs or activities receiving Federal financial assistance.

291.    As a public entity administering Medicaid HCBS services, WCBDD must not exclude qualified individuals with disabilities from participation in, deny them the benefits of, or subject them to discrimination under any of its programs, services, or activities. 42 U.S.C. § 12132.

292.    Defendants have adopted and enforced a minor-only parent-replacement policy under which minor waiver recipients must replace their long-standing parent care workers with a "willing and able" stranger, and under which any refusal to use a proposed provider "for whatever reason" disqualifies the parent from serving as caregiver.

293.    Defendants also apply a policy stating that "services that a family does not want an outside provider to provide and would rather provide itself, without pay, are natural supports and should not be assessed as hours needed." Under this rule, if a family refuses intimate bodily care by strangers, Defendants remove those services from the minor child's plan.

294.    These policies discriminate by reason of disability because only individuals who, due to the severity of their disabilities, require intimate ADL assistance face the threat of losing essential services if they do not accept unfamiliar caregivers. Individuals who can perform these tasks independently (i.e., those with less significant disabilities) are not subjected to any comparable penalty or loss of services.

295.    Defendants' policies also violate the ADA's integration mandate, which requires that services be provided in the most integrated setting appropriate.  Removing M.S.'s long-standing, highly trained, qualified, and willing caregivers and compelling intimate care by temporary strangers foreseeably destabilizes her functioning, increases medical and behavioral risks, and places her at heightened risk of hospitalization or institutionalization.

296.   Defendants' actions deny Plaintiffs the full benefit of HCBS services, threaten M.S.'s ability to remain safely in her home, and impose eligibility conditions not imposed on nondisabled individuals or on disabled individuals with less intensive care needs.

297.   Defendants acted with deliberate indifference. WCBDD's own Discovery Assessment acknowledges that untrained or temporary workers "do not understand [M.S.'s] risk profile" and create heightened danger.

298.   Despite this knowledge, WCBDD is pursuing a forced provider replacement search.

299.   As a direct and proximate result of these policies, M.S. faces loss of medically necessary services, destabilization of her care environment, risk of injury or institutionalization, and denial of the benefits of HCBS services solely by reason of disability.

300.   Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs.

## SIXTEENTH CAUSE OF ACTION
### 42 U.S.C. §§ 3601–3619
### Fair Housing Act
### Disability Discrimination

301.   Plaintiffs incorporate all preceding paragraphs as though fully rewritten herein.

302.   The Fair Housing Act ("FHA") prohibits discrimination in housing based on disability. To state a claim under 42 U.S.C. § 3604(f), a plaintiff must show: (1) she is a person with a disability under § 3602(h); (2) she resides in or seeks to reside in a "dwelling" under § 3602(b); (3) the defendant made housing "unavailable," or imposed discriminatory terms, conditions, or privileges of housing because of disability; (4) the discrimination was intentional, had a disparate impact, or involved denial of reasonable accommodation.

303.    To state a claim under § 3617, a plaintiff must show: (1) she exercised or enjoyed rights protected by the FHA; (2) the defendant coerced, threatened, intimidated, or interfered with her; (3) the interference was because of the exercise of FHA rights or because of disability.

304.    Plaintiff M.S. is a person with a disability under 42 U.S.C. § 3602(h). She has profound developmental disabilities, is medically fragile, and requires continuous personal care to safely remain in her home.

305.    The home in which M.S. resides with her family is a "dwelling" under 42 U.S.C. § 3602(b). The FHA applies fully to discriminatory conduct that interferes with a disabled individual's ability to remain safely housed, use her home, or enjoy its amenities.

306.    Defendants administer and enforce policies, including the mandatory parent provider replacement search, the policy that refusal of a stranger caregiver "for whatever reason(s)" disqualifies the parent, that directly jeopardize M.S.'s ability to continue residing safely in her home. These actions interfere with her use and enjoyment of her dwelling because of disability, in violation of the FHA.

307.    Defendants' forced caregiver replacement process destabilizes the in-home supports that permit M.S. to remain in her dwelling, seeks to remove her trained and trusted caregivers, and introduces unfamiliar individuals into highly intimate caregiving tasks. For a medically fragile and profoundly disabled minor, these actions foreseeably create risk of hospitalization or institutionalization, effectively making housing unavailable due to disability in violation of the FHA.

308.    All Plaintiffs are seeking is to have M.S. remain safely housed: permitting her trained, qualified, willing, long-term caregivers to continue performing intimate, medically necessary personal care without being displaced by temporary strangers. This accommodation is necessary

56

for M.S. to use and enjoy her home, and is reasonable on its face, as Defendants' parent replacement policy has no basis in law. Defendants refused this reasonable accommodation, violating the FHA.

309.    Defendants have further interfered with the exercise of FHA rights by threatening the loss of necessary care hours, destabilization of supports, and potential loss of the ability to remain at home unless the family submits to the parent replacement search. This coercion violates 42 U.S.C. § 3617.

310.    As a direct and proximate result of Defendants' discriminatory actions, M.S. faces imminent loss of essential supports required to remain in her home, loss of caregiver continuity, destabilization of her medically necessary care environment, and risk of institutionalization. These constitute cognizable injuries under the FHA.

311.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, punitive damages where available, and reasonable attorneys' fees and costs.

## SEVENTEENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Monell Liability

312.    Plaintiffs incorporate all preceding paragraphs as though fully rewritten herein.

313.    Defendant WCBDD is a county-level governmental entity subject to suit under 42 U.S.C. § 1983. As a political subdivision, it is not an arm of the State and is not entitled to Eleventh Amendment immunity.

314.    Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a local government is liable under § 1983 when a constitutional violation is caused by one of the following an official policy; a widespread custom or practice; or the actions or ratification of officials who possess final policymaking authority over the subject matter at issue.

315.    At all relevant times, Superintendent Manuel, SSA Director Hidy and SSA Supervisor Lindeen exercised final policymaking authority for WCBDD regarding the administration of IO Waiver services, including provider approval and removal, person-centered service planning, and implementation of the parent replacement policy. Their decisions was not subject to meaningful review by any higher county authority, making them final policymakers.

316.    WCBDD has adopted, maintained, and enforced an official policy requiring minor waiver recipients to undergo mandatory provider replacement searches, and to lose their current parent providers if they decline the "willing and able" replacement workers "for whatever reason." This policy has been consistently identified by WCBDD personnel as its official policy for minor children on the IO Waiver.

317.    On November 18, 2025, SSA Director Hidy formally stated on behalf of WCBDD that the Board "will continue to follow" the March 24, 2025 DODD FAQ titled *Frequently Asked Questions: OAC 5160-44-32.* This written declaration expressly adopted the FAQ as binding WCBDD policy, despite DODD's earlier admission in litigation that the FAQ was nonbinding and carried no legal force.

318.    WCBDD's final policymakers instructed the other Defendants and other staff to implement the DODD FAQ as mandatory.

319.    WCBDD's policymakers ratified these unconstitutional practices after receiving repeated written objections from Plaintiffs demonstrating that the policy violated federal constitutional rights, the IO Waiver's binding terms, and Medicaid due process requirements. Rather than investigate or modify the policy, WCBDD reaffirmed its enforcement and directed staff to proceed.

320. WCBDD acted with deliberate indifference to Plaintiffs' constitutional rights. WCBDD's policymakers knew that enforcing the parent replacement policy would likely subject the minor child to involuntary intimate bodily contact with strangers; interfere with her parents' well-established liberty interests in caregiving decisions; burden their religious exercise; deny federally required hearing rights; and destabilize her medically necessary care, creating foreseeable risk of hospitalization or institutionalization.

321. WCBDD's official policy, and the decisions of its final policymakers enforcing that policy, are the moving force behind the constitutional violations at issue, including violations of bodily integrity and bodily privacy; parental liberty interests; Free Exercise rights; equal protection; procedural and substantive due process; and the unconstitutional-conditions doctrine.

322. As a direct and proximate result of WCBDD's unconstitutional policies and practices, Plaintiffs have suffered loss of constitutional rights, emotional distress, coercion, destabilization of medically necessary care, and the threat of imminent harm.

323. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## EIGHTEENTH CAUSE OF ACTION
### Declaratory Relief
### 28 U.S.C. §§ 2201–2202
### (Against All Defendants)

324. Plaintiffs incorporate all preceding paragraphs as though fully rewritten herein.

325. Under 28 U.S.C. § 2201, a federal court may "declare the rights and other legal relations of any interested party" when an actual controversy exists. The statute requires: (a) a real, substantial, and immediate controversy between parties with adverse legal interests; (b) that the controversy is of sufficient immediacy and reality to warrant declaratory relief; and (c) that

declaratory judgment will settle the legal rights at issue or afford relief from uncertainty. Under §

2202, the Court may grant further necessary or proper relief based on the declaratory judgment.

326.   An actual, immediate, and substantial controversy exists between Plaintiffs and

Defendants regarding the legality of Defendants' ongoing and threatened actions, including: (1)

enforcing WCBDD's parent replacement policy as binding authority; (2) requiring M.S. to

attempt to replace her current caregivers with unfamiliar "willing and able" caregivers; (4)

disqualifying Plaintiff-parents from serving as caregivers if they decline strangers "for whatever

reason"; (5) removing authorized Medicaid services from M.S.'s person-centered plan if her

parents refuse to allow strangers to perform intimate ADLs; (6) denying all Medicaid due process

rights guaranteed by the IO Waiver, federal Medicaid law, and the Fourteenth Amendment; (7)

conditioning Medicaid services on surrender of constitutional rights; (8) implementing and

ratifying countywide policies that conflict with federal statutes, the Constitution, and the CMS-

approved IO Waiver.

327.   Plaintiffs contend that Defendants' policies and practices violate: (a) the ADA; (b)

Section 504 of the Rehabilitation Act; (c) the Fair Housing Act and 42 U.S.C. § 3615; (d) the

Medicaid Act and federally binding IO Waiver requirements; (e) the Fourteenth Amendment

(procedural due process, substantive due process, bodily integrity, parental liberty, equal

protection); (f) the First Amendment (free exercise); and (g) the unconstitutional-conditions

doctrine.

328.   Defendants dispute these assertions, maintain that the parent replacement policy is lawful

and required, and have repeatedly stated their ongoing intent to conduct replacement searches,

remove Plaintiffs Justin and Lindsey Sodano from their daughter's care, and impose successive

strangers as caregivers without advance notice, due process, or any limit on the number of strangers.

329.     These threatened actions are neither hypothetical nor remote; they are actively being implemented, creating an immediate and irreparable risk of constitutional, statutory, and waiver-based injury. Plaintiffs therefore face present, substantial harm absent judicial intervention.

330.     Declaratory judgment will resolve the legal uncertainty between the parties, clarify the governing law, and prevent continued violations by establishing Plaintiffs' federal rights and Defendants' corresponding obligations.

331.     Plaintiffs seek a judicial declaration that: (a) Defendants' policies and practices violate the ADA, Section 504 of the Rehabilitation Act; the Fair Housing Act, the Medicaid Act; the Fourteenth Amendment; and the First Amendment; (b) enforcement of the DODD FAQ, including the annual parent replacement search, the "for whatever reason" provision, and the "natural supports" provisions, violates Plaintiffs' constitutional rights; (c) Plaintiffs are entitled to all Medicaid due process protections guaranteed by the IO Waiver, including prior written notice, appeal rights, and continued services pending appeal; (d) Defendants may not condition receipt of Medicaid services on surrender of constitutional rights (bodily integrity, parental decision-making, religious exercise, equal protection); (e) Defendants may not forcibly replace M.S.'s long-standing, qualified, willing parent caregivers with unfamiliar strangers; and (f) WCBDD's adoption and enforcement of the DODD FAQ as mandatory policy is unlawful to the extent it conflicts with federal statutory or constitutional protections.

332.     Plaintiffs respectfully request that this Court enter declaratory judgment under 28 U.S.C. §§ 2201–2202 declaring the rights and legal relations of the parties as set forth above, and awarding any further necessary or proper relief.

**NINETEENTH CAUSE OF ACTION**
**Injunctive Relief**
**(Against All Defendants)**

333.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully rewritten herein.

334.    To obtain injunctive relief, Plaintiffs must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the public interest. Plaintiffs plead facts satisfying each element below.

335.    Defendants continue to threaten and prepare to enforce the parent replacement policy described above, including: compelling Plaintiff M.S. to submit to another search for "willing and able" strangers to take over her care; requiring Plaintiffs to allow unfamiliar adults to perform intimate bodily care on their profoundly disabled minor child; disqualifying Plaintiffs as the child's caregivers if they decline the "willing and able" strangers "for whatever reason"; removing already-authorized Medicaid services from M.S.'s person-centered service plan if Plaintiffs refuse intimate care by strangers; refusing to provide required Medicaid notice and appeal rights; and terminating Plaintiffs Justin and Lindsey Sodano from their longstanding employment with their Medicaid provider agency, Peace of Mind Care.

336.    Plaintiffs are likely to succeed on their claims because Defendants' threatened actions violate Plaintiffs' rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, the Medicaid Act the CMS-approved IO waiver, and the First and Fourteenth Amendments to the United States Constitution, enforceable under 42 U.S.C. § 1983.

337.    Defendants have repeatedly refused to provide hearing rights or due process procedures, leaving Plaintiffs with no administrative remedy and no mechanism to prevent imminent enforcement of the unconstitutional policy.

338.    Plaintiffs will suffer irreparable harm absent injunctive relief, including: forced intimate bodily contact between Plaintiff M.S. and unfamiliar adults in violation of her bodily integrity and privacy; loss of medically necessary Medicaid services; destabilization of M.S.'s living environment and increased risk of institutionalization; termination of Justin and Lindsey Sodano from their employment; coercion to abandon religious beliefs; and ongoing violations of liberty, property, due process, and equal protection rights.

339.    These threatened harms are concrete, immediate, and cannot be remedied after the fact through monetary damages. Forced intimate bodily care, removal of essential services, deprivation of due process, loss of constitutional freedoms, and destruction of a child's medically necessary care structure constitute irreparable injury as a matter of law.

340.    The balance of equities favors an injunction because Defendants have no legitimate interest in enforcing policies that violate federal statutes or the Constitution, while Plaintiffs face severe, irreversible, and life-altering harm if the policy proceeds.

341.    An injunction serves the public interest by ensuring compliance with federal disability rights statutes, Medicaid law, and constitutional protections for vulnerable children and their families. Preventing unlawful policies that endanger the health and welfare of a profoundly disabled minor directly promotes public welfare and the rule of law.

342.    Plaintiffs therefore request that this Court issue preliminary and permanent injunctive relief prohibiting Defendants from enforcing or threatening to enforce any parent replacement search or caregiver replacement requirement against Plaintiffs; compelling Plaintiff M.S. to

accept intimate personal care from unfamiliar "willing and able" strangers; disqualifying

Plaintiffs Justin or Lindsey Sodano from serving as their daughter's caregivers without cause;

removing or reducing already-authorized Medicaid services on the basis that Plaintiffs decline

unfamiliar caregivers; refusing to provide Medicaid due process notice and appeal rights before

any adverse action; interfering with Plaintiffs' employment with Peace of Mind Care; and taking

any further action that violates Plaintiffs' rights under the ADA, Section 504 of the Rehabilitation

Act, the FHA, the Medicaid Act, the IO waiver, or the United States Constitution.

343.    Plaintiffs further request such additional relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and

grant the following relief:

I.     Declaratory Relief

    A.     A declaration under 28 U.S.C. § 2201 that Defendants' policies, practices, and actions, violate the Medicaid Act, the ADA, Section 504, the Fair Housing Act, and the United States Constitution.

    B.     A declaration that Plaintiff M.S. retains the federally protected right to receive Medicaid HCBS services from her qualified and willing providers of choice, including her parents.

    C.     A declaration that Defendants may not remove, replace, or disqualify Plaintiff's chosen caregivers absent lawful cause, evidence, notice, and meaningful due process.

II.    Injunctive Relief

    Pursuant to 28 U.S.C. § 2202 and this Court's equitable authority, Plaintiffs request

preliminary and permanent injunctive relief:

A. Prohibiting Defendants from initiating, enforcing, or carrying out any provider replacement process directed at Plaintiff M.S., including posting advertisements, interviewing applicants, or soliciting replacement caregivers.

B. Prohibiting Defendants from removing, reducing, altering, or terminating Plaintiff's current HCBS services or parent providers without lawful cause, evidence, and due process, or based on any nonbinding guidance such as the DODD FAQ.

C. Requiring Defendants to honor and implement Plaintiff's person-centered service plan as written unless and until any lawful, person-centered modification is requested by her representative and completed in accordance with federal requirements.

D. Requiring Defendants to provide all federally mandated Medicaid notice and appeal rights prior to any adverse action affecting services or providers.

E. Enjoining Defendants from conditioning Medicaid waiver benefits on the surrender of constitutional rights, including bodily integrity, free exercise, parental rights, and due process.

III.    Compensatory and Punitive Damages

A.  Award compensatory damages to Plaintiffs for emotional distress, interference with federally protected rights, economic harm, instability, and all other injuries caused by Defendants' conduct.

B.  Award punitive damages against the individual Defendants for their reckless, intentional, and outrageous disregard of Plaintiffs' rights.

IV.    Attorneys' Fees and Costs

Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 42 U.S.C. §

3613(c)(2), and any other applicable fee-shifting statutes.

Respectfully Submitted,

/s/ Michela Huth
MICHELA HUTH
(Reg. No. 0091353)
257 Canal Street, SE
Bolivar, OH 44612
Ph:  330-440-4027
Email: michelahuth.esq@gmail.com

**JURY DEMAND ENDORSED HERON**

## VERIFICATION OF COMPLAINT
## PURSUANT TO U.S.C. § 1746

I verify under penalty of perjury that the foregoing is true and accurate.

Executed on December 10, 2025.

_____
Lindsey Sodano

**VERIFICATION OF COMPLAINT**
**PURSUANT TO U.S.C. § 1746**

I verify under penalty of perjury that the foregoing is true and accurate.

Executed on December 10, 2025.

_____
Justin Sodano