UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

Case No. 1:25-cv-910 - Civil

| | |
|---|---|
| M.S., Et al.<br><br>vs.<br><br>WARREN COUNTY BOARD OF DEVELOPMENTAL DISABILITIES, Et al. | **PLAINTIFFS LINDSEY SODANO AND JUSTIN SODANO'S DECLARATION** |

We, Justin Sodano and Lindsey Sodano, are adults who are competent to make this declaration pursuant to 28 U.S.C. Section 1746 and we have firsthand knowledge of the facts set forth herein.

1. We are the parents and caregivers of M.S., our seventeen-year-old daughter, and our family resides in Warren County, Ohio.

2. Our daughter has a confirmed diagnosis of STXBP1-DEE, an extremely rare and life-threatening neurogenetic disorder. STXBP1-DEE causes severe intellectual delay, severe tremor, gait abnormalities, profound autism, behavioral disturbances, seizures, and many other problems too numerous to list.

3. In addition to this extremely rare genetic disorder, our daughter suffered a traumatic brain injury resulting in encephalomalacia (permanent loss of brain tissue) in the frontal lobes, with gliosis (scar tissue), consistent with partial brain death. This traumatic brain injury occurred in 2017 when our daughter was under the supervision of a non-parent caregiver at a disability respite event at the Mason Community Center in Mason, Ohio. Despite being warned about her condition and trained on her safety protocols, the caregiver put my daughter on a tumble track trampoline without anyone holding her hands, resulting in her falling and landing on her head on the concrete floor. Nobody present, including the nurse on duty, called 911. This injury has permanently altered our daughter's brain structure, development, and future health needs.

4. The negligent caregiver accident is every parent's worst nightmare, and it has stayed with us every day since. We nearly lost our daughter. Because of that trauma, we have a well-founded fear that allowing any untrained or unfamiliar worker to perform her care could cause another catastrophic injury or death.

5. As a result of her neurogenetic disorder and traumatic brain injury, our daughter has the following medical and developmental conditions/needs (non-exhaustive): total dependence for all activities of daily living, global developmental delay, epilepsy with seizures, severe cognitive

impairment, behavioral dysregulation and aggression, self-injurious behavior, elopement risk, fall risk, absence of safety awareness, pica (eating non-food items), intention tremor that severely limits the use of her hands.

6. Our daughter exceeds the criteria to qualify for institutional care, but instead of living in an institution, she receives care at home and in the community under a Medicaid waiver. Medicaid waivers combine federal and local funding to pay for care workers, medical equipment, and other supports to help people with developmental disabilities live at home instead of in institutions.

7. The specific Medicaid waiver our daughter has is called the Individual Options waiver, and it is governed by the Centers for Medicare and Medicaid Services (CMS) at the federal level, overseen under authority of the Ohio Department of Medicaid (ODM) by the Ohio Department of Developmental Disabilities (DODD) at the state level, and administered locally by the Warren County Board of Developmental Disabilities (WCBDD). Our daughter has had a Medicaid waiver for about ten years.

8. Under the terms of the waiver application approved at the federal level by CMS, WCBDD gave our daughter a test called the Ohio Developmental Disabilities Profile (ODDP) to determine how much care and funding she needs. She scored a 9, the highest possible score.

9. Through the person-centered service planning process, WCBDD determined that our daughter needs an average of 75 hours of personal care per week to assure her health and safety. WCBDD decided that up to 20 of those hours need to be 2:1 care (two caregivers assisting her at once during especially challenging tasks), and the other 55 hours are 1:1 care (one caregiver working alone). This means our daughter needs workers to cover about 95 staff hours per week—that's 55 hours for the 1:1 staff plus 20 hours each for the 2:1 staff (55+20+20).

10. WCBDD documented our daughter's needs in her person-centered service plan, called the Ohio Individual Service Plan (OISP). The OISP that WCBDD created correctly reflects our daughter's complex condition and the fact that she needs "close and constant" supervision. WCBDD also wrote in our daughter's OISP: "Temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

11. Our daughter receives some of the care hours WCBDD authorized through an agency called Peace of Mind Care. This agency began serving our child in 2017 and understands her needs very well. Peace of Mind Care hired Justin (father) in 2020 and Lindsey (mother) in 2022 to be direct care workers for our daughter, both working as W-2 employees. We met all the same requirements as any other care worker (CPR and First Aid certification, clean criminal background check, 8 hours of training, etc.). Justin fills an average of 35 hours and Lindsey fills an average of 33 hours per week of the 95 weekly staff hours authorized by WCBDD.

12. Neither our employer nor our daughter's service and support administrators (SSAs) from WCBDD have ever raised any concerns about our daughter's health and safety under our care.

13. In one section of the OISP called the "Discovery Assessment," the assessment asks, "What is the best thing that ever happened to the person?" WCBDD staff wrote, "Having her parents be her provider."

14. Lindsey has a master's degree in communication and a bachelor's degree in education; Justin will graduate with his MBA in December 2025. We each have over 17 years of experience working with our daughter. Care worker positions like the ones we hold do not require any prior career experience or even a high school diploma. By any measure, we are uniquely and exceptionally qualified care workers. Further, we have both earned the competency/longevity add-on designation from the Ohio Department of Developmental Disabilities. This distinction is for direct care workers who have stayed on the job for several years and have completed at least 60 hours of continuing education.

15. Our daughter requires continuous, hands-on support, including but not limited to: seizure monitoring and rapid intervention; prevention of elopement; behavioral de-escalation; diapering; menstrual hygiene; bathing; dressing; feeding; 1:1 care most of the time, with 2:1 care during challenging activities or episodes; management of STXBP1-specific triggers, patterns, and idiosyncrasies; programming, updating, and management of her augmentative communication device; understanding of her profoundly dysarthric speech. These tasks cannot be performed safely or successfully by an inexperienced caregiver. Our daughter's care requires months to a full year of intensive, side-by-side training before a person can safely manage even a single full day alone. Her seizures, medical needs, behavioral triggers, elopement risk, communication patterns, and the effects of her traumatic brain injury are unpredictable, complex, and deeply individualized.

16. WCBDD attempted to replace us with non-parent care workers twice in 2024. These two parent replacement searches required: contacting agencies, weeding out unqualified applicants, researching legal options, attempting to prevent trauma and instability, finding a lawyer, and filing a mandamus action in the Supreme Court of Ohio.

17. WCBDD's first provider replacement attempt took place in January 2024. The process was chaotic, unsafe, hostile to parental involvement, and impossible to conduct safely for our daughter. It also demonstrates the type of harm she would face again if forced to repeat it. Some of the issues we faced included:

- SSA (at the time) Julie Miller stated that she could tell the many applicants to replace us had never even read the job description.
- Lindsey contacted every applicant to ask some basic screening questions to find out if they were "able" to replace us, but most did not respond.
- Despite Lindsey's protest that applicants should be willing to answer a few screening questions by email, SSA Miller said that even though the applicants had not read the job description and did not respond to follow up messages, they still deserved in-person interviews for the job.
- One candidate, Blissful Days Management, said they wanted to take the job but only if we (the family) pay their second staff member $15 per hour of our own money. They also wanted to know if we the parents would be willing and able to handle the services related to our child's behaviors. SSA Miller told us this provider was "inappropriate."
- SSA Miller's superior, SSA Director Tony Hidy, insisted on considering Blissful Days Management to replace us.
- SSA Director Hidy proposed splitting my daughter's 1:1 and 2:1 care into separate, prescheduled shifts instead of using 2:1 care sparingly and only as needed.

- SSA Director Hidy also stated that the applicants would be able to determine whether they are "willing and able," effectively giving the applicants the power to hire *themselves*.
- Lindsey had to ask DODD Director Kimberly Hauck to intervene with WCBDD on our daughter's behalf.

18. After 28 days and approximately 70-80 emails, SSA Director Hidy determined that no replacement provider was found, so we were not replaced.

19. Throughout January of 2024, we constantly worried that WCBDD, and especially SSA Director Hidy, would replace us with wholly unqualified workers who would endanger or hurt our child. Then, after the replacement search ended, we constantly dreaded having to go through this process again when WCBDD would try to replace us 4-6 months later.

20. On August 28, 2024, our new SSA, Laura Hathaway, initiated a second search to try to replace us as our daughter's care providers.

21. As this second replacement search began, we became worried about the threat during the previous search that WCBDD would replace us with a large number of agency providers, each taking a "portion" of the care hours. Lindsey contacted DODD senior leadership – Director Kimberly Hauck, Deputy Director Lyndsay Nash, and Deputy Director Allan Showalter – on August 28, 2024, and asked the following question: "Is there a limit to how many 'willing and able' strangers these young girls are expected to expose their bodies to during personal care tasks like bathing and diapering? Has DODD given any consideration to the comfort of the teenage waiver recipients?"

22. DODD Deputy Director Allan Showalter's response to Lindsey's question was shocking: "We have not set limits on how many willing and able providers a family may use." That means that technically, a county board could hire ten different strangers to replace one parent. Now we worried that WCBDD could hire as many different strangers as they want to perform a "portion" of the intimate care tasks such as bathing, diapering, and menstrual care.

23. Our family is Unitarian Universalist. Central to our faith is the principle that every person has inherent worth and dignity and must be treated in ways that respect their bodily autonomy. Because our daughter is profoundly disabled, nonverbal, and unable to understand or consent to intimate contact, we believe it is a religious obligation to limit such care to trusted individuals she recognizes as safe. Forcing her to receive intimate care from a rotating group of strangers is inconsistent with our sincerely held religious beliefs.

24. The incompetence of the applicants WCBDD put forward to replace us was shocking. For example, one applicant, ATES Healthcare Services, LLC, listed its business address as 123 Main Street, Anytown, USA. Its company phone number was listed as 1-800-123-4567. On its website, the description of the home health services ATES provides said, "I am a paragraph. Click here to add your own text and edit me. It's easy. Just click 'Edit Text' or double click me to add your own text and make changes to the font."

25. Ultimately, this second provider replacement search ended like the first one, without the replacement of the parents.

26. Our daughter does not want to replace her existing care team with strangers, but WCBDD keeps forcing our family to endure these repeated provider replacement searches. After the close of the second forced provider replacement search, Lindsey and our daughter participated as relators in a mandamus action to try to stop DODD from bypassing the official rule-making process using an online FAQ. We were incredibly relieved when DODD told the Supreme Court of Ohio that its online FAQ advising county boards to replace parents was "aspirational" and "not a mandatory obligation."

27. But on August 27, 2025, during an in-person meeting at our home, SSA Hathaway told us WCBDD would require yet another parent replacement search in the fall of 2025.

28. SSA Hathaway also told us that once our daughter turns 18 in 2026, she and WCBDD will stop attempting to replace us.

29. At that August 27, 2025, meeting, Lindsey explained to SSA Hathaway that DODD represented to the Supreme Court of Ohio that the online FAQ is just "advisory" and no county board has to follow it. SSA Hathaway said WCBDD would speak with DODD about any consequences of not doing the provider replacement search.

30. We didn't hear anything further, so on September 23, 2025, Lindsey sent an email to SSA Hathaway in which she formally objected to any upcoming parent replacement search. Lindsey included a screenshot of DODD's admission to the Supreme Court of Ohio that the online FAQ is "aspirational" and "not a mandatory obligation," as well as a link to the docket. SSA Hathaway responded that she would pass the message on to her superiors on September 23, 2025. We never heard back about this issue after that.

31. Since we did not hear back after raising the issue in August of 2025 and again in September of 2025, on November 17, 2025, Lindsey asked SSA Hathaway a third time whether WCBDD intended to try to replace us.

32. On November 18, 2025, SSA Hathaway informed us that WCBDD has decided once again to try to replace us. She forwarded an email from SSA Director Hidy, who cited DODD's online "Frequently Asked Questions" page as the legal basis for attempting to replace us. Lindsey responded to SSA Hathaway and her superiors – SSA Supervisor Sarah Lindeen, SSA Director Hidy, and Board Superintendent Megan Manuel – asking what the penalty would be for our daughter refusing to fire her care team and replace them with newcomers. Nobody responded with an answer to that question.

33. In the same email on November 18, 2025, Lindsey also asked SSA Hathaway and her superiors for our daughter's rights to appeal WCBDD's decision. Nobody responded with information on our child's right to a state hearing and an explanation of the hearing procedures.

34. On November 24, 2025, after six days with no due process and no response from WCBDD, our attorney sent correspondence informing them that we would file a federal suit if they continue trying to replace us. Our attorney also reminded WCBDD that they had an obligation under the Individual Options waiver to provide due process rights.

35. After that, on November 24, 2025, SSA Hathaway contacted Lindsey in a separate matter but still did not answer our questions or provide due process rights. Lindsey asked for that due process information yet again. On November 25, 2025, SSA Hathaway responded that she cannot answer the questions about provider replacement or due process rights.

36. As of December 10, 2025, our daughter has still not received notice for WCBDD's proposed adverse action. It has now been 22 days since Lindsey asked WCBDD, the SSA, and her superiors for our daughter's appeal rights. To date, despite repeated written requests, we have received no notice of action and no explanation of appeal hearing procedures.

37. Our daughter wants to appeal WCBDD's adverse action against her services, but she has not been able to file her due process appeal because WCBDD and its employees will not respond to our requests for appeals information.

38. Our daughter turns 18 on November 7, 2026. The SSA confirmed during our August 27, 2025, meeting that she would stop trying to replace us with strangers at that time. Any temporary replacement worker WCBDD hires would still be in the early stages of training when our daughter turns 18. WCBDD wrote in our daughter's person-centered service plan: "Temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

39. In practical terms, WCBDD wants to fire two fully trained, experienced, knowledgeable, loving, dedicated, safe, willing, and qualified providers and replace them with brand new workers who WCBDD knows could not possibly reach competency before WCBDD's unlawful parent replacement policy expires and the original workers are re-hired. WCBDD's plan would force our daughter to spend the next several months in the most dangerous stage of caregiver learning, the onboarding period when mistakes are most common, only for those temporary, unwanted, and not freely chosen providers to be fired in November 2026.

40. From an employment standpoint, WCBDD wants to fire us without cause from our long-standing jobs at a private Ohio business. Next, WCBDD expects us to interview our own replacements, then stay close by to train and supervise these replacements for several months, before firing them on November 7, 2026.

41. We would have to remain by our daughter's side and supervise the replacement workers closely because DODD allows these workers to perform intimate care on minor girls for up to 60 days without a completed background check. We would be negligent parents if we left our daughter alone with a multitude of random strangers with no background checks and allowed those strangers to change her diapers, bathe her, dress her, and perform her menstrual care unsupervised.

42. We have already met the conditions required by OAC 5160-44-32 to be hired as parent direct care workers, and we have been working in these direct care positions for years. Firing and replacing us for just a few months before re-hiring us in November of 2026 is logistically preposterous, dangerous to our daughter's health and safety, and not supported by law.

43. WCBDD's plan to try to replace us with temporary providers exposes our child to catastrophic, unnecessary danger for no legitimate reason, with no benefit to her health or safety. If WCBDD removes and replaces us without cause, our child will face severe behavioral

6

destabilization, trauma from unwanted strangers performing intimate feminine care (with no required criminal background check for the first 60 days), increased seizures, elopement risk, regression, hospitalization, and risk of injury similar to the 2017 incident.

44.     There are no adequate words to describe the fear of losing our child to caregiver negligence a second time, the lasting trauma our family lives with from the 2017 brain injury, the constant vigilance we have had to maintain every day since, and the terror of watching WCBDD attempt to remove two of the only direct care workers in the world who know how to keep our child healthy and safe.

We declare under penalty of perjury that the foregoing is true and accurate to the best of our knowledge and recollection.

_____
LINDSEY SODANO


  12/10/2025
_____
DATE

_____
JUSTIN SODANO

12/10/2025
_____
DATE