**THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **M.S., et al.** | **CASE NO. 1:25-cv-00910** |
| **Plaintiffs,** | |
| **vs.** | **JUDGE JEFFERY P. HOPKINS** |
| **WARREN COUNTY BOARD OF DEVELOPMENTAL DISABILITIES, et al.** | |
| **Defendants.** | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY ATTORNEY KATHRYN HORVATH**

**I.      INTRODUCTION**

Defendants' Response in Opposition to Plaintiffs' Motion to Disqualify (ECF 23) does not answer Plaintiffs' motion. Instead, it attacks a straw man.  Plaintiffs do not contend that every lawyer who gives legal advice becomes a witness. Plaintiffs do not contend that every communication from counsel to an adversary creates a conflict. And Plaintiffs do not seek wholesale disclosure of privileged mental impressions. What Plaintiffs argue is far narrower, and far more serious: Attorney Horvath's own written communications are part of the operative conduct challenged in this case, county board staff continued to identify "the county lawyers" as the source of that conduct, and Defendants now ask the Court to allow the same lawyer whose conduct is embedded in the facts to continue shaping, defending, and potentially testifying about those same events. This problem is not confined to past communications. WCBDD has decided to not conduct required in-person contact visits unless Plaintiffs permit a litigation witness to enter their home, making this a live and ongoing controversy rather than a historical dispute.

1

The opposition never seriously confronts that problem. Instead, it repeatedly recites that Horvath was providing "legal advice," as though labeling challenged conduct as legal advice resolves the ethical issue. It does not. Labels do not resolve Rules 1.7 or 3.7. Once counsel's own acts become disputed facts, conflict and witness concerns arise.

## II. REPLY ARGUMENT

### A. Defendants Attack A Straw Man, Not Plaintiffs' Actual Motion.

The opposition is built around the proposition that giving legal advice to a client does not, by itself, convert a lawyer into a necessary witness. Plaintiffs do not dispute that proposition. Nor does Plaintiffs' motion turn on any such broad theory. Plaintiffs' Motion to Disqualify devotes multiple pages to establishing each element of the necessary witness standard — materiality, relevance, and unavailability elsewhere — with specific factual support for each. *See* Pls.' Mot. to Disqualify (ECF No. 18) at 14–25. A bare declaration it is not.

Plaintiffs' motion is directed at a materially different problem than an attorney simply giving legal advice to her client: Horvath's own written communications are part of the operative conduct challenged in this case, and the record, on its face, confirms it. Defendants' brief does not explain away Horvath's actions. It merely relabels them as "practical advice" and "ordinary legal services." But relabeling is not analysis. A lawyer does not insulate herself from Rule 1.7 or Rule 3.7 simply by insisting that every challenged act was undertaken in a professional capacity. The Rules of Professional Conduct exist precisely because conduct undertaken in a professional capacity can still create conflicts and witness problems.

The relevant standard, which Defendants quote but do not apply, is whether the lawyer's proposed testimony is "material and relevant to the issues being litigated and" unobtainable

elsewhere. *Cabatech, LLC v. Nextlight, LLC*, 2023 U.S. Dist. LEXIS 52432, at *7 (S.D. Ohio Mar. 27, 2023).

No document in the record answers the following disputed factual questions:

- Why did the litigation witness requirement arise immediately after this lawsuit was filed, with no prior policy, regulation, or statute authorizing it?

- What specific authority, if any, did Attorney Horvath believe permitted conditioning Medicaid HCBS service plan implementation on in-home access for a litigation witness?

- Why did the witness arrive at Plaintiffs' home on December 18, 2025, after Plaintiffs' counsel had directly notified Attorney Horvath in writing that consent was revoked?

Defendants also assert that Horvath had "no policy-making role." That misses the point. Plaintiffs' motion does not turn on the formal source of policymaking authority. It turns on whether Horvath's own directives and communications were *treated* as operative and whether those acts are now disputed factual issues in the case. The record says they were and they are.

### III.     Defendants Misuse Privilege And Work Product To Obscure The Real Issue.

Defendants' principal response is to invoke attorney-client privilege and work product as though those doctrines automatically defeat disqualification. They do not.  Work product protects an attorney's mental impressions and legal strategy. It does not protect facts. The question of whether Attorney Horvath conveyed the revocation of consent before the witness appeared at Plaintiffs' home is a factual question about what happened, not a privileged mental impression. The question of what regulatory authority supported Horvath's assertion that a new Extraordinary Care Instrument was required by "federal law" is a factual question about the source of a governmental directive communicated to an adverse party. The question of why service plan implementation was conditioned on home entry of a litigation witness is a factual question about governmental conduct alleged to be retaliatory and unconstitutional.

3

More fundamentally, Defendants cannot invoke privilege as both sword and shield, using Horvath's legal status to explain the conduct while simultaneously insisting that no court may examine the ethical consequences because her role was privileged. If Defendants' position is that the origin, basis, implementation, and continuation of the litigation witness condition and related directives can only be understood through Horvath's privileged legal advice, that concession strengthens the conflict analysis. It means the defense of the case is inseparable from Horvath's own role in the disputed conduct. Rule 1.7 exists to prevent precisely that entanglement. Defendants insist that the documents "speak for themselves." That is not the defense they think it is. If the documents speak for themselves, they speak of Horvath as a direct factual actor whose communications imposed and shaped disputed conditions. If Defendants instead mean that the Court should infer benign legal advice from those documents, they are asking the Court to resolve the meaning and purpose of Horvath's own acts in Defendants' favor while keeping Horvath in the role of advocate. That is the ethical problem, not the solution.

Privilege may protect certain communications. It does not erase operative facts, nor does it cure a present conflict of interest. If a governmental official can impose a coercive home entry condition on a Medicaid waiver recipient, filter all accountability for that condition through the attorney-client relationship, and then claim absolute privilege against any examination of its origins or purpose, the Fourth and First Amendment claims become effectively unanswerable. That is not what privilege and work product doctrines are meant to protect.

## IV. Defendants' Response Confirms Attorney Horvath's Central Role in the Litigation Witness Requirement

The most significant feature of Defendants' response is what it concedes in its own Statement of Facts. Defendants state: "Because the conflict had at that point escalated to

4

litigation, the Board's attorney advised the Board to always include a witness when having direct contact with the Plaintiffs." Defs.' Resp. in Opp'n (ECF No. 23) at 3 (hereinafter "Response"). This is a judicial admission, made by counsel of record in a filed brief, that the litigation witness requirement was litigation-triggered and originated with Attorney Horvath personally. There was no pre-existing county policy. There was no regulation or statute requiring it. There was a lawsuit, and there was Attorney Horvath's advice.

The documented sequence of events demonstrates not ordinary legal consultation, but a progressive escalation in which Attorney Horvath was the originating and hardening force. The graphic below illustrates that escalation:



## Litigation Witness Escalation

**1** — Lawsuit filed 12/10/25. Horvath advises WCBDD to always include a witness when having direct contact with the Plaintiffs (Defense Response 4/22/26)

**2** — 12/12/25 - Def. Hidy tells Plaintiffs Residential Options Coordinator will attend a meeting "due to pending litigation matters"; later refuses to substitute a neutral WCBDD employee. (Hidy Emails)

**3** — 12/16/25* - Horvath email to counsel and Plaintiff Lindsey Sodano conditions service plan going into effect on "witness" attending "60-day monitoring," and Plaintiff may not dicate who attends the meeting in her home. (Horvath Email 12/16/25)

**4** — 12/17/25 Plaintiffs agree to comply under protest and duress, with understanding that M.S. will lose services otherwise. (Plaintiff Email 12/17/25)

**5** — 12/18/25 1:15 p.m. - Plaintiffs' counsel emails Horvath, revoking agreement to the witness requirement. (Plaintiff Email 12/18/25)

**6** — 12/18/25 3:30 p.m. - Witness arrives at Plaintiffs' home unaware that agreement was revoked.

*12/16/25 Horvath Email sent to Atty. Huth and Plaintiff Lindsey Sodano:

"It has come to my attention that your clients are attempting to dictate to the Warren County Board of Developmental Disabilities (WCBDD) how they perform their statutory functions related to your clients' receipt of services. That cannot continue. Please inform your clients that WCBDD must complete the following steps prior to M.S.'s Ohio Individual Services Plan (OISP) to go into effect February 19, 2026. ***

1. 60-day monitoring must occur. WCBDD will be sending two qualified employees to this appointment. Ms. Sodano may not dictate who attends on behalf of WCBDD. On my advice, they will be sending the SSA and one witness."

As the graphic above reflects, the witness requirement arose soon after this lawsuit was filed, expressly "due to pending litigation matters." Exhibit L. Plaintiffs responded with a courteous request to substitute a neutral WCBDD employee for the Residential Options

Coordinator, whose role overlapped directly with disputed issues. Exhibit L. Defendant Hidy refused. Attorney Horvath then escalated. Her December 16, 2025 email to both counsel and Plaintiff Lindsey Sodano directly warned that Plaintiff's advocacy "cannot continue," stated that "Ms. Sodano may not dictate who attends," and conditioned M.S.'s service plan going into effect on completion of a "monitoring" litigation witness home visit. Exhibit B to Motion to Disqualify (ECF No. 18-2). When consent to that visit was revoked in writing directly to Attorney Horvath on December 18, 2025, the witness appeared at Plaintiffs' home anyway. Exhibit D to Motion to Disqualify (ECF No. 18-4). The requirement did not end on December 18, 2025. WCBDD has failed to retract its litigation witness requirement.

Defendants characterize the December 16 letter as merely "clarifying the Board's expectations with regard to M.S.'s annual OISP review." Response at 3. This characterization is irreconcilable with the letter's actual text. A communication that warns a Medicaid waiver recipient's mother that her speech "cannot continue," informs her that she "may not dictate" who enters her home, and conditions her disabled child's service plan on compliance with a litigation witness home entry requirement is not clarifying expectations. It is issuing directives.

Defendants also claim that "the Board communicated with Plaintiffs through legal counsel." Response at 3. This is only partially accurate. Attorney Horvath copied Plaintiff Lindsey Sodano directly at her personal email address, not only Plaintiffs' counsel. The adversarial substance of that letter, including the directive that Plaintiff's speech "cannot continue" and that "Ms. Sodano may not dictate" who attends a meeting inside her home, went directly to a represented party during active federal litigation.

6

**V.      The "Litigious / Misconstruing" Justification Fails And Underscores Why Horvath's Testimony Is Necessary**

Defendants argue that the witness requirement was "rooted in common sense, particularly in a case where Plaintiffs have a history of misconstruing facts and communications." Response at 8. This justification fails on the face of the record and, critically, underscores rather than defeats the necessity of Attorney Horvath's testimony.

The litigation witness requirement was imposed on December 12, 2025, two days after the lawsuit was filed. Defendants identify no act of misconstruction that predates December 12, 2025. They cite no exhibit. They point to no specific prior communication. The only record evidence contemporaneous with the witness requirement's imposition is Plaintiffs' own communications: a December 11 email requesting a new SSA to avoid conflicts of interest while expressly committing to proceed with service planning, a December 13 email offering to accommodate any neutral WCBDD staff member unconnected to the disputed issues, and a December 15 email requesting that, since the request for a neutral witness was denied, the in-person contact visit be conducted by the assigned SSA. Exhibit L. All three messages are courteous, cooperative, and focused entirely on M.S.'s service coordination needs. They are the opposite of the conduct Defendants describe.

Even taking Defendants' characterization at face value, it does not explain the specific operational choices made in implementing the witness requirement. A general concern about misconstruction would not explain why the Residential Options Coordinator was specifically required rather than a neutral WCBDD employee. It would not explain why M.S.'s service plan was conditioned on compliance with the witness requirement. And it would not explain why the witness appeared after consent was revoked.

Those questions point to both Defendant Hidy, who refused Plaintiffs' request for a neutral substitute for the Residential Options Coordinator, and Attorney Horvath, who hardened the requirement into a service-conditioning directive and received the revocation of consent before the witness appeared. Someone must answer for each step. Neither can do so from behind the shield of the other.

There is a further problem with the "litigious client" characterization. Defendants' brief refers to Plaintiffs as Horvath's "client." Response at 8. Plaintiffs are the adverse party. That word choice reflects precisely the blurring of roles at the heart of this motion: Attorney Horvath was not managing a difficult "client" relationship. She was issuing directives to an adverse party during active federal litigation.

## VI. Attorney Horvath is a Necessary Witness Under Rule 3.7

Defendants' opposition to disqualification under Rule 3.7 rests on a fundamental mischaracterization of what Plaintiffs seek to establish at trial and why only Attorney Horvath can establish it.

### A. The Distinction Between Content and Origin Is the Crux

Defendants argue that the communications "speak for themselves" and that no testimony from Attorney Horvath is necessary because other witnesses were parties to the communications. Response at 6. This argument addresses the *content* of the communications. However, it does not address their origin, authority, or purpose, which are the contested factual issues.

When a lawyer communicates a requirement grounded in statute or regulation, the law is the source and the lawyer is a messenger. Other witnesses may testify to the content equally well. But several of the directives in Attorney Horvath's December 2 and December 16 letters are alleged to lack support in any statute or regulation. The litigation witness home entry condition

appears in no statute, no regulation, and no pre-existing WCBDD policy, a fact Defendants effectively concede by attributing it exclusively to Attorney Horvath's advice. Where a directive has no identified external legal source and is attributed to counsel's own advice, counsel is not merely transmitting policy but becomes a factual source of the challenged action.

SSA Poteet's attribution of the ongoing requirement to "the county lawyers," Exhibit G to Motion to Disqualify (ECF No. 18-7), is not a description of a client communicating its own position through counsel. It is the description of an institution that received a directive from its lawyer and implemented it. That distinction is the crux of the necessary witness analysis, and Defendants' response never addresses it.

### B.  The Witness-After-Revocation Fact Cannot Be Answered by Any Other Witness

Defendants argue that "any witness who accompanied an SSA on a monitoring visit can testify as to why they did so." Response at 9. This is incorrect on these specific facts. The contested question is not why the witness accompanied the SSA on December 18, 2025. The contested question is why the witness appeared at Plaintiffs' home *after* Plaintiffs' counsel had notified Attorney Horvath in writing, at 1:15 p.m. that same day, that consent was revoked. The witness who arrived cannot answer that question because she was not told consent had been revoked. Plaintiffs have contemporaneous evidence confirming this. The only person who received the revocation notice and had the authority and responsibility to act on it was Attorney Horvath. Whether she conveyed it to Defendants, or why she did not, and what direction she gave after receiving it are questions that only she can answer from personal knowledge. No other witness can supply that testimony. That is precisely what "unobtainable elsewhere" means.

### C.  Defendants' Rule 3.7 Exception Arguments All Fail

Defendants argue that all three exceptions to Rule 3.7(a) apply. Response at 10–11. None does. Defendants claim the issues are "uncontested." Response at 10. Defendants cannot simultaneously argue that Plaintiffs "misconstrue" the record, "mischaracterize" legal advice as policy, and improperly seek to convert ordinary attorney communications into disputed facts, while also claiming those same matters are "uncontested" for purposes of Rule 3.7. That is a self-defeating argument.

Defendants claim the testimony relates to the "nature or value of legal services rendered." Response at 10. That exception applies to fee-type matters, not testimony about whether counsel's own directives became part of the challenged conduct. Defendants attempt to stretch it beyond recognition by arguing that anything touching on Horvath's role as counsel is automatically testimony about legal services. That reading would swallow the rule.

On substantial hardship, Reminger Co., LPA has represented WCBDD since December 2025 and has signed all pleadings. Response at 11. Reminger is fully capable of continuing the representation. Moreover, the Warren County Prosecutor's Office employs other assistant prosecutors fully capable of providing statutory counsel to WCBDD without any conflict..  The hardship exception does not apply.

### D.  R.C. 309.09 Does Not Exempt a Prosecutor From Abiding by Ethical Obligations

Defendants repeatedly invoke Horvath's status as statutory counsel under R.C. 309.09 as though government-lawyer status immunizes her from the ordinary operation of the ethics rules. Ohio's rules say the opposite.

The Ohio Supreme Court retains exclusive authority over attorney discipline. Prosecutors remain subject to the Ohio Rules of Professional Conduct, and neither statutory authority nor

10

prosecutorial immunity doctrines shield them from discipline. The Ohio Supreme Court possesses exclusive constitutional authority to regulate and discipline attorneys. This authority cannot be displaced by statute, including R.C. 309.09. Accordingly, all attorneys, including prosecutors, are subject to the Ohio Rules of Professional Conduct.

Ohio disciplinary decisions confirm that prosecutors are subject to discipline for misconduct arising from their official duties.  *See Disciplinary Counsel v. Yelsky*, 143 Ohio St. 3d 171, 2015-Ohio-1418, ¶ 10 (imposing discipline for misconduct arising from prosecutorial functions); *Disciplinary Counsel v. Kellogg-Martin*, 124 Ohio St. 3d 415, 2010-Ohio-282, ¶ 1 (analyzing prosecutorial conduct under professional rules, confirming applicability of Rule 3.8 obligations).

Statutory authority does not create ethical immunity.  Ohio Revised Code Section 309.09 defines the duties of a prosecutor but does not provide immunity from ethical obligations or disciplinary proceedings. Authority to act does not excuse misconduct in the exercise of that authority.

The Sixth Circuit confirms the limits of prosecutorial immunity.  The United States Supreme Court and Sixth Circuit distinguish between civil immunity and ethical accountability. *See Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("This immunity does not bar disciplinary action."); *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003) (limiting absolute immunity to advocacy functions intimately associated with the judicial phase of the criminal process); *Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999) (same).

In conclusion, R.C. 309.09 does not immunize prosecutors from compliance with the Ohio Rules of Professional Conduct. Prosecutors remain subject to discipline by the Ohio Supreme Court, and prosecutorial immunity doctrines do not extend to ethical accountability.

11

### E. Rule 3.7(c)'s Government-Lawyer Provision Reinforces Disqualification

Rule 3.7(c) specifically addresses government lawyers. Ohio does not exempt government lawyers from the advocate-witness problem. It expressly regulates them. That is highly significant here because Horvath is not merely private counsel who happened to observe disputed events. She is a government lawyer whose own directives were treated as operative in the administration of Medicaid services by a public body, and whose role is now defended under the banner of statutory representation. Defendants' opposition never addresses Rule 3.7(c). It never explains why Horvath's government-lawyer status should diminish ethical concern rather than heighten it.

## VII. The Rule 1.7 Conflict Requires Complete Disqualification.

Defendants' Rule 1.7 argument occupies less than one page of a thirteen-page brief. Response at 11. Its core assertion is that because Attorney Horvath is not a named defendant, "her conduct is not at issue." *Id.* This misreads both the rule and the record.

Rule 1.7(a)(2) is triggered when there is a substantial risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for her client will be materially limited by her own personal interests. It does not require that counsel be a named party. Ohio's commentary makes the point directly: where the probity of the lawyer's own conduct is seriously in question, the lawyer may be unable to give the client detached advice on that same matter. That is exactly this case.

Defendants may need advice on matters that are directly adverse to Horvath's personal interests, including:

- Whether to contend that county personnel were acting in reliance on legal direction from Horvath;

- Whether to produce or waive privileged communications bearing on Horvath's role in originating the disputed directives;

- Whether to allocate responsibility for the litigation witness condition in a way that distances named defendants Hidy and Manuel from Horvath; and

- Whether settlement terms or factual concessions should be considered that would implicitly or expressly recognize impropriety in Horvath's own actions.

No lawyer can give detached advice on those matters when the advice may point toward her own error, overreach, or responsibility.

Defendants' brief illustrates this conflict rather than curing it. In their Statement of Facts, Defendants attribute the litigation witness requirement to Attorney Horvath's advice. Response at 3. In their Argument section, they claim she "has no power over the decisions made by her clients." *Id.* at 7. These two positions cannot both be true. If the witness requirement was her advice, she owns it professionally. If it was the Board's decision, she was a messenger and the Board and its specific named employees own it. That internal contradiction is itself evidence of the conflict: Attorney Horvath cannot give WCBDD disinterested advice about how to defend or distance itself from conduct she personally directed, because her interest in vindicating that conduct points in a different direction than her client's interest in an objectively evaluated defense.

The federal court in *Henderson v. Wright*, 2025 U.S. Dist. LEXIS 194290 (N.D. Ohio Oct. 1, 2025), denied Rule 1.7 disqualification specifically because the attorney there had no personal stake in the outcome; he was not named and his own prior conduct was not a disputed issue. *Id.* at *45–46. Defendants cite *Henderson* but omit this reasoning. The court's logic confirms that Rule 1.7(a)(2) disqualification is appropriate precisely where those conditions are reversed, as they are here: the lawyer's own prior conduct is a central disputed issue, and she has a concrete personal interest in how those disputes resolve.

13

Defendants attempt to neutralize the conflict by asserting that Horvath acted only in a "professional capacity." But the entire premise of Rule 1.7 is that a lawyer's professional role does not eliminate conflicts created by the lawyer's own interests. If anything, acting in a professional capacity while becoming personally embedded in the disputed facts is precisely what creates the conflict the rule addresses.

## VIII. The Present Record Is Sufficient; A Limited Hearing Is Requested Only If Necessary

Defendants suggest that Plaintiffs are fishing for testimony. That is precisely wrong. The documentary record already establishes sufficient grounds for relief. The current record shows: (1) the litigation witness condition arose after suit was filed and from Horvath's advice; (2) Horvath expressly tied it to her own advice in writing; (3) M.S.'s February 2026 service plan going into effect was conditioned on Plaintiffs' compliance with the witness requirement; (4) the witness appeared even after consent was revoked; (5) county staff continued to identify "the county lawyers" as the source of the requirement; (6) WCBDD has decided to not conduct required in-person contact visits unless Plaintiffs permit a litigation witness to enter their home; and (7) the same attorney whose role is thus embedded in the dispute now appears as advocate defending the conduct.

If the Court concludes that limited testimony is necessary before ruling, Plaintiffs request a narrowly focused evidentiary hearing directed to the origin, authority, purpose, implementation, and continued enforcement of the litigation witness condition and the December 2 and December 16 directives. Plaintiffs do not seek a fishing expedition. Plaintiffs seek a fair boundary between factual actor and advocate.

14

**CONCLUSION**

Defendants' opposition does not solve the ethical problem presented by this case. It confirms it.  Defendants insist that Horvath was acting as counsel at every relevant moment. Plaintiffs agree. That is precisely why the Rules of Professional Conduct matter. When a lawyer's own actions, directives, and judgments become part of the disputed facts, and when the client may need detached advice about how to defend or distance itself from those actions, the lawyer cannot continue as unconflicted counsel.

Defendants' brief treats privilege as a talisman, government-lawyer status as immunity, and the absence of a claim against Horvath as dispositive. None of those propositions is correct. Privilege does not erase operative facts. Government lawyers are not exempt from Rule 3.7; Ohio has a specific provision addressing them. And Rule 1.7 does not require that counsel be a named defendant before counsel's own interests materially limit her representation. There was no statute authorizing the litigation witness requirement. There was no regulation requiring it. There was no pre-existing policy. There was a lawsuit, and there was "[o]n my advice."

The challenged condition is not hypothetical or historical; it remains in force and continues to affect Plaintiffs' Medicaid waiver service administration as WCBDD is not conducting the in-person contact visits required by OAC 5160-44-32(E)(2)(g). For all of the foregoing reasons, and for the reasons set forth in Plaintiffs' Motion to Disqualify, Plaintiffs respectfully request that the Court grant the Motion to Disqualify Attorney Kathryn Horvath as counsel for Defendants. In the alternative, Plaintiffs request an order barring Attorney Horvath from serving as trial counsel or from acting as advocate at any evidentiary hearing at which she is likely to be a necessary witness.

15

Respectfully submitted,

/s/ Michela Huth
**MICHELA HUTH**
(Reg. No. 0091353)
257 Canal Street, SE
Bolivar, OH 44612
Ph: 330-440-4027
michelahuth.esq@gmail.com

/s/ Richard Rosenthal
**RICHARD BRUCE ROSENTHAL**
*Pro Hac Vice*
545 E. Jericho Turnpike
Huntington Station, NY 11746
Ph: (631) 629-8111
richard@thedoglawyer.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of May, 2026, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, and that said filing will be served via the

Court's CM/ECF system upon all counsel of record.

/s/ Michela Huth
MICHELA HUTH

16