## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| M.S., LINDSEY SODANO, and JUSTIN SODANO | CASE NO. 1:25-cv-00910 |
| Plaintiffs, | JUDGE JEFFREY P. HOPKINS |
| vs. | MAGISTRATE JUDGE STEPHANIE BOWMAN |
| WARREN COUNTY BOARD OF DEVELOPMENTAL DISABILITIES, MEGAN MANUEL, TONY HIDY, KATHRYN HORVATH, PATRICK POTEET, SARAH LINDEEN, and LAURA HATHAWAY | JURY DEMAND ENDORSED HEREON |
| Defendants. | |

## SECOND AMENDED COMPLAINT WITH JURY DEMAND

Plaintiffs M.S., by and through her parents and natural guardians, Lindsey Sodano and Justin Sodano, Lindsey Sodano, individually and as the parent of M.S., and Justin Sodano, individually, and as the parent of M.S., for their Second Amended Complaint against the above-named Defendants, Warren County Board of Developmental Disabilities, Megan Manuel, Tony Hidy, Sarah Lindeen, Laura Hathaway, Patrick Poteet, and Kathryn Horvath, state and aver the following:

## NATURE OF THE CASE

M.S. is a seventeen-year-old girl with a rare neurogenetic disorder and traumatic brain injury, nonverbal and dependent on others for every activity of daily living. Her parents are her trained, agency-employed Medicaid waiver caregivers. The Warren County Board of Developmental Disabilities' ("WCBDD") own service plan states that "the best thing that ever happened" to M.S. is "[h]aving her parents be her provider."

1

Plaintiffs sued WCBDD over its demand for a recurring search to replace those parents as care workers, a requirement appearing in no statute or regulation. When sued, WCBDD escalated.  Soon thereafter, on December 29, 2025, Defendants' counsel transmitted to Plaintiffs' counsel an email chain that had been materially altered by Defendant Manuel. (ECF No. 33-1 at PageID 526-528; ECF No. 33-2 at PageID 529-533). Among Manuel's deletions was the DODD Deputy Director's characterization of the parent provider replacement search guidance as a "recommend[ation]," not a requirement. Relying on the altered document, Plaintiffs refrained from seeking a temporary restraining order. Everything below followed from that decision.

On January 27, 2026, over Plaintiffs' express written objection, WCBDD published M.S.'s age, weight, city, diagnoses, and intimate care needs, including diapering, bathing, and menstrual care, to the OnSeen LiveCARE Marketplace, reaching 392 third parties. Ohio law makes such a release without written parental consent a first-degree misdemeanor. R.C. 5126.044(B); 5126.99(A). The search produced no provider and changed nothing. When it ended, defense counsel asked: "Are you going to be dismissing the case given the above?"

WCBDD also conditioned M.S.'s service plan on a litigation "witness" entering the family's home, telling Plaintiffs their objection "cannot continue." Asked in discovery to produce documents concerning any other family ever told they "may not dictate who enters their home," Defendants answered: "none other than Plaintiffs."

Plaintiffs bring this action under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments, the ADA, Section 504, and the Fair Housing Act.

2

**JURISDICTION AND VENUE**

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under federal law, and under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of constitutional and federal statutory rights under color of state law.

2.      This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

3.      All events giving rise to this action occurred in Warren County, Ohio, and all Defendants reside or are employed in this district.

4.      Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this judicial district and Defendants reside or are employed here.

**PARTIES**

5.      Plaintiff M.S. is a qualified individual with disabilities under the ADA. She is a seventeen-year-old minor with profound disabilities, including STXBP1-DEE and a traumatic brain injury. M.S. is wholly dependent on direct care workers[1] for all activities of daily living, behavioral support, and seizure care.

6.      Plaintiff Lindsey Sodano is the mother and natural guardian of M.S. She resides in Warren County, Ohio with her daughter M.S. and other family members. She is an agency-employed direct care worker who provides a portion of M.S.'s authorized care hours.  Lindsey Sodano is a Plaintiff in this action both individually and as the parent of Plaintiff M.S.

---

[1] "Direct care worker," according to Ohio Administrative Code 5160-44-32, "refers to the person providing hands on care to an individual receiving a medicaid [sic] 1915(c) waiver program service."

3

7. Plaintiff Justin Sodano is the father and natural guardian of M.S.  He resides in Warren County, Ohio with his daughter M.S. and other family members. He is an agency-employed direct care worker who provides a portion of M.S.'s authorized care hours. Justin Sodano is a Plaintiff in this action both individually and as the parent of Plaintiff M.S.

8. Defendant Warren County Board of Developmental Disabilities ("WCBDD") is a county agency responsible for administering Medicaid HCBS waiver services and implementing person-centered service plans. WCBDD is a political subdivision, a public entity under the ADA, and received federal funding under Section 504. WCBDD is a "person" under 42 U.S.C. § 1983.  At all relevant times, this Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983. WCBDD is not an extension or local office of the Ohio Department of Developmental Disabilities (DODD), or any other state entity.  WCBDD is an independent local governmental actor responsible for its own actions, policies, customs, and constitutional compliance.

9. Defendant Megan Manuel is the Superintendent of WCBDD. She is responsible for the administration of WCBDD and for agency-wide policy and operational decisions. Plaintiffs allege that she personally created, participated in, approved, authorized, and/or ratified actions challenged in this Complaint. She is a final policymaker as it pertains to the challenged matters as set forth in this Complaint.  Megan Manuel is a "person" under 42 U.S.C. § 1983.  At all relevant times, she acted under color of law and is a state actor.  She is being sued in both her individual and official capacities.

10. Defendant Tony Hidy is the Director of Service and Support Administration. He supervises service and support administration activities and personnel. Plaintiffs allege that he personally created, participated in, directed, authorized, and/or enforced actions challenged in this Complaint. He is a final policymaker as it pertains to the challenged matters set forth in this

4

Complaint.  Tony Hidy is a "person" under 42 U.S.C. § 1983.  At all relevant times, he acted under color of state law within the meaning of 42 U.S.C. § 1983.  He is being sued in both his individual and official capacities.

11.     Defendant Kathryn Horvath is an Assistant Prosecuting Attorney for Warren County, Ohio and, at all relevant times, served as legal counsel to WCBDD pursuant to Ohio law. Plaintiffs allege that Horvath personally created, participated in, directed, authorized, communicated, and/or enforced certain actions challenged in this Complaint. Kathryn Horvath is a "person" under 42 U.S.C. § 1983. At all relevant times, she acted under color of state law within the meaning of 42 U.S.C. § 1983. She is being sued in both her individual and official capacities.

12.     Defendant Patrick Poteet is a Service and Support Administrator who was assigned to M.S. during some of the events described in this Complaint. Poteet personally participated in, directed, authorized, and/or enforced actions challenged in this Complaint. Patrick Poteet is a "person" under 42 U.S.C. § 1983.  At all relevant times, he acted under color of state law within the meaning of 42 U.S.C. § 1983. He is being sued in both his individual and official capacities.

13.     Defendant Sarah Lindeen supervises SSAs assigned to M.S. Sarah Lindeen is a "person" under 42 U.S.C. § 1983.  At all relevant times, she acted under color of state law within the meaning of 42 U.S.C. § 1983. She is being sued in both her individual and official capacities.

14.     Defendant Laura Hathaway is a Service and Support Administrator who was assigned to M.S. during some of the events described in this Complaint. Hathaway personally participated in, directed, authorized, and/or enforced actions challenged in this Complaint. Laura Hathaway is a "person" under 42 U.S.C. § 1983.  At all relevant times, she acted under color of state law

5

within the meaning of 42 U.S.C. § 1983. She is being sued in both her individual and official capacities.

## FACTS REGARDING M.S. AND HER RIGHTS AND SERVICES

### I.     M.S. and Her Parents

15.     M.S. is a seventeen-year-old girl who lives with her parents in Warren County, Ohio.

16.     M.S. has a rare neurogenetic disorder, is nonverbal, and requires close and constant hands-on assistance with essentially every activity of daily living.

17.     In 2017, while in the care of a non-family caregiver, M.S. suffered a skull fracture, a brain hemorrhage, and a permanent traumatic brain injury.

18.     M.S. is enrolled in Ohio's Individual Options Medicaid waiver (0231.R06.00[2]) and qualifies for Medicaid waiver services at an intermediate care facility ("ICF") level of care.

19.     M.S.'s Individual Service Plan (ISP) documents the following risks: falling, elopement, self-injury, choking, disruptive behaviors, and seizure activity.

20.     WCBDD also documented in M.S.'s ISP: "temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

21.     Plaintiffs Lindsey Sodano and Justin Sodano are M.S.'s parents and her trained, certified, agency-employed Medicaid waiver direct care workers.

22.     Plaintiffs Lindsey Sodano and Justin Sodano are W-2 employees of a private care agency and have never billed Medicaid.

23.     Defendants admitted in their Answer to Plaintiffs' First Amended Complaint that "At no time has Defendant WCBDD ever indicated in any form or manner that either parent is

---

[2] The full text of the Individual Options waiver is available for download at the following link: https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/82836

unwilling, unable, unqualified, or unsafe to provide services." (*See* ECF No. 14 and PageID 179 and ECF No. 22 at PageID 382).

## II.      Protections for M.S. and Limitations on Defendants' Authority

24.      According to the CMS-approved Individual Options Waiver, the Ohio Revised Code, and the Ohio Administrative Code, including the provisions identified in the Counts below, M.S. has the following rights.

25.      M.S. has the right to not have her identity or records disclosed by a county board without her parents' written approval (R.C. 5126.044(B); R.C. 5126.99(A)).

26.      M.S. has the right that, if WCBDD personnel want to share her personal information with anyone not employed by WCBDD, they must obtain written permission first. (WCBDD Privacy Policy).

27.      M.S.'s service plan in effect during the events of this case, and signed by Plaintiff Lindsey Sodano, Defendant Hathaway, and Defendant Lindeen, states that M.S.'s records "are protected by Federal and Ohio Law governing confidentiality rules, and cannot be disclosed without written consent".

28.      M.S. has the rights to be treated with courtesy, respect, and dignity; to privacy; to be treated equally as a citizen under the law; to participate in decisions that affect her life; to select a parent to act on her behalf; to confidential treatment of all information in her personal and medical records; and to voice grievances without coercion or reprisal. (R.C. 5123.62(A), (H), (N), (Q), (R), (T), (U).)

29.      M.S. has the right to choose her providers from all qualified and willing providers. (IO Waiver, Appendix D-1.)

30. M.S. has the right to choose the services and supports she receives in her home, and to choose who provides them. (IO Waiver, Appendix C-5.)

31. M.S. has the right to select who is included in her person-centered service planning process; no one else, including Defendants, holds that right. (IO Waiver, Appendix D-1.)

32. When any decision denies M.S. the choice of a qualified and willing provider, or changes her enrollment, services, or service plan, she must be afforded Medicaid due process, including prior written notice of the proposed action and the right to a state hearing. (IO Waiver, Appendix F; Appendix F-1; 42 C.F.R. Part 431, Subpart E.)

33. Defendant WCBDD possesses only the powers and authority expressly granted to it by statute or necessarily implied therefrom, and any doubt as to its authority for a contemplated action is to be resolved against the exercise of that authority.

34. None of Defendants' challenged conduct described in this Complaint was authorized by any statute, properly promulgated rule, or provision of the CMS-approved IO Waiver.

**III. In 2022, Defendants Responded to M.S.'s Increased Funding Score by Challenging Test Answers and Researching Institutions that "Take Children"**

35. On October 24, 2022, WCBDD SSA Julie Miller completed M.S.'s Ohio Developmental Disabilities Profile ("ODDP"), a standardized funding assessment, with Plaintiff Lindsey Sodano; the instrument electronically generated a Level 9 score, the highest funding level, up from M.S.'s prior score of 2.

36. SSA Miller stated she could not submit the score the test automatically generated because WCBDD fiscal staff would "question" it and WCBDD leadership approval would be required first.

37. One day after SSA Miller informed Defendant Lindeen of the higher score, WCBDD Residential Options Coordinator Lori Carr documented a request from an SSA "requesting

assistance with ICF's that take children," and on November 10, 2022, Ms. Carr "compiled [a] list of icf open beds throughout the state" for M.S. and "emailed this to [M.S.'s] ssa to share with the team."

38.    During the same period, Defendant Lindeen requested the draft assessment for review and, with Defendant Hidy, neither of whom has ever met M.S., participated in internal meetings challenging M.S.'s responses on specific ODDP questions that affect the score, including her longstanding and medically documented wheelchair use; these changes lowered the score from 9 to 6.

39.    Plaintiff Lindsey Sodano objected and escalated the matter to then-DODD Director Kimberly Hauck, after which WCBDD submitted the score of 9 generated by the test's scoring algorithm.

40.    Plaintiffs never requested an ICF placement for M.S., did not know WCBDD was researching one, and learned of Ms. Carr's search for "ICF's that take children" for the first time through discovery in this lawsuit.

41.    Thus, when M.S.'s assessed needs rose to the highest level, Defendants moved to reduce the recorded score and to locate an institution that would take her, without telling Plaintiffs, and submitted the correct score only after Plaintiff Lindsey Sodano escalated outside WCBDD.

## FACTS REGARDING WCBDD'S PARENT REPLACEMENT POLICY

### IV.    WCBDD's Parent Replacement Policy

42.    The process whereby Defendant WCBDD's searches for a provider to replace some or all of the authorized direct care hours that a minor child's parent currently provides is hereinafter referred to as the "parent replacement policy".

43.     As revealed to Plaintiffs by Defendants, and as experienced by Plaintiffs, WCBDD's parent replacement policy requires the following.

44.     WCBDD requires the child to be advertised on an online portal or marketplace, even if the parent objects in writing, for the purpose of attracting an "able and willing" provider to take over the child's authorized care hours.

45.     The advertisement must be posted for 15 days (as of 2024) or one week (as of 2026).

46.     WCBDD allows the applicants themselves to decide whether they will be permitted to interact in person with the minor child: "Whoever wants to interview, can interview when [M.S.] is home, as they will need to interact with her." (SSA Miller, January 8, 2024.)

47.     Applicants may request and WCBDD will send a copy of the child's county board records without consent of the parent: "If Provider requests, service description is given to the Provider within three (3) business days of the request." (WCBDD Form SSF-116[3].)

48.     WCBDD's policy allows the applicants to self-declare whether they are "able and willing" to replace the child's parents as providers; WCBDD defines an "able and willing" provider as "one that can provide all or a portion of the hours." (WCBDD Form SSF-116.)

49.     If the family refuses to hire the self-declared "able and willing" provider, under WCBDD's policy, the parent may no longer be the child's provider.

---

[3] Form SSF-116, effective February 2024, contains substantial portions of WCBDD's parent replacement policy and materially differs from the DODD FAQ Defendants repeatedly identify as the source of the challenged requirements. Plaintiffs first received SSF-116 in discovery in response to requests concerning provider searches. Before that production, Defendants had never provided or identified the form, despite Plaintiffs' repeated requests since January 2024 for the basis, scope, and requirements of WCBDD's policy. The form is not made available to the individuals and families governed by it, and Plaintiffs did not learn of its existence until discovery in this litigation.

50.     WCBDD's parent replacement process is mandatory; if the parent refuses or objects, WCBDD proceeds with posting the minor child online anyway, and the provider search must occur prior to the child's upcoming service plan going into effect.

51.     WCBDD requires the parent replacement process to repeat every six months (as of 2024) or annually (as of 2026).

52.      WCBDD does not provide appeal rights at any point in the process.

53.     This parent replacement policy appears in no federal regulation, no Ohio statute, and no provision of the Ohio Administrative Code, and has no official name.

54.     Defendants have referred to the parent replacement policy variously as "its practice of conducting and documenting a periodic search for a willing and able provider," "the EC Rule," the "parent of minor child rule," the "required 4-6 month provider check," and "The Extraordinary Care act[4]," among other names.

55.     According to ODM, WCBDD served approximately 767 waiver recipients in 2025, and according to Defendant Hathaway, approximately 10 to 12 of those recipients were subject to the parent replacement policy.

56.     Adult waiver recipients with parent providers, adult waiver recipients with non-parent providers, and minor waiver recipients with non-parent providers are not subject to recurring mandatory searches to replace their freely chosen care providers.

57.     The requirements, timelines, procedures, and consequences of the parent replacement policy changed substantially between 2024 and 2026, and Defendants have never provided Plaintiffs any single document setting them forth.

---

[4] There is no such law or act as "The Extraordinary Care Act."

11

**V.      Defendants Have Advertised M.S. Online Three Times Since 2024**

58.     The *third* parent replacement search is the focus of this Complaint and will be discussed in detail further below. The facts regarding the first and second parent replacement searches are set forth in this section.

**A.  Parent Replacement Search 1 – January of 2024**

59.     On or about January 2, 2024, Defendant WCBDD posted the first advertisement of M.S. to its online portal, where approximately 46 strangers viewed it.

60.     Plaintiff Lindsey Sodano wrote the January 2024 advertisement of M.S. solely because Defendants and DODD asserted the posting was legally required and that refusal would cost M.S. her parents as providers.

61.     Approximately eleven applicants replied that they were interested in M.S., which under WCBDD's process entitled each of them to an in-person interaction with M.S.

62.     SSA Miller instructed: "Whoever wants to interview, can interview when [M.S.] is home, as they will need to interact with her."

63.     Defendants applied no screening criteria before declaring applicants entitled to interact in person with a nonverbal, medically fragile minor girl.

64.     SSA Miller repeatedly stated that she could tell the applicants had not read the advertisement before applying.

65.     Only one applicant used a business email address, one had no history of providing any Medicaid-funded services in Ohio, and one had documented compliance citations for failing to run criminal background checks on its care workers.

66. Plaintiff Lindsey Sodano contacted the applicants with further information regarding M.S., in the hope that those who were not truly "willing and able" would screen themselves out and Defendants would not mandate M.S. to "interact with" them in person.

67. One applicant, Blissful Days Management, conditioned its interest on the Sodano family personally paying an additional staff member $15 per hour out of pocket.

68. SSA Miller called the Blissful Days proposal "inappropriate" and reported the company to the provider compliance department.

69. Defendant Hidy nevertheless insisted that Blissful Days remain on the list of providers who could potentially claim a portion of M.S.'s care hours.

70. The parent replacement process continued for approximately twenty-eight days and generated more than seventy emails.

71. Defendant Hidy declared the search to be over only after Plaintiff Lindsey Sodano escalated the matter to then-DODD Director Kimberly Hauck.

### B. Parent Replacement Search 2 – Late 2024

72. Following Search 1, Plaintiffs attempted to satisfy the recurring search requirement by conducting their own discreet provider search and hiring a non-family caregiver, who then took over a portion of M.S.'s authorized care hours.

73. Defendant Hidy nevertheless asserted, "I am of the opinion that re-engaging the provider search process is required based upon the following taking [sic] from the *Frequently Asked Questions around Ohio Admin. Code 5123-44-32* document dated November 20, 2023." (Emphasis original).

13

74. When Plaintiff Lindsey Sodano challenged the requirement, then-DODD Deputy Director Lyndsay Nash wrote on August 28, 2024: "the rule and the associated FAQs **require** a new provider search." (Emphasis added).

75. Thus, believing the online advertisement of M.S. was required, Plaintiff Lindsey Sodano wrote the advertisement of M.S. again.

76. Defendant Hathaway, M.S.'s SSA at the time, assured Plaintiffs: "I would never publish a provider request for [M.S.] without your knowledge or consent."

77. Defendant Hathaway, told Plaintiffs on October 9, 2024: "Fingers crossed no one responds."

78. Defendant Hathaway stated: "We're gonna do it every six months until she turns 18, and check the box."

79. Defendant Hathaway stated: "You take care of [M.S.] the best… I don't have any concerns" and "I don't care that you're her provider."

80. Regarding the applicant pool, Defendant Hathaway stated: "There's gonna be some weird ones," "They just say yes to everything," and regarding one particular applicant, "They've got a sketchy past."

81. Regarding Ohio's abuser registry, Defendant Hathaway stated: "It's awful ... I mean, you gotta rip somebody off, God, millions of dollars or essentially kill them before they put you on [the abuser registry]… it takes you five years to get on there."

82. On November 18, 2024, Defendant Hathaway told Plaintiffs she would "work the system," stated she would "try and get [the applicants] to a no, because what's the point?", and described the search as "a lot of busy work for nothing to come."

14

83.     Nevertheless, Defendant Hathaway's case notes confirm she shared M.S.'s "information" with at least ten third parties, including ATES Healthcare Services, LLC.

84.     ATES obtained information about M.S. by simply replying "yes" to Defendant Hathaway's email; at the time, ATES's website listed its business address as "123 Main Street, Anytown, USA" and its phone number as "1-800-123-4567."

85.     Defendant Hathaway later noted in her case notes: "SSA received call from ATES Healthcare services… they received an email from [M.S.'s] mom about provider request, they felt it was very condescending and aggressive."

86.     On December 3, 2024, Defendant Hathaway informed Plaintiffs: "We don't have a willing and able provider."

87.     Thus, after two online advertisements of M.S., the only provider actually hired was the one Plaintiffs *themselves* hired outside of WCBDD's parent replacement policy.

**VI.     No Statute or Administrative Rule Sets Forth WCBDD's Parent Replacement Policy, and DODD Told the Supreme Court of Ohio the Searches Are Not Mandatory**

88.     Between 2024 and 2026, Defendants have cited many different and shifting authorities for the parent replacement policy, including Defendant Hidy, Defendant Manuel,  a "choice" made by Defendant Manuel and "attorney," "DODD's guidance," "an administrative discussion," an online FAQ webpage, "general accountability principles in the local administration of Medicaid dollars," unspecified authority expressed in the passive voice: "The Board is not permitted to…", and a WCBDD-DODD email chain that Defendant Manuel admits to have altered (as explained further below).

89.     Upon information and belief, the "attorney" who made the "choice" with Defendant Manuel is Defendant Horvath.

15

90.     The only state or federal regulations Defendants have ever cited as the basis for the parent replacement policy are OAC 5160-44-32 and 42 C.F.R. 441.301; neither of these sets forth the parent replacement policy as enforced by WCBDD.

91.     OAC 5160-44-32(E)(1) provides in full: "A parent of a minor child, or the spouse of an individual may only provide HCBS waiver services to an individual if both of the following conditions are met: (a) There is no other willing and able provider or direct care worker available to provide the HCBS waiver services to the individual. (b) ODM, ODA, DODD, or their designee has determined the health and safety needs of the individual can be ensured."

92.     OAC 5160-44-32 contains no authority related to advertising minor children online, posting a child to an online marketplace, recurring or annual provider searches, expiration of a parent's provider eligibility once established, providers self-declaring themselves "able and willing," requiring the child to "interact" with applicants, defining "able and willing" as "one that can provide all or a portion of the hours" or disclosure of a minor child's information to third parties over the parents' written objection.

93.     42 C.F.R. 441.301 does not reference providers or provider searches at all.

94.     Defendants have also cited a DODD online FAQ webpage ("DODD FAQ") first published in November 2023, which stated that "DODD expects that each [county] Board would re-engage the provider search process every four to six months."

95.     Throughout 2024, both DODD and WCBDD officials characterized the DODD FAQ's requirements as mandatory.

96.     In December 2024, Plaintiffs M.S. and Lindsey Sodano, with other Ohio families, filed a mandamus action in the Supreme Court of Ohio challenging DODD's enforcement of the FAQ as

if it were law. See *State ex rel. Sodano v. Ohio Dep't of Developmental Disabilities, No. 2024-1724 (Ohio).*

97.     In its January 23, 2025 Motion to Dismiss, DODD represented to the Court:

     a. "The words [requiring parent replacement] are advisory on their face."
     b. "The FAQ does not use 'shall' or 'must.'"
     c. "The word 'expect' is aspirational rather than mandatory."
     d. "[The FAQ's] guidance is aspirational rather than mandatory."
     e. "OAC 5160-44-32 does not set a time frame when a county board of developmental disabilities should reassess whether there are any willing and able providers."
     f. "The FAQ is a quintessential example of a guidance document."
     g. "Adm.Code 5160-44-32(E) does not set a time frame when a county board of developmental disabilities should reassess whether there are any willing and able providers."
     h. "With or without the guidance from the FAQ, county boards are exercising their own discretion when to require the reassessment."

98.     DODD thus conceded to Ohio's highest court that no rule requires recurring parent replacement searches.

99.     On March 24, 2025, DODD posted a revised FAQ changing the search expectation from "4 to 6 months" to "annually," and the mandamus case was therefore mooted and dismissed.

100.     After *this* lawsuit was filed, DODD removed the FAQ as a downloadable publication and replaced it with regular website text; as of July 2026, the FAQ web page in the screenshot below cites "OAC 5123-44-32" as authority for provider searches; "OAC 5123-44-32" does not exist in the Ohio Administrative Code.



YOU & YOUR FAMILY     SUPPORTING PROVIDERS     COUNTY BOARDS     FORMS & RULES

You will work with the county board to locate available providers within your county who can provide all or a portion of the hours. If the provider search is not successful, meaning a provider cannot be found, or, if found, cannot provide all the hours needed, the parent can decide if they would like to be considered as the provider for their minor child or spouse, pursuant to Ohio Administrative Code 5123-44-32.

17

101.    Every parent replacement search Defendants conducted or demanded, including the search culminating in the unauthorized LiveCARE Marketplace posting of M.S. as described below, was unlawful.

**VII.    After Plaintiffs Objected in Writing to Any Further Parent Replacement Searches, DODD Told Defendants Manuel and Hidy the Search Was Only a Recommendation**

102.    Defendant SSA Hathaway informed Plaintiff Lindsey Sodano on August 27, 2025 that WCBDD would conduct another parent replacement search for M.S. in the fall.

103.    On September 23, 2025, Plaintiff Lindsey Sodano emailed Defendant Hathaway a formal written objection to any further parent replacement searches, quoting, linking, and attaching DODD's admissions to the Supreme Court of Ohio that the searches are not mandatory.

104.    Defendant Hathaway forwarded the objection to Defendant Hidy that day, and Defendant Hidy forwarded it to Defendant Manuel on September 24, 2025.

105.    On October 1, 2025, Defendant Manuel forwarded Plaintiff Lindsey Sodano's objection to DODD Deputy Director Allan Showalter and DODD Director Lyndsay Nash, copying Defendant Hidy, writing: "I wanted to get your input on this, as we would be following DODD's guidance in doing the search."

106.    On October 8, 2025, Deputy Director Showalter replied by email:

> We've discussed and recommend the board follow DODD's guidance in our updated FAQ's related to 5160-44-32. I don't think you need to engage with the threat of a lawsuit but just share that you will follow our published guidance and conduct the provider search annually to align with 42 CFR 441.301.

107.    Thus, as of October 8, 2025, Defendants Manuel and Hidy possessed DODD's written confirmation, consistent with DODD's admissions to the Supreme Court of Ohio, that the search was a "recommend[ation]" in DODD's "guidance", not a legal requirement.

18

108.    Defendant Manuel later altered[5] the email chain, removing Mr. Showalter's October 8 message and other content, and sent the altered version to Attorney Abshier, who then sent it to Plaintiffs' counsel, as described in further detail below. (ECF No. 33-1 at PageID 526-528; ECF No. 33-2 at PageID 529-533).

109.    During an October 24, 2025 meeting, Defendant SSA Hathaway stated the following regarding the upcoming parent replacement search:

> I think for us, because you guys aren't the only ones-- I think we have 10 or 12 [minors with parent care workers in Warren County]***
>
> So it went above Tony [Hidy]. Tony was like, "I'm gonna let, like, Megan [Manuel] make this decision, and we will follow the protocol," you know, for everyone gets the same. ***

110.    Defendants' privilege log identifies Defendant Horvath as a participant in an eight-email conversation with Defendant Manuel concerning the WCBDD-DODD email chain between October 9, 2025 and December 2, 2025.

111.    Whether Defendant Horvath received the complete and unaltered email chain, including Mr. Showalter's full October 8 message, or an altered version is a fact known only to Defendants Horvath and Manuel.

**VIII.  Despite DODD's October 8 Recommended Guidance Email, Defendants Told Plaintiffs the Parent Replacement Search was Required**

112.    On November 18, 2025, Defendant Hidy announced, through Defendant Hathaway, that "[a]n administrative discussion took place" and WCBDD "will continue to follow the Ohio Department of Developmental Disabilities' guidance" from its FAQ page.

---

[5] Plaintiffs previously advised the Court that an extension to file this Second Amended Complaint might be necessary because the identity of the person who altered the email string was unknown. (See ECF No. 33). Defendant Manuel's July 15, 2026 RFA responses admitted that she made the alterations, permitting Plaintiffs to complete this amendment.

113.    That same day, Plaintiff Lindsey Sodano emailed Defendants Hathaway, Lindeen, Hidy, and Manuel: "Please let me know what will happen if I refuse to participate in this third unlawful provider replacement search."

114.    On November 24, 2025, Plaintiffs' counsel sent the Board a written pre-litigation notice, addressed to Defendants Manuel, Hidy, Lindeen, and Hathaway, stating that the parent replacement search lacked any basis in statute or rule, quoting DODD's admissions to the Supreme Court of Ohio, invoking the ADA, Section 504, and the Fair Housing Act by name, and noting that M.S. would turn eighteen within months, after which the policy would no longer apply to her, so that the search would displace her trained caregivers with strangers for only a brief period before the requirement expired by its own terms. The letter requested that the Board confirm by December 3, 2025 whether it intended to proceed.

115.    In a December 2, 2025 letter to Plaintiffs' counsel, Defendant Horvath wrote that the Board "has no intention of veering from its practice," and that "[i]f your client refuses the annual review, the Board is not permitted to authorize Mr. and Mrs. Sodano to continue to bill for Medicaid dollars as parent providers."

116.    On December 16, 2025, six days after this lawsuit was filed, Defendant Horvath emailed Plaintiffs' counsel, copying Plaintiff Lindsey Sodano, a represented party, asserting that Plaintiffs were "attempting to dictate" WCBDD's statutory functions, that "[t]hat cannot continue," and that a "provider search" was among the steps WCBDD "must complete" before M.S.'s OISP could go into effect on February 19, 2026.

117.    Defendant Horvath's December 2 and December 16, 2025 assertions of a mandatory search were contradicted by DODD's October 8, 2025 email, DODD's admissions to the Supreme Court of Ohio, and the text of OAC 5160-44-32 itself.

**IX.    Defendant Manuel Asked DODD What 'Ramifications' She Could Enforce if Plaintiffs Refused to Comply**

118.    On November 21, 2025, Defendant Manuel emailed Deputy Director Showalter and Director Nash, copying Defendant Hidy: "What are the ramifications if someone refuses to go through the provider search process annually?… Will they no longer be able to be authorized to provide the service? Do we proceed without them?"

119.    Manuel's November 21 email opened: "Thank you for your response on this. Unfortunately, I have another question for you," thus confirming her receipt of Showalter's October 8 email.

120.    No DODD official responded to Defendant Manuel's November 21 email for eleven days. Manuel wrote again on December 1, 2025: "Since sending this email to you, we have received notification from their attorney with threats of litigation. Our prosecutor's office is involved, and we will be discussing with the board tonight at our board meeting, so I would like to let them know where we are with that question."

121.    In the same email, Defendant Manuel wrote: "I don't feel we as the county board have the answer to that question, since we are following the rule/DODD guidance."

122.    On December 2, 2025, Deputy Director Showalter replied that the board "should not authorize the parent as the provider unless a new provider search is completed, assuming we have the parent's refusal to participate in the annual provider search or accept the results in writing," and that the board "should also ensure there is documentation showing that the individual or parents were aware of the requirement in OAC 5160-44-32(E)(1)(a) and that they know the county board is available to assist with finding providers if assistance is wanted."

123.    Deputy Director Showalter's December 2 email did not advise Defendant Manuel or Defendant WCBDD to advertise M.S. online without consent, post her records on an online

21

marketplace, or disclose her information on third parties against her parents' written objection, and it did not cite anything in OAC 5160-44-32(E)(1)(a) that requires any of those actions.

124. Defendant Horvath's December 2, 2025 letter asserting the Board "is not permitted" to authorize the parents to "continue to bill for Medicaid dollars" asserted a penalty that does not apply to Plaintiffs, since Plaintiffs do not bill Medicaid.

125. Plaintiffs asked Defendant Horvath for clarification in a December 4 letter, but she did not respond.

126. Plaintiffs filed this action on December 10, 2025.

127. On December 11, 2025, Defendant Hathaway recorded in her case notes: "The board has determined that [the provider search] has to be completed and we cannot skip it."

## X. Defendant Manuel Materially Altered the WCBDD-DODD Email Chain, Which Was Then Sent to Plaintiffs' Counsel

128. On December 19, 2025, Plaintiffs informed Defense counsel that they were preparing to seek a temporary restraining order ("TRO") to stop the provider search. To avoid the expense of emergency motion practice, Plaintiffs proposed that the parties confer about "hold[ing] this search in abeyance during this litigation." The subject line of Plaintiffs' email was "M.S. v. Warren County Board of DD."

129. Defendants' privilege log shows an email with the subject line "FW: M.S. v. Warren County Board of DD" from Defendant Horvath to Defendant Manuel on December 19.

130. On December 23, 2025, Defendant Manuel then made three material alterations to the WCBDD-DODD email chain and sent the altered version to Attorney Abshier, copying Defendant Horvath, Defendant Hidy, and Attorney Valentine. (ECF No. 33-1 at PageID 526-528; ECF No. 33-2 at PageID 529-533).

22

131.    Defendants' privilege log describes Manuel's December 23, 2025 email as a communication concerning "gathering facts at counsel's request in defense of litigation."

132.    In response to Plaintiffs' Requests for Admission, Defendant Manuel formally admitted that she made the following three alterations and sent the altered document to Attorney Abshier.

133.    First, Defendant Manuel admitted that she removed the following from the middle of her December 1, 2025 email, and the surrounding text was moved together so that no gap appears:

> Since sending this email to you, we have received notification from their attorney with threats of litigation. Our prosecutor's office is involved, and we will be discussing with the board tonight at our board meeting, so I would like to let them know where we are with that question.

134.    Second, Defendant Manuel admitted that she deleted the opening sentences of her November 21, 2025 email: "Thank you for your response on this. Unfortunately, I have another question for you." These deleted sentences disclosed that Manuel's November 21 email was a reply to earlier correspondence, rather than the beginning of an email exchange.

135.    Third, Defendant Manuel admitted that she removed three entire emails from the lower portion of the chain:

> a. Deputy Director Showalter's October 8, 2025 email stating, "We've discussed and recommend the board follow DODD's guidance";
> b. Defendant Manuel's October 1, 2025 forwarding email revealing advice she received from OACB CEO Adam Herman; and
> c. Plaintiff Lindsey Sodano's September 23, 2025 written objection, which cited the admissions DODD had made to the Supreme Court of Ohio with a quote, link, and screenshot.

136.    Manuel did not identify any of her deletions with ellipses, brackets, redaction markings, explanatory text, or any other notation indicating that any material had been removed. The remaining text retained ordinary email formatting and appeared facially continuous.

23

137.    Manuel's three alterations therefore concealed that: (a) DODD had characterized following its "guidance" as a "recommend[ation]"; (b) Manuel had received Plaintiff Lindsey Sodano's written objection and the citations to the mandamus case and forwarded it to DODD senior leaders; (c) Manuel's later inquiry was a follow up that arose in the context of threatened litigation; (d) the prosecutor's office was involved; and (e) Manuel intended to discuss the matter with the board.

138.    Defendant Manuel's alterations to the WCBDD-DODD email chain made the correspondence appear to be Manuel asking DODD a straightforward question and receiving a conditional response.

139.    Ohio and federal law prohibit the alteration, concealment, or destruction of government records and evidence under specified circumstances relating to official proceedings. Plaintiffs do not seek relief under these criminal statutes or ask the Court to determine criminal liability. Rather, Plaintiffs cite them because they reflect the public policy judgment of the Ohio General Assembly and Congress that such conduct is fundamentally improper and incompatible with the integrity of judicial proceedings, and therefore cannot reasonably be characterized as routine, innocuous, or consistent with accepted governmental practice. See Ohio Rev. Code §§ 2913.42(A)(1), 2921.12(A)(1); 18 U.S.C. § 1512(c)(1).

140.    Attorney Abshier received Defendant Manuel's altered document on December 23. During a December 26, 2025 phone call, Attorney Abshier told Plaintiffs' counsel that he possessed an email from DODD stating that the provider searches were required, and he offered to send that email to Plaintiffs' counsel.

24

141.    After Plaintiffs followed up on December 29, 2025, Attorney Abshier forwarded the altered WCBDD-DODD email chain to Plaintiffs' counsel, stating, "Attached is the e-mail. The only thing redacted is their e-mail forwarding the e-mail chain to me."

142.    Upon receipt of the altered document, Plaintiffs believed that it was a complete and unaltered email chain and did not know or suspect that it had been materially altered.

143.    Attorney Abshier later stated that he did not know at the time that the email chain had been altered, and that he provided it to Plaintiffs "to try to resolve the administrative issues occurring at that time."

144.    Relying in part on the altered email chain, Plaintiffs decided not to file the TRO they had drafted.

145.    Had Plaintiffs received the complete and unaltered email chain, or had Defendants provided no email chain at all, Plaintiffs would have filed the TRO.

146.    Because Plaintiffs did not file the TRO, the court had no opportunity to determine whether emergency relief should issue before Defendants posted M.S.'s confidential information online to 392 unauthorized vendors across Ohio. The posting occurred over Plaintiffs' express written objection and cannot now be undone.

147.    Plaintiffs do not know when Attorney Abshier, Attorney Valentine, or any Defendant other than Manuel knew that Manuel had altered the email chain or that it was sent to Plaintiffs' counsel as evidence supporting Defendants' position. Information concerning this knowledge is within Defendants' possession and control.

148.    Defendant Horvath participated in an eight-email exchange bearing a similar subject line to the later-altered email between October 9 and December 2, 2025; Defendant Hidy was copied on the emails in the original chain. Defendant Manuel copied both Horvath and Hidy when she

25

sent the altered chain to Attorney Abshier. Plaintiffs do not presently know whether Horvath or Hidy compared the altered version with the earlier correspondence or otherwise recognized that Manuel's December 23 version had been altered.

149.    Because no Defendant or Defense attorney ever disclosed to Plaintiffs that the document sent to Plaintiffs' counsel on December 29, 2025 had been altered, Plaintiffs reasonably treated the document as an authentic and complete representation of the relevant DODD correspondence for six months.

150.    Plaintiffs relied on the altered document in preparing their First Amended Complaint (ECF No. 14) and their Motion to Disqualify Kathryn Horvath (ECF No. 18), to which the altered document was attached as Exhibit J.

151.    Defendants' initial discovery productions did not include the complete WCBDD-DODD email chain.

152.    While examining documents, Plaintiffs identified a discrepancy and then sent Defendants a deficiency letter demanding the full email chain. Plaintiffs' letter explained, in relevant part, that the "email produced by Defense counsel has 'Re' in its subject line, suggesting that it is part of an ongoing chain."

153.    After receiving Plaintiffs' deficiency letter, Defendants produced the complete, unaltered email chain on June 29, 2026, six months after Attorney Abshier sent the altered version to Plaintiffs' counsel.

**XI.     Defendants Issued an Ultimatum and Plaintiffs Objected in Writing**

154.    On January 16, 2026, before the threatened advertisement of M.S. had been posted, Defendant Poteet signed M.S.'s new ISP designating Plaintiffs as her authorized direct care workers through February 18, 2027, with assigned hours for each parent.

> ** M███ is authorized for 46 hours of 1:1 HPC-POM and 20 hours of 2:1 HPC (1:1 HPC-POM and 1:1HPC) per week. Her POM providers through Peace of Mind Care Services are Justin Sodano and Lindsey Sodano. Erin Stephens is authorized 9 hours per week.
>
> ** Thought the schedule follows a typical week, it should be noted that it can change based on the person's needs, if appropriate, in the event that the family needs to shift their hours to accommodate life changes.

155. Five days later, on January 21, 2026, Attorney Abshier wrote to Plaintiffs' counsel:

> I checked and I was told that your clients still have not authorized the provider search nor provided the parameters for providers as was provided by your clients last year to allow Warren County to run the search. As I have said, they [sic] State has told the county that we cannot do the Extraordinary Care Instrument or put the parents down as providers if the search is not run.

156. The State had told Defendants no such thing; DODD's October 8, 2025 email "recommend[ed]" following "guidance," its December 2, 2025 email advised only that the board "should not authorize" without a documented refusal, and neither message mentioned the "Extraordinary Care Instrument" whatsoever.

157. On January 26, 2026, Plaintiffs' counsel asked Defendants to explain why the Board needed Plaintiffs' authorization to conduct what it claimed was its own legal obligation, to identify any statutory requirement for a new ECI, and asserting that the policy is "violative of the ADA," *inter alia*.

158. Defendants answered none of Plaintiffs' questions.

159. Instead, on January 26, 2026 at 1:27 p.m., Defendants through Attorney Abshier responded to Plaintiffs' counsel:

> Warren County likes to work with the parents and involve them in the search... If they do not want to be involved, that is fine… Unless we hear some objection today, the County is going to move forward with the provider search tomorrow morning.

160. On January 27, 2026 at 10:04 a.m., Plaintiffs' counsel emailed Defendants' Attorneys Abshier and Valentine the following, *inter alia*:

27

a. "Our clients do not consent to the disclosure to third parties of their child's or their own personal, contact, or medical information protected under HIPAA and the [Ohio Disability] Bill of Rights."

b. "If the County elects to proceed with its own provider search using information it already collected regarding M.S. through its service planning and assessment processes, it is doing so unilaterally and not at our clients' request or direction."

c. "Nothing in this correspondence should be construed as consent, authorization, refusal, or waiver of any rights."

d. "If the County chooses to proceed with its own parent replacement search to find temporary workers to replace the parents for the next several months, it is doing so on its own initiative and under its own asserted authority."

161. Defendants did not respond to Plaintiffs' objection.

## XII. Defendants Posted M.S.'s Records to an AI-Powered Marketplace Over Plaintiffs' Written Objection and Without Their Knowledge

162. Sometime after 10:21 a.m. on January 27, 2026, within hours of receiving Plaintiffs' written objection, Defendants compiled, reviewed, approved, and posted an online advertisement of M.S. on the OnSeen LiveCARE Marketplace.

163. The screenshot below describes OnSeen LiveCARE as an artificial intelligence-supported software system that enhances return on investment for "Development [sic] Disabilities Providers."



| Home | Disabilities | Insurance | Defense | Government |

**LiveCARE**

**Novel, AI-Supported Software for Developmental Disabilities Community**

Delivering Self Direction, Independence and Community Inclusion to Individuals with Development Disabilities. Driving Increased Efficiency, Improved Compliance and Enhanced ROI for Development Disabilities Providers.

28

164. Defendant Poteet's notes record:

> Tony [Hidy] and I compiled notes from prior provider searches to develop the new one in LiveCARE. Tony requested screenshots of the process to show status. Once reviewed and approved, SSA sent out a provider request. The plan is to keep it active for one week and then follow up with the vendor to verify if they are ready and willing.

165. The advertisement discloses M.S.'s age, sex, city of residence, diagnoses, approximate weight, nonverbal status, seizure disorder, behaviors, communication device, transportation history, sensory profile, and the days and hours she is at home.

166. The advertisement describes M.S.'s body and intimate care needs in detail, including that the "Client (17 year old girl) needs close and constant hands-on assistance with all activities of daily living – feeding, dressing, diapers, menstrual care, bathing, hair care, walking/transitions, wheelchair, etc."

167. Defendant Hathaway had previously assured this family: "I would never publish a provider request for [M.S.] without your knowledge or consent."

168. Defendant WCBDD's own published Privacy Policy provides M.S. the following protection: "If DD Board staff want to share your personal information with anyone who is not employed by the DD Board, you must give them written **permission** first." (Emphasis added.)

169. Plaintiffs never gave written permission; they gave the opposite, a written objection delivered to Defendants' counsel.

170. At the time of the posting, Plaintiffs had never heard of the LiveCARE Marketplace; Plaintiffs found out that Defendants posted M.S. on the LiveCARE Marketplace five months later, during discovery in this lawsuit.

171. The "Providers" pane of the LiveCARE Marketplace screen lists "392 total" provider entities associated with M.S.'s advertisement.

29

172. The 392 recipients included entities located hours from M.S.'s home, as far away as Toledo, Cleveland Heights, and Akron; one Toledo-area respondent wrote: "Hello, I'm not interested at this time due to the distance. I'm located in Lucas county."

173. Thirteen of the 392 recipients were repeat applicants from Parent Replacement Searches 1 and 2: Loving Hearts, Good Hope, Nab Home Services, Blissful Days, Franko Trading, Assure Living, Rainbow Home Care, Enohadel, TrustQuest, Adino Homehealth and Medical Supplies, LLC, ATES Healthcare Services, LLC, Lovable Hearts, and Media Enterprises.

174. These repeat recipients included Blissful Days, the company SSA Miller deemed "inappropriate" and reported to provider compliance in 2024, and ATES, the company whose website listed its address as "123 Main Street, Anytown, USA" and which had telephoned Defendant Hathaway in 2024 to complain about Plaintiff Lindsey Sodano.

175. Recipients with prior exposure to M.S.'s information and prior communications with her family did not need M.S.'s legal name to connect the 2026 advertisement, describing a seventeen-year-old nonverbal girl in Mason with her precise diagnoses, care needs, and schedule, to M.S.

176. Defendant Hathaway had described the applicant pool to Plaintiffs in 2024: "There's gonna be some weird ones" and "They just say yes to everything."

## XIII. Defendant Poteet Solicited Strangers to Declare Themselves "READY and WILLING"

177. On February 2, 2026, Defendant Poteet emailed twenty entities from among the 392 advertisement recipients, attaching a file titled "Information.pdf."

178. The email stated: "You are receiving this email because you previously expressed interest in working with a 17-year-old female located in Mason," instructed recipients to "thoroughly review the attached document, which outlines the specific needs and required services for this

30

individual," and directed: "If, after reviewing the information, you are READY and WILLING to proceed, please reply with those exact words by Thursday, February 5th."

179. Both previous parent replacement searches had used the term "willing and able" or "able and willing"; to Plaintiffs' knowledge, Defendants substituted "READY and WILLING" only after Plaintiffs filed this lawsuit.

180. On February 3, 2026, Defendant Poteet emailed fourteen of the same recipients again, attaching "Information.pdf" again and accelerating the deadline: "I will need a confirmation by 12pm today if you are interested."

181. Respondents' replies confirm on their face that these strangers read M.S.'s records: "I have reviewed the notes," "After review," "I have reviewed the attached documents," "I have read the case in depth now," and "After thoroughly reviewing the provided information."

182. When one person replied "Yes we are interested," Defendant Poteet coached them: "Please read again and reply with phrase to confirm interest," and the entity responded "READY and WILLING[.]"

183. Approximately eleven entities replied "Ready and Willing," and Defendant Poteet then telephoned all eleven: "SSA called 11 of them to review the case and the need of the home and client and outlines expectations and requirements by staff."

184. Defendant Poteet's notes identify no screening criteria other than replying with "READY and WILLING."

**XIV. The Two Finalists Confirm the Absence of Any Screening**

185. After the phone calls, nine entities withdrew, leaving two; Defendant Poteet's case notes state: "Rainbow Home Care and H Love Solution were the only vendors who expressed interest."

31

186. Rainbow Home Care's compliance review, written by WCBDD personnel and hosted on DODD's website, records citations for providing direct services through employees with disqualifying offenses, failing to perform BCII and FBI background checks, failing to enroll any employee in the RAPBACK background check system, and failing to maintain required unusual-incident policies and logs.

187. H Love Solution's website displays customer testimonials illustrated with stock photographs, including images findable online as "Handsome young man with new stylish haircut" and "Pretty Smiling Joyfully Female Fair Hair Stock Photo," and lists as its address a Warren County office building whose lobby tenant directory contains no such entity.

188. Defendant Hidy directed Defendant Poteet to "follow up with the two interested providers and specifically review three questions related to the Extraordinary Care Instrument," and both then "chose to pass."

189. On February 4, 2026, Defendant Poteet informed Plaintiff Lindsey Sodano: "as directed by superiors, I completed the provider search."

## XV. Defendant Hidy Directed Defendant Poteet's Disclosure of M.S.'s Information While in Ongoing Communication with Counsel

190. Defendants' privilege log identifies an "Email Exchange (21 emails)" dated January 26 through February 4, 2026, from Attorney Abshier to Defendants Horvath, Manuel, and Hidy, copying Attorney Valentine, under the subject line "FW: M.s. v wcbdd. Sodano" — the subject line of Plaintiffs' January 27, 2026 written objection.

191. The twenty-one emails thus span the entire disclosure: from the day Attorney Abshier solicited Plaintiffs' objection, through the posting over that objection, through Defendant Poteet's mass emails and "READY and WILLING" phone calls, to the search's completion.

32

192. In sworn discovery responses, Defendants identified "Tony Hidy" as the sole person who directed Defendant Poteet to complete the search and review M.S.'s needs with interested vendors.

193. Asked what action was taken in response to Plaintiffs' written objection, Defendants answered: "Tony Hidy met with Patrick Poteet and directed him that no personally identifiable information would be in the provider search and to utilize the summary of needs that Lindsey Sodano wrote for the previous provider search."

194. The action taken in response to Plaintiffs' objection was therefore to proceed with the disclosure anyway.

195. The advertisement Defendant Hidy approved disclosed M.S.'s age, sex, city of residence, approximate weight, diagnoses, nonverbal status, intimate care needs, and the days and hours she is home, information sufficient to identify her, including to the thirteen recipients who had received her information in prior searches.

196. Defendants also swore: "WCBDD did not put anything in the provider search description that Ms. Sodano had not previously consented to providing."

197. As explained above, Plaintiff Lindsey Sodano wrote that search in 2024, under Defendant Hidy's and then-DODD Deputy Director Nash's assertions that the search was "require[d]" and under the threat that refusal would end her ability to serve as M.S.'s provider.

198. Defendants' sworn position is therefore that a document written under compulsion in 2024 constitutes consent overriding an express written objection in 2026, and that disclosing M.S.'s information to approximately 46 third parties through WCBDD's local provider portal in 2024 authorized Defendants to disclose it to 392 third parties on the statewide OnSeen LiveCARE Marketplace in 2026.

199.    Asked for all documents reflecting authority to publish a provider request without consent, Defendants identified four items: OAC 5160-44-32, the DODD FAQ, "Plaintiffs' counsel's January 26 and January 27, 2026 correspondence," and "the summary of needs previously prepared by Lindsey Sodano." None of these documents contain any authority or even guidance to publish a provider request without consent.

200.    Upon information and belief, at all times during the January 27 to February 4 disclosure, Defendants possessed Plaintiffs' written objection, knew of the privacy protections set forth in R.C. 5126.044(B), knew of Ohio's Disability Bill of Rights privacy protections, and knew of WCBDD's own published privacy policy.

201.    Asked for all documents relating to any response to Defendant Manuel's November 21, 2025 question to DODD, "Do we proceed without them?", Defendants answered: "No response was received." By Defendants' own sworn account, no one ever directed Defendants to proceed with the posting over Plaintiffs' express written objection.

202.    Asked for all documents reflecting any notice of appeal rights, hearing rights, or any mechanism to challenge the search and disclosure, Defendants answered: "None. There was no reduction, alteration, or change in services." Defendants thus provided Plaintiffs no process of any kind, before or after disclosing M.S.'s records to hundreds of third parties over their written objection.

## XVI.    After Ending the Search, Defendants, Through Counsel, Asked if Plaintiffs Would Drop this Case

203.    Defendant Horvath predicted the outcome before the search began, writing on December 16, 2025 that WCBDD did not "anticipate that any willing provider will result from the provider search process."

204. On February 5, 2026, Defendants through Attorney Abshier reported to Plaintiffs' counsel: "There are no able and willing providers interested in scheduling an interview with the Sodanos."

205. No applicant in the 2026 search was ever asked whether it was "able and willing"; Defendant Poteet instructed applicants to reply, "READY and WILLING," in "those exact words," and coached at least one applicant who answered otherwise to resubmit using the required phrase.

206. On February 12, 2026, Attorney Abshier emailed Plaintiffs' counsel: "The parents' ability to serve as the child's provider will continue… Are you going to be dismissing the case given the above?"

207. The search thus accomplished nothing except the exposure of M.S.'s private information to hundreds of strangers over her parents' written objection, followed immediately by a request that Plaintiffs abandon this lawsuit.

**XVII. No Due Process Attached at Any Point**

208. As a Medicaid waiver enrollee, M.S. has the right to Medicaid due process, including prior written notice and a state hearing, before any decision that denies her the choice of a qualified and willing provider, or that approves, reduces, denies, or terminates her enrollment or changes her services or service plan. (IO Waiver, Appendix F.)

209. M.S. likewise has the right to a hearing whenever she is denied the choice of a provider who is qualified and willing, and the county board is required to inform her in writing of her right to request one. (OAC 5123-9-11.)

210. OAC 5160-44-32(J), however, provides: "A decision by ODM, ODA, DODD, or their designee related to whether someone qualifies under this rule to serve as a provider or a direct

35

care worker for an individual is not subject to notice and appeal rights under division 5101:6 of the Administrative Code."

211.     Defendants' position throughout has been that no notice or hearing rights attach before or during a parent replacement search because no "adverse action" has yet occurred; Defendant Hathaway's November 19, 2025 case notes record: "there are no services being denied to provide appeal rights for," and Defendant Horvath's December 16, 2025 email asserted that "WCBDD has taken no adverse action."

212.     Under Defendants' position and OAC 5160-44-32(J) together, no due process attaches *before* the online advertisement is posted, because no adverse action has occurred; none attaches *during* the mandatory disclosure of the child's record online, for the same reason; and none attaches *after* a parent is disqualified under the rule, because subsection (J) strips notice and appeal rights from that decisions regarding the parent's qualification to serve.

213.     There is accordingly no point at which M.S. or her parents could obtain prior notice, a hearing, or review by any neutral decisionmaker of WCBDD's decision to disseminate her private information or of any determination affecting whether her parents remain her providers.

214.     Plaintiffs asked anyway; on December 4, 2025, Plaintiffs' counsel wrote to Defendant Horvath: "[P]lease provide the due process appeal forms, so that M.S. can appeal this demand from the Board."

215.     Defendant Horvath did not respond.

216.     As set forth above, Defendant WCBDD's sworn response to Plaintiffs' request for all documents reflecting any notice of appeal, hearing, grievance, or review rights was: "None. There was no reduction, alteration, or change in services."

36

217.    The only opportunity to object Defendants ever afforded was Attorney Abshier's January 26, 2026 email giving Plaintiffs until that day to object; Plaintiffs objected in writing the next morning, and Defendants proceeded anyway.

**XVIII.    The Parent Replacement Search Policy Is Capable of Repetition Yet Evading Review**

218.    M.S. will turn eighteen in November 2026; Defendant Hathaway told M.S. in October 2024 that the parent replacement policy would "just be done" once M.S. reaches eighteen.

219.    The policy appears in no statute or rule, and DODD represented to the Supreme Court of Ohio that "[c]ounty boards are exercising their own discretion when to require the reassessment" and that a new search might occur "after only a few weeks."

220.    Following the 2026 search, Defendant Poteet stated only that there are "currently" no "ready and willing" replacement providers; WCBDD has not committed to refraining from further searches.

221.    The search Defendant Poteet conducted did not apply the standard Defendants contend is required; no applicant was asked whether it was "able and willing". Defendant Poteet instead instructed applicants to reply, "READY and WILLING," in "those exact words." On Defendants' own position that a search for an "able and willing" provider is required, Defendants retain a ready basis to declare Poteet's completed search deficient or erroneous and repeat it at any time.

222.    Defendant WCBDD's sworn position is that the summary of needs Plaintiff Lindsey Sodano wrote in 2024 constituted consent for the 2026 posting, notwithstanding Plaintiffs' express written objection delivered the same morning.

223.    Under Defendants' position, no objection Plaintiffs make will ever prevent a future posting, because Defendants treat consent, once compelled, as irrevocable.

224.    As set forth above, no notice, hearing, or appeal attaches at any point before, during, or after a search, and OAC 5160-44-32(J) strips appeal rights from the resulting provider qualification decision.

225.    Each search is brief; the 2026 search ran eight days, from posting to completion, faster than any judicial review could occur.

226.    A practice that is discretionary in timing, days in duration, immune from administrative review, impervious to written objection under Defendants' own sworn theory of consent, and set to expire by its own terms when M.S. turns eighteen is capable of repetition yet evading review.

**XIX.    The Parent Replacement Search Policy Continues to Endanger M.S.**

227.    M.S.'s traumatic brain injury occurred in 2017, when a non-parent caregiver allowed her to use a trampoline unassisted at a community center; she fell on her head onto a concrete floor, and no one present called 911.

228.    M.S.'s own person-centered service plan, in the section describing that caregiver-caused injury, states: "Temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

229.    Introducing unfamiliar caregivers into M.S.'s care creates immediate risks of seizures, regression, behavioral crisis, elopement, falls, hospitalization, and death, and exposes a medically fragile, nonverbal minor girl to unfamiliar workers during bathing, diapering, and menstrual care.

230.    Any temporary care workers who replace M.S.'s parents may not have valid background checks (*See* OAC 5123-2-02(C)(7)).

231.    When Plaintiff Lindsey Sodano asked DODD leadership in August 2024 whether there is "a limit to how many 'willing and able' strangers these young girls are expected to expose their

bodies to during personal care tasks like bathing and diapering," Deputy Director Showalter answered: "We have not set limits on how many willing and able providers a family may use."

232. Defendants' conduct of the 2026 search confirmed the absence of vetting: Defendant Poteet advanced Rainbow Home Care to final consideration despite its documented history of failing to run background checks and abuser registry checks on its direct care workers, and Defendant Hathaway had already told Plaintiffs that "it takes you five years" to be added to the abuser registry in the first place.

233. If a future search produces a self-declared "Able and Willing" or "READY and WILLING" applicant and M.S. rejects the applicant, her parents would be barred from providing her care, and the resulting loss of care hours would place M.S. at serious risk of institutionalization.

234. That risk is not hypothetical: in 2022, as set forth above, when M.S.'s funding range test score increased, WCBDD's Residential Options Coordinator searched for "ICF's that take children" for M.S., an institutional placement search her parents never requested and learned of only through discovery in this case.

## XX. The OnSeen LiveCARE Marketplace Disclosure Created Privacy Harms That Are Ongoing and Unmeasured

235. WCBDD's website advertises a "Free Choice of Provider Portal"; as of this filing, its link is dead, and upon information and belief WCBDD has replaced the portal with the OnSeen LiveCARE Marketplace.

236. Plaintiffs were never informed that WCBDD had adopted the OnSeen LiveCARE Marketplace, were given no advance notice that Defendant Poteet would transmit M.S.'s information to OnSeen, Inc., and were given no way to opt out.

39

237.   OnSeen's LiveCARE Privacy Policy states that it collects individuals' "name, residence, service request type(s) and detail(s), waiver types, personal preferences, outcome objectives, and other relevant data."

238.   The transmission of M.S.'s information to OnSeen, Inc., a private company, was itself an unconsented dissemination, independent of the 392 provider entities who could then access the posting.

239.   Plaintiffs do not know how many third parties viewed M.S.'s posting, what further information Defendant Poteet shared with the eleven applicants he telephoned, or what additional information was provided to Rainbow Home Care and H Love Solution.

240.   Plaintiffs first learned the extent of the disclosure through discovery on or about June 19, 2026, and are still assessing how and whether M.S.'s information could be removed from OnSeen's databases, artificial intelligence models, and other systems.

## FACTS REGARDING WCBDD'S LITIGATION WITNESS REQUIREMENT

**XXI.   Two Days After This Lawsuit Was Filed, Defendants Imposed a New Requirement for a Litigation Witness During M.S.'s Home Visits**

241.   Plaintiffs filed this lawsuit on December 10, 2025.

242.   On December 12, 2025, Defendant Hidy informed Plaintiffs by email that WCBDD personnel would enter Plaintiffs' home explicitly because of the lawsuit: "[D]ue to pending litigation matters, Lori Carr, Residential Options Coordinator with the Warren County Board of Developmental Disabilities, will accompany Patrick [Poteet] for both meetings."

243.   Lori Carr is the same WCBDD Residential Options Coordinator who, on November 10, 2022, "compiled list of icf open beds throughout the state" for M.S., an institutional placement search Plaintiffs never requested and learned of only through discovery in this case.

40

244. The two meetings Defendant Hidy assigned Lori Carr to attend were a 60-day in-person contact and M.S.'s annual service planning meeting. (*See* OAC 5160-44-32(E)(2)(g) and OAC 5123-4-02(F)(2)(b)).

245. The Ohio Administrative Code assigns those meetings to the individual's SSA; neither meeting requires any additional county board personnel, and neither requires that the visits occur inside the disabled person's home.

246. On December 13, 2025, Plaintiff Lindsey Sodano objected in writing to Ms. Carr's entry into the family home, citing the pendency of this litigation and Ms. Carr's role in residential placement matters; Lindsey Sodano asked for a neutral employee as a substitute.

247. Defendant Hidy then refused to substitute another employee for Residential Options Coordinator Lori Carr.

248. On December 15, 2025, Plaintiff Lindsey Sodano then requested to Defendant Hidy that the upcoming visit proceed with the assigned SSA alone, the only WCBDD participant required:

> Lori Carr's role as a Residential Options Coordinator is directly connected to residential alternatives and housing-related matters that are presently disputed in the pending case. Given that overlap, her participation in in-home meetings at this time would not feel neutral or appropriate.
>
> To keep these meetings focused solely on [M.S.'s] immediate service coordination needs and timely OISP development, we are requesting that the meetings proceed with Patrick as the sole WCBDD representative present. As the assigned SSA, he is fully qualified to conduct both the in-person contact meeting and the OISP meeting.

249. The next day, on December 16, 2025, Defendant APA Horvath sent the following to Plaintiffs' counsel and Plaintiff Lindsey Sodano personally:

> It has come to my attention that your clients are attempting to dictate to the Warren County Board of Developmental Disabilities

41

(WCBDD) how they perform their statutory functions related to your clients' receipt of services. That cannot continue.

250. Defendant Horvath's email did not identify what conduct constituted "attempting to dictate," which "statutory functions" were implicated, what authority prohibited the conduct, or what consequences would follow if "that" continued.

251. In the same email, Defendant Horvath announced: "Ms. Sodano may not dictate who attends on behalf of WCBDD," and: "On my advice, they will be sending the SSA and one witness."

252. Defendant Horvath's email conditioned M.S.'s service plan on compliance, listing "60-day monitoring" with the "witness" among the steps WCBDD "must complete" "prior to M.S.'s Ohio Individual Services Plan (OISP) to go into effect February 19, 2026."

253. The email asserted that "WCBDD has taken no adverse action" and identified no appeal, hearing, or review mechanism by which Plaintiffs could challenge the witness condition.

254. Plaintiff Lindsey Sodano, a mother advocating for her medically fragile, nonverbal daughter six days into a federal lawsuit, thus received a direct personal communication from opposing counsel stating that unspecified conduct "cannot continue," that she "may not dictate" who enters her family's home, and that her daughter's service plan would not go into effect unless she complied.

255. In sworn interrogatory answers served June 10, 2026, Defendants Manuel and Hidy identified the conduct they contend constituted "attempting to dictate": "Plaintiffs attempted to direct WCBDD which employees they may assign to monitoring functions."

256. The request Defendants swear was the offending conduct was Plaintiff Lindsey Sodano's December 13 and 15, 2025 request that the visits be conducted by M.S.'s assigned SSA, the employee the Ohio Administrative Code itself assigns to both functions.

42

257.     Asked to admit that no statute, regulation, rule, guidance document, or policy authorized the directive that Plaintiffs' conduct "cannot continue," Defendants answered: "Deny. Policies, regulations, and Ohio statutes speak for themselves," and identified no such authority.

258.     Asked to admit that no statute, regulation, rule, guidance document, or policy authorized the statement that Plaintiff Lindsey Sodano "may not dictate" who attends visits inside her home, Defendants gave the same answer and identified no authority.

259.     Asked in sworn interrogatory answers to identify who communicated to Defendant Horvath that Plaintiffs were "attempting to dictate," Defendants refused on privilege grounds.

### XXII.     Defendants Have Admitted the Witness Requirement Was Their Own Invention, Imposed Because of This Lawsuit

260.     In sworn interrogatory answers, Defendants identified Defendants Manuel and Hidy as the persons who decided that a witness would attend Plaintiffs' in-person visits after this lawsuit was filed, and as the persons responsible for conditioning M.S.'s OISP on the witness visit.

261.     In briefing to this Court, Defendants stated: "Because the conflict had at that point escalated to litigation, the Board's attorney advised the Board to always include a witness when having direct contact with Plaintiffs." (ECF No. 23 at PageID 390.)

262.     In the same briefing, Defendants described Plaintiffs as "an otherwise litigious client," asserted that "Plaintiffs have a history of misconstruing facts and communications" (ECF No. 23 at PageID 395).

263.     By Defendants' own filings and sworn answers, the witness requirement was imposed because of this litigation and Plaintiffs' communications, not because of any concern relating to M.S.'s health, safety, welfare, or service needs.

264. When asked for documents concerning any instance in which any other WCBDD waiver recipient or guardian was told they may not dictate who enters their home, Defendants answered: "none other than Plaintiffs."

265. In the years preceding this lawsuit, WCBDD conducted numerous in-home 60-day visits and service planning visits for M.S. without ever sending a "witness."

**XXIII.     December 18, 2025: The Witness Arrived After Plaintiffs Revoked Consent**

266. On December 17, 2025, Plaintiffs' counsel wrote to Defendant Horvath that "under protest and under duress," Plaintiffs would permit the witness to enter their home, stating: "It is our understanding that if our clients do not agree to this witness in their home they will lose M.S.'s waiver services."

267. Defendant Horvath did not dispute or correct that understanding; she proceeded to schedule the visit.

268. On December 18, 2025, Plaintiffs' counsel revoked the consent given under protest, informing Defendant Horvath and Defendants' outside counsel that Plaintiffs would welcome the SSA but could not permit the litigation witness to enter.

269. At approximately 3:30 p.m. that day, Defendant Poteet and the witness, Ms. Carr, arrived at Plaintiffs' home; Plaintiffs invited Defendant Poteet in and declined entry to Ms. Carr.

270. Defendant Poteet's notes record that he "explained that, according to our county directive, we would only be able to conduct the monitoring with the presence of Lori and myself," and both employees left without conducting the visit.

271. Plaintiffs requested Ms. Carr's case notes in discovery; Defendants have produced no case notes authored by Ms. Carr covering the litigation witness events.

272.    The required 60-day visit was due by December 23, 2025; the deadline passed unmet, and WCBDD has not completed any required 60-day visit since October 2025, solely because of its insistence on the litigation witness.

### XXIV.    January 16, 2026: Defendants Required a Witness Attend M.S.'s Person-Centered Planning Meeting

273.    M.S. has the right to select who is included in her person-centered service planning process, and her SSA is required to ensure that planning occurs with the active participation the persons M.S. selects. (IO Waiver, Appendix D-1.)

274.    On January 16, 2026, Defendants required a new litigation witness, WCBDD employee Brittany Roberts, to enter Plaintiffs' home and attend M.S.'s annual service planning meeting; M.S. did not select Ms. Roberts and did not request any litigation-related witness.

275.    Ms. Roberts's own contemporaneous notes state: "I did not serve the role as an SSA at this time, and was there as a witness."

276.    Plaintiffs permitted Ms. Roberts's entry because completion of the annual service plan was required for M.S.'s Medicaid services to continue, and Plaintiffs understood based on communications with Defendant Horvath that refusing the witness meant WCBDD would not conduct the meeting and M.S.'s service plan would not go into effect; i.e., her Medicaid services would lapse.

### XXV.    The Litigation Witness Requirement Continues, and WCBDD Refuses to Perform Required Medicaid Service and Support Administration Visits

277.    On March 4, 2026, asked for the authority requiring the witness, Defendant Poteet answered that the witness must attend because "there is an ongoing court case" and that the authority is "the county lawyers."

278. On March 17, 2026, Defendant Poteet wrote: "The previous directive that I received, of having Brittany Roberts, Service Coordinator, join me for all in-person visits, still stands due to current litigation matters," and: "Since you have informed me that you do not consent to Ms. Roberts joining me for the March in-person visit, the visit will not take place."

279. In sworn interrogatory answers, Defendants identified Defendants Manuel and Hidy as the source of that "directive," and Defendant Hidy as the person who decided "the visit will not take place."

280. By Defendants' own sworn admissions, Defendant Hidy personally decided that a required in-person Medicaid contact visit would not occur because Plaintiffs declined to admit litigation personnel into their home.

281. On May 13, 2026, Defendant Poteet wrote: "I want to be transparent that, due to ongoing litigation, county legal counsel has advised that I am not permitted to attend without a county witness," describing the witness as a "county legal requirement"; the May visit did not occur.

282. The "county legal counsel" whose advice governs whether M.S.'s visits occur is Defendant Horvath: she is the attorney who announced the witness requirement "[o]n my advice," and Defendants have stated in briefing to this Court that "the Board's attorney advised the Board to always include a witness when having direct contact with Plaintiffs" because "the conflict had at that point escalated to litigation." (ECF No. 23 at PageID 390.)

283. Defendant Horvath has appeared in this action as counsel defending against Plaintiffs' claims. The person Defendants describe as "the county lawyers", whose advice determines who enters Plaintiffs' home, is opposing counsel in Plaintiffs' own federal civil rights lawsuit.

284. Plaintiffs have repeatedly offered to admit the assigned SSA, the only WCBDD participant the rule requires; Defendants refuse to conduct the visits without the litigation

46

witness, and have never offered to conduct the required in-person contacts at any location other than Plaintiffs' home.

### XXVI. The Litigation Witness Requirement Has No Basis in Law and WCBDD Provides No Due Process

285. In sworn interrogatory answers, asked to identify the basis for the witness requirement, Defendants answered only: "WCBDD is not aware of any statute or regulation that limits the number of individuals who may attend any in-person meetings."

286. No statute, federal regulation, waiver provision, or administrative rule grants Defendant WCBDD the power to condition a child's Medicaid services on the admission of litigation personnel into her family's private residence, and the witness requirement was never disclosed as a condition of M.S.'s eligibility or contained in any agreement governing her services.

287. The witness performed no Medicaid administration function of any kind. Ms. Roberts's own contemporaneous record states: "I did not serve the role as an SSA at this time, and was there as a witness." The witness's sole function was to serve Defendants' position in this lawsuit.

288. The requirement was thus the use of Defendants' control over M.S.'s Medicaid services to install personnel serving only a litigation function inside the home of the family litigating against them, on the advice of Defendant Horvath, counsel appearing against Plaintiffs in this action, who conditioned M.S.'s service plan on the family's submission to the requirement.

289. Defendants have not explained how, when, or under what conditions the witness requirement might end; Defendants admitted in discovery that "WCBDD has not stated anything this specifically" regarding any means by which the home entry requirement could end.

290. There is no process to challenge the requirement: asked for all documents setting forth any such process, Defendants produced only WCBDD's Administrative Resolution of Complaints/Due Process policy (AGP 2.07), which states on its face that it "is not applicable to"

47

"Medicaid services, including home and community-based waiver services." Plaintiffs have no means to appeal the litigation witness requirement.

291. On June 19, 2026, upon learning the details of Defendant Poteet's role in the OnSeen LiveCARE Marketplace disclosure, Plaintiff Lindsey Sodano wrote to DODD requesting that M.S.'s service coordination be transferred away from WCBDD; as of this filing, approximately one month later, no one at DODD has responded to that request, and Defendant Poteet remains M.S.'s assigned SSA.

292. M.S.'s required 60-day in-person contact visits remain uncompleted, and the witness requirement remains in force with no authority, no function, no review, and no end.

## FACTS RELATED TO MEDICAID WAIVER ADMINISTRATION CONDUCTED THROUGH COUNSEL ON AN ALTERED RECORD

**XXVII. Ohio Law Assigns Waiver Administration to Trained, Certified SSAs**

293. After Plaintiffs filed this lawsuit, M.S.'s Medicaid waiver did not stop operating: her service plan still had to be developed and put into effect and her in-person visits conducted.

294. The filing of this lawsuit did not suspend, transfer, or diminish those obligations. Ohio law required WCBDD to continue administering M.S.'s waiver services during this litigation exactly as before: under the same rules, through certified personnel, subject to the same rights. Nothing in Ohio law permits a county board, once sued by a waiver recipient, to administer the recipient's service administration through its litigation counsel or to condition the performance of its statutory duties on the recipient's conduct of the lawsuit.

295. M.S. has the right to have her service and support administration performed only by persons holding SSA certification. (*See* OAC 5123-4-02(A)(14), (A)(15), (F)).

296. M.S. has the right to have her service administration performed by persons who have completed training in the rights of individuals with developmental disabilities, the individual

48

service plan, and in the procedural protections that apply to decisions affecting waiver services. (*See* R.C. 5123.62 to 5123.64; OAC 5123-5-02; R.C. 5126.25.)

297. The certified SSA conducting M.S.'s service administration must retain responsibility for decisions regarding these functions and for communicating those decisions to M.S. and her parents. (*See* OAC 5123-4-02(F)(2)(o)).

298. These requirements exist so that the persons making and communicating decisions affecting M.S.'s services are trained to recognize and protect her rights, rather than these functions being performed by opposing counsel whose role is to defend the county board in adversarial litigation.

299. A certified SSA remained assigned to M.S. at all relevant times.

300. Plaintiffs do not contend that Defendants' attorneys were prohibited from communicating with Plaintiffs' counsel about the lawsuit itself.

**XXVIII. Defendant Horvath Performed Operational Waiver Functions While Asserting a Mandate the Record Contradicted**

301. Defendant Horvath is an Assistant Prosecuting Attorney of Warren County, a separate elected office; she is not employed by WCBDD, and upon information and belief held no SSA certification and did not complete the required SSA trainings.

302. Defendant Horvath's statutory role with regard to WCBDD is to serve as its legal adviser and to prosecute and defend suits. (See R.C. 309.09(A)).

303. As set forth above, Defendant Horvath asserted a mandatory provider search that appears nowhere in law, contacted Lindsey Sodano at her personal email address, announced the witness requirement "[o]n my advice," directed that Plaintiffs' conduct "cannot continue" and that Plaintiff Lindsey Sodano "may not dictate" who attends, asserted the steps WCBDD "must complete" before M.S.'s OISP could go into effect, scheduled the home visits, and received and

49

acted on Plaintiffs' consent given "under protest and under duress" and the revocation of that consent.

304. Scheduling required visits, communicating the steps for OISP development and implementation, and communicating with the recipient's guardian, and communicating regarding provider searches are functions of M.S.'s certified SSA.

305. Directing a Medicaid waiver recipient's family that their objections "cannot continue" or that they "may not dictate" who enters their home is not a function of any statutory position.

306. In discovery, asked about any instance in which the Warren County Prosecutor's Office contacted a waiver recipient or family member regarding waiver services, service planning, or in-person visits, or told a recipient or family that conduct "cannot continue," WCBDD answered in each instance that it "is not aware of any non-privileged responsive documents in WCBDD's possession, custody, or control."

307. Defendants' privilege log identifies Defendant Horvath as a participant in an eight-email conversation concerning the WCBDD-DODD email chain between October 9 and December 2, 2025, the same email chain that Defendant Manuel admits she later altered.

308. On December 19, 2025, Plaintiffs informed Defendants' counsel that they were preparing to seek a TRO, and Defendants' privilege log shows Defendant Horvath forwarding Plaintiffs' TRO-related email to Defendant Manuel.

309. On December 23, 2025, Defendant Manuel copied Defendant Horvath on her transmission of the altered email chain to Attorney Abshier.

310. The unaltered WCBDD-DODD email chain contains Deputy Director Showalter's October 8, 2025 statement that DODD "recommend[s]" the board follow its "guidance."

50

311. Which version of the email chain—altered or unaltered—Defendant Horvath possessed when she asserted on December 2, 2025 that "the Board is not permitted" to authorize Plaintiffs, and on December 16, 2025 that the provider search was among the steps WCBDD "must complete," is a fact within Defendant Horvath's knowledge.

**XXIX.    Attorney Abshier Performed Operational Waiver Functions on the Altered Record**

312. Brandon Abshier of Reminger Co., L.P.A. is WCBDD's insurance defense counsel; he is not employed by WCBDD, and upon information and belief held no SSA certification and did not complete the required SSA trainings.

313. On December 23, 2025, Defendant Manuel transmitted to Attorney Abshier the altered email chain, from which DODD's "recommend" characterization, Plaintiffs' September 23 written objection, and Defendant Manuel's disclosures regarding this litigation had been deleted, as Defendant Manuel has admitted.

314. Attorney Abshier's operational communications concerning M.S.'s continuing waiver services followed his receipt of the altered document from Defendant Manuel.

315. On December 26, 2025, three days after receiving Manuel's altered document, Attorney Abshier told Plaintiffs' counsel that he possessed an email from DODD stating that the provider searches were required; Abshier later sent that altered document to Plaintiffs' counsel in support of Defendants' position.

316. On January 21, 2026, Attorney Abshier asserted: "they [sic] State has told the county that we cannot do the Extraordinary Care Instrument or put the parents down as providers if the search is not run."

317. As set forth above, the State had told Defendants no such thing; the statements deleted from the document Defendant Manuel sent Attorney Abshier were the statements establishing DODD's position as advisory guidance.

318. On January 26, 2026, Attorney Abshier communicated the search ultimatum: "Unless we hear some objection today, the County is going to move forward with the provider search tomorrow morning."

319. Provider selection, communication of requirements the Board asserts recipients must fulfill, receiving a recipient's objection and acting on it, and communicating regarding assessments and service planning are SSA functions. (*See* OAC 5123-9-11 and OAC 5123-4-02).

320. Attorney Abshier received Plaintiffs' January 27, 2026 written objection to the information disclosure at 10:04 a.m.; he did not respond to it, and M.S. was posted to the OnSeen LiveCARE Marketplace that same day.

321. Whether Defendant Poteet, M.S.'s assigned and certified SSA at the time, ever received Plaintiffs' written objection is a fact within Defendants' knowledge.

322. When Attorney Abshier knew the document Defendant Manuel gave him had been altered is a fact within Defendants' knowledge.

**XXX. SSA Duties Performed by Opposing Counsel Contributed Directly to the Violations**

323. The combined effect of Defendants' arrangement was that operational tasks affecting M.S.'s services were performed and communicated by Defendant Horvath, who lacked the certification and rights training Ohio law requires, and, from December 23, 2025 forward, by insurance counsel relying on an altered document from which critical information had been deleted by Defendant Manuel.

52

324. M.S.'s only avenue to object to the impending unauthorized disclosure of her private information was not a hearing, not a neutral decisionmaker, and not her trained SSA; it was an email to opposing counsel in her own federal lawsuit, on a one-day deadline he set for her.

325. That objection was received by Attorney Abshier, was not answered by anyone, and was overridden by Defendants within hours.

326. WCBDD's own certified SSA, Defendant Hathaway, had previously assured Plaintiffs: "I would never publish a provider request for [M.S.] without your knowledge or consent."

327. Each function performed by uncertified opposing counsel affected M.S.'s substantive rights: the conditioning of her service plan on steps appearing nowhere in law, the witness home entry requirement, the directive "That cannot continue," that her mother "may not dictate" who enters the family home, the posting of M.S.'s information on an online marketplace over her parents' written objection, and the absence at every step of notice, a governing standard, or any right of appeal.

328. That WCBDD conducted this Medicaid waiver administration through statutory counsel and insurance defense counsel rather than through M.S.'s certified SSA does not diminish Defendants' responsibility for the conduct or its consequences.

## PLAINTIFFS' INJURIES

329. Plaintiffs incorporate by reference all preceding paragraphs.

330. Defendants' conduct inflicted concrete injuries on each Plaintiff. Those injuries were complete when Defendants' unlawful acts occurred; they do not depend on whether Defendants ultimately succeeded in replacing M.S.'s parents as her providers.

53

### A. Injuries to Plaintiff M.S.

331. M.S. suffered an invasion of her privacy when Defendants, without consent and over her and her parents' express written objection, published her diagnoses, seizure disorder, nonverbal status, age, weight, city, weekly schedule, and intimate care needs, including diapering, bathing, and menstrual care, to the OnSeen LiveCARE Marketplace, reaching 392 unauthorized third parties, including repeat recipients from prior searches who could identify her.

332. The invasion was compounded by its source and its recipients: it was carried out by Defendant Poteet, whose statutory duty was to safeguard her rights, and it delivered her information to entities including a company that cannot be found at its advertised address, a company with documented compliance citations for failing to run background checks on its care workers, and multiple companies who could identify M.S. from previous mandatory parent replacement searches.

333. M.S. is nonverbal and cannot read. She could not consent to the disclosure, could not object to it, could not learn of it on her own, and cannot defend herself against its consequences; her information now resides permanently with OnSeen, Inc. and hundreds of strangers, beyond her family's power to retrieve.

334. M.S.'s interest in stable, continuous care from her chosen providers was placed under sustained threat. She qualifies for waiver services at an ICF level of care, and the threatened disruption of her care hours placed at risk her ability to remain in her family home, a risk WCBDD itself confirmed when discovery revealed it had researched "ICF's that take children" in 2022 after her funding score increased.

335. M.S. was subjected to the required entry of litigation personnel into her home, her right under the IO Waiver to select the participants in her own person-centered planning was

54

overridden, and her required 60-day visits have not occurred since October 2025 because Defendants refuse to conduct them without the litigation witness.

336.    Under Defendants' sworn position that a compelled 2024 consent for information disclosure overrides a 2026 written objection, and with no notice, hearing, or appeal attaching at any point, M.S. holds a right to the confidentiality of her records that Defendants may extinguish at will, with no means by which she or her guardians can ever prevent the next disclosure.

### B.  Injuries to Plaintiffs Lindsey Sodano and Justin Sodano

337.    Lindsey and Justin Sodano each suffered emotional distress, anxiety, loss of sleep, humiliation, and mental anguish as a direct and proximate result of Defendants' conduct, distress of the kind any reasonable parent would experience when a government agency repeatedly threatens to install strangers as their medically fragile child's caregivers and conditions her services on the family's submission to demands lacking any basis in law.

338.    Both parents suffered humiliation and loss of autonomy when their daughter was advertised to hundreds of strangers over their written objection, and the further humiliation of reading, in Defendants' own production, strangers' written evaluations of their daughter's body, behaviors, and intimate care needs, solicited and collected by the agency charged with protecting her.

339.    Because M.S. cannot know what was published about her, her parents now carry the permanent burden of shielding her from that knowledge and humiliation, and of exercising on her behalf the vigilance she cannot exercise for herself.

340.    Both parents suffered an invasion of the sanctity of their home when M.S.'s services were conditioned on the admission of litigation personnel into it: their consent was extracted under protest and duress, was revoked in writing, and county personnel arrived at their door anyway,

dispatched at the direction of the county's own prosecutor expressly because the family had filed a lawsuit.

341. Both parents suffered the deprivation of any process at any point: no notice of the standard being applied, no opportunity to be heard before a neutral decisionmaker, and no administrative appeal, such that the family's only avenue to object to the disclosure of their daughter's records was an email to opposing counsel, on a deadline of less than one day, which was overridden within hours.

342. Both parents were injured by Defendant Manuel's alteration of the record: relying on Manuel's altered email chain provided by Attorney Abshier, which deleted DODD's characterization of the "recommend[ation]" to follow DODD "guidance," Plaintiffs refrained from seeking the emergency judicial relief that was their last remaining means to prevent the online advertisement of M.S., and the opportunity to prevent it is now permanently lost.

343. Both parents lived, and continue to live, with persistent fear that M.S. could lose the caregiving support that keeps her in her home, a fear Defendants' own 2022 ICF research confirms is reasonable, and with the knowledge that no change of assigned personnel offers assurance against recurrence, because Defendants' sworn answers attribute the challenged directives to the Superintendent and SSA Director themselves.

344. Both parents were forced to weigh their protected advocacy, including their objections, their assistance to similarly situated families, and this lawsuit itself, against the risk of further conditions on their daughter's services; conduct that conditions a child's services on her parents' silence would chill a person of ordinary firmness from exercising First Amendment rights.

345. Plaintiff Lindsey Sodano was additionally compelled to expend substantial uncompensated time and labor: in 2024, drafting the compelled advertisement and screening

applicants to protect M.S. from in-person "interaction" with unvetted strangers; and in 2026, investigating the unauthorized disclosure, including traveling to H Love Solution's advertised address to determine whether the company exists there and researching the recipients of M.S.'s information to assess the threat. This injury is ongoing, as the full extent of the disclosure emerged only in discovery.

### C. The Injuries Were Complete When the Conduct Occurred

346. Plaintiffs do not challenge merely a threatened future replacement of M.S.'s providers; they challenge completed acts and ongoing conditions.

347. The denial of procedural due process is itself a cognizable injury. The publication of a child's protected records to a private company and hundreds of strangers, over written objection, is itself a cognizable injury. The coerced entry of government personnel into a private home as a condition of a child's services is itself a cognizable injury. Retaliation that would deter a person of ordinary firmness is itself a cognizable injury. The loss of the opportunity to obtain judicial review before an irreversible disclosure is itself a cognizable injury. None of these depends on Defendants having accomplished the replacement of M.S.'s parents[6].

---

[6] The allegations herein are based on the documents and discovery responses presently available to Plaintiffs. Discovery remains ongoing, and the parties are meeting and conferring regarding Defendants' incomplete productions, missing documents, disputed privilege designations, and other deficiencies. Because Plaintiffs have confirmed that at least one document furnished by Defendants during this litigation was materially altered, Plaintiffs cannot presently verify that all materials produced are complete and unaltered. To the extent any allegation is later shown to be incomplete or inaccurate, it may reflect information omitted, altered, withheld, or not yet produced. Plaintiffs reserve the right to amend or correct these allegations as additional discovery becomes available.

**CAUSES OF ACTION**

**COUNT ONE**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Substantive Due Process**
**Informational Privacy: Nonconsensual Disclosure of M.S.'s Intimate Personal Information**
**Against Defendants WCBDD, Manuel, Hidy, and Poteet**

348.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

349.    The Due Process Clause of the Fourteenth Amendment protects an individual's fundamental interest in preventing governmental disclosure of personal matters, including information of a sexual, personal, and humiliating nature.

350.    That protection is at its apex where the information concerns the intimate bodily functions and personal care of a minor child who is profoundly disabled, nonverbal, and unable to advocate for her own privacy.

351.    Information describing M.S.'s diapering, bathing, menstrual care, seizure disorder, behaviors, body, and the days and hours she is home is information of a personal and humiliating nature in which M.S. holds a fundamental privacy interest.

352.    The Due Process Clause likewise protects an individual's fundamental interest in preventing governmental disclosure of personal information where the disclosure creates a risk to the individual's personal safety and bodily integrity. That interest is independent of, and in addition to, the interest in information of a personal and humiliating nature.

353.    Ohio law confirms the reasonableness and strength of that interest: R.C. 5126.044(B) forbids release of a county board record regarding an eligible person absent written parental approval, R.C. 5126.99(A) makes violation a first-degree misdemeanor, R.C. 5123.62(T) guarantees confidential treatment of personal and medical records, and WCBDD's own published

58

privacy policy requires "written permission first." Plaintiffs cite these provisions to establish the nature and contours of M.S.'s protected privacy interest, not as independent claims.

354. On January 27, 2026, within hours of receiving Plaintiffs' written objection, Defendants posted an advertisement of M.S. to the OnSeen LiveCARE Marketplace disclosing her intimate, personal information as described above.

355. The posting was accessible to 392 provider entities, including thirteen repeat recipients from prior mandatory searches, some of whom could identify M.S. from the information disclosed; and the transmission of M.S.'s record to OnSeen, Inc. itself, a private artificial-intelligence software company, was an additional unconsented disclosure to a third party.

356. Defendants then compounded the disclosure: Defendant Poteet emailed twenty of the recipient entities describing M.S.'s "specific needs and required services," solicited replies of "READY and WILLING" in "those exact words," telephoned eleven responding entities to "review the case and the need of the home and client," and provided still further information to the two finalists at Defendant Hidy's direction.

357. The advertisement disclosed the information a stranger would need to locate and gain access to M.S.: her city of residence, her age, sex, and approximate weight, her behaviors and sensory profile, the fact that she is nonverbal and cannot report what is done to her, and the specific days and hours she is at home. Several of the recipients had received M.S.'s information in prior searches and could connect the advertisement to her specifically.

358. Defendants delivered M.S.'s information to 392 recipients they had not screened or vetted in any way, including an entity whose advertised address is a Warren County office building whose lobby directory contains no such tenant, an entity whose website had listed its address as "123 Main Street, Anytown, USA" during the previous parent replacement search, and an entity

with documented compliance citations for failing to run required criminal background checks on its care workers. The disclosure thereby placed the personal safety and security of a medically fragile, nonverbal minor girl at risk, and Defendants made it while knowing, in Defendant Hathaway's words, that it takes "five years" for an abuser to appear on the registry meant to protect individuals like M.S.

359. Neither M.S. nor her parents consented to any of these disclosures.

360. To the contrary, at 10:04 a.m. on January 27, 2026, hours before the posting, Plaintiffs through counsel refused consent in writing: "Our clients do not consent to the disclosure to third parties of their child's or their own personal, contact, or medical information."

361. M.S.'s OISP in effect at the time contained a Release of Information provision that assures that "records are protected by Federal and Ohio law governing confidentiality rules, and cannot be disclosed without written consent"; the OISP did not authorize, and Plaintiffs never consented to, disclosure of M.S.'s information to OnSeen, Inc. or to 392 additional entities.

362. Defendant WCBDD's sworn position is that the "summary of needs" Plaintiff Lindsey Sodano wrote in 2024, under Defendant Hidy's and DODD's assertions that the search was legally required and that refusal would end her ability to serve as M.S.'s provider, constitutes consent overriding the family's express written objection in 2026.

363. A document compelled by threat of losing a child's caregivers is not consent, and consent, even if once given, was expressly revoked in writing before the 2026 disclosure occurred.

364. No governmental interest justified the disclosure. No statute, regulation, or properly promulgated rule required or authorized any online posting of a minor child.

60

365. Even the interest Defendants assert, identifying "able and willing" replacement providers, was not implicated, as Defendant Poteet searched only for "READY and WILLING" applicants, using "those exact words."

366. Further, the IO Waiver's provider selection process operates from "the list of qualified providers available on the DODD website" and requires no internet posting of any child's private information at all.

367. The online posting had no genuine governmental purpose: Defendant Horvath wrote beforehand that WCBDD did not "anticipate that any willing provider will result," the search produced none, M.S.'s care arrangement was unchanged, and Defendants' counsel then asked whether Plaintiffs would be "dismissing the case."

368. M.S.'s fundamental privacy interest in her intimate personal information far outweighs any interest Defendants can assert in this nonconsensual disclosure.

369. The disclosure was deliberate, not inadvertent.

370. In sworn interrogatory answers, Defendant WCBDD identified the person who directed the search: "Tony Hidy."

371. Defendant Manuel held final decision-making authority over the parent replacement policy, which, by Defendants' own account, "went above Tony" so that "Megan" would "make this decision," and she maintained the policy under which the disclosure proceeded after receiving both Plaintiffs' September 23, 2025 written objection, DODD's October 8, 2025 written characterization of the search as a "recommend[ation]", and Plaintiffs' January 27, 2026 written objection.

372. Defendant Poteet compiled, posted, and disseminated M.S.'s information and confirmed in writing that he did so "as directed by superiors."

61

373. Defendants' privilege log documents twenty-one emails among Attorney Abshier, Defendant Horvath, Defendant Manuel, and Defendant Hidy spanning January 26 through February 4, 2026, under the same subject line as Plaintiffs' written objection, covering the entire span of the disclosure.

374. Defendants acted with knowledge that the disclosure contravened R.C. 5126.044(B), WCBDD's own written-permission policy, WCBDD's prior assurance that it "would never publish a provider request for [M.S.] without your knowledge or consent," and Plaintiffs' written objections.

375. The disclosures were made pursuant to the official policy, practice, and custom of Defendant WCBDD and pursuant to the decisions of Defendants Manuel and Hidy, officials with final policymaking authority.

376. The right to be free from unjustified governmental disclosure of information of a sexual, personal, and humiliating nature was clearly established at all relevant times, as was the right to be free from governmental disclosures of personal information that place an individual's safety and bodily integrity at risk, and as was the principle that a minor's records held by an Ohio county board may not be released without written parental approval.

377. At all relevant times, Defendants acted under color of state law.

378. As a direct and proximate result of Defendants' unconstitutional conduct, M.S. suffered the nonconsensual exposure of her intimate personal information to OnSeen, Inc. and hundreds of strangers, the permanent loss of control over information concerning her body and personal care, and exposure of that information to unvetted entities including one with documented background-check compliance failures; and Plaintiffs Lindsey and Justin Sodano suffered humiliation, fear for M.S.'s safety and privacy, mental anguish, and emotional distress.

62

379. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWO**
**42 U.S.C. § 1983**
**First Amendment Retaliation**
**OnSeen LiveCARE Marketplace Posting**
**Against Defendants WCBDD, Manuel, Hidy, Poteet, and Horvath**

380. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

381. The First Amendment, including its Petition Clause, protects the right to file and prosecute a lawsuit against government officials and to object in writing to government conduct. A state actor who takes adverse action because a person engaged in such protected activity commits retaliation actionable under 42 U.S.C. § 1983.

382. Plaintiffs engaged in protected activity by filing this action on December 10, 2025, by prosecuting it, and by objecting in writing to Defendants' conduct, including the September 23, 2025 and January 27, 2026 written objections described above.

383. Defendants knew of that protected activity: they were served with this action, Defendant Hidy attributed new requirements to "pending litigation matters" two days after filing, and Defendant Manuel described "threats of litigation" to DODD in the unaltered version of the WCBDD-DODD email chain.

384. Defendants took adverse action: they posted M.S.'s intimate personal information to the OnSeen LiveCARE Marketplace over Plaintiffs' written objection, transmitted her information to twenty entities, discussed her with eleven, and conditioned her service plan going into effect on that "provider search", all as set forth above.

63

385. The sequence of Defendants' own statements establishes that this adverse action was retaliatory.

386. Before Plaintiffs filed suit, the only consequence Defendants identified for declining the search was Defendant Horvath's December 2, 2025 assertion that "the Board is not permitted to authorize Mr. and Mrs. Sodano to continue to bill for Medicaid dollars as parent providers." No Defendant conditioned M.S.'s service plan going into effect on a search, and no Defendant stated that the consequence of refusal would be the posting of M.S.'s information online to hundreds of third parties across Ohio against her parents' written objection.

387. Six days after Plaintiffs filed suit, the consequence changed: Defendant Horvath's December 16, 2025 email conditioned M.S.'s service plan "go[ing] into effect February 19, 2026" on completion of a "provider search," while stating in the same email that WCBDD did "not anticipate that any willing provider will result from the provider search process."

388. Defendants thus announced, after being sued, a new consequence they predicted would accomplish nothing.

389. The search itself changed after Plaintiffs filed suit, in kind and not merely in degree. Every parent replacement search before this lawsuit was conducted through WCBDD's local provider portal; 46 people viewed the advertisement in Search 1. The search Defendants conducted after suit was the first to use the OnSeen LiveCARE Marketplace, a statewide artificial-intelligence-supported platform, and it reached 392 entities. It was also the first conducted over Plaintiffs' express written objection, the first executed on a same-day ultimatum, and the first in which Defendants solicited applicants to declare themselves "READY and WILLING" rather than the "able and willing" standard Defendants contend the law requires and had used in every prior search. Defendants then reported the result of that search in the terms of

the standard they had not applied, informing Plaintiffs' counsel that no "able and willing" provider was interested.

390. No one directed Defendants to proceed with the online posting of M.S. In sworn interrogatory answers, Defendant WCBDD stated that "[n]o response was received" to Defendant Manuel's November 21, 2025 question to DODD, "Do we proceed without them?" By Defendants' own sworn account, no authority ever instructed them to post M.S.'s information on the LiveCARE Marketplace over Plaintiffs' objection.

391. At all relevant times, Defendants Manuel and Hidy knew the annual provider search was optional. DODD had represented to the Supreme Court of Ohio that the search guidance is "advisory on their face," "aspirational rather than mandatory," and that boards conducting searches are "exercising their own discretion"; and Deputy Director Showalter's October 8, 2025 email, received by Defendants Manuel and Hidy, characterized the "guidance" as something that DODD would "recommend."

392. Defendant Manuel concealed that knowledge. As set forth above, Defendant Manuel has admitted removing from the email chain she transmitted to counsel on December 23, 2025 the "recommend" email, Plaintiffs' September 23 objection, and her own references to this litigation; the document Manuel altered was then transmitted to Plaintiffs' counsel on December 29, 2025; and relying on it, Plaintiffs refrained from seeking emergency relief that could have prevented the online posting.

393. On January 21, 2026, Attorney Abshier asserted that "they [sic] State has told the county that we cannot... put the parents down as providers if the search is not run," an assertion contradicted by the very statements deleted from the document Defendant Manuel altered.

65

394. On January 26, 2026, Plaintiffs' counsel asked six specific questions about the search's asserted legal basis; Defendants answered none of them and instead set a same-day deadline: "Unless we hear some objection today, the County is going to move forward with the provider search tomorrow morning."

395. At 10:04 a.m. on January 27, 2026, Plaintiffs objected in writing and refused consent; that same morning, Defendants posted M.S.'s information on the OnSeen LiveCARE Marketplace.

396. Defendants did precisely what they had assured this family they would never do, as Defendant Hathaway had previously stated: "I would never publish a provider request for [M.S.] without your knowledge or consent."

397. The online posting produced no provider and changed nothing. On February 12, 2026, the day DODD approved M.S.'s Extraordinary Care Instrument and Parent Exception, Defendants' counsel emailed Plaintiffs' counsel: "The parents' ability to serve as the child's provider will continue… Are you going to be dismissing the case given the above?"

398. Defendants thus abandoned both consequences they had threatened, never removing M.S.'s parents and never allowing her service plan to lapse, and instead carried out the one act they had never identified as a consequence at all: the public disclosure of a disabled child's private information, followed immediately by a request that her family abandon this lawsuit.

399. An adverse action that inflicts injury while accomplishing none of its stated purpose, taken after protected activity, in place of previously threatened consequences, on the heels of an unanswered objection, and followed by a request to dismiss the lawsuit, is retaliation.

66

400. Defendants posted M.S.'s information on the LiveCARE Marketplace, at least in part, in response to and to retaliate for Plaintiffs' protected activity and to pressure Plaintiffs to abandon this action.

401. Defendants' conduct would deter a person of ordinary firmness from prosecuting a lawsuit or objecting to government conduct: no parent of ordinary firmness would continue protected activity knowing the price is the publication of their disabled child's intimate information to hundreds of strangers and the conditioning of the child's essential services on submission.

402. The right to be free from government retaliation for filing and prosecuting a lawsuit and for objecting in writing to government conduct, including the taking of adverse action that would deter a person of ordinary firmness from continued protected activity, was clearly established at all relevant times, as was the principle that a government actor may not condition a person's receipt of an established benefit on the surrender of that person's First Amendment rights.

403. At all relevant times, Defendants acted under color of state law.

404. Each Defendant is responsible in the respects set forth in the factual allegations above.

405. Defendant Horvath conditioned M.S.'s service plan on completion of a "provider search", asserted the search was mandatory notwithstanding the contrary record, and predicted in the same email that it would produce no provider.

406. Defendant Manuel held final decision-making authority over the parent replacement policy, which by Defendants' own account "went above Tony" so that "Megan" would "make this decision"; she maintained the requirement after receiving Plaintiffs' September 23 objection; she was aware since at least October 8, 2025 that DODD does not require these annual

67

advertisements of minor children; and she has admitted to altering the document showing DODD's position and sending that altered document to counsel.

407. Defendant Hidy directed the search, as Defendant WCBDD's sworn answer confirms in two words, "Tony Hidy," and he responded to Plaintiffs' written objection by directing Defendant Poteet to proceed.

408. Defendant Poteet compiled, posted, and disseminated M.S.'s information "as directed by superiors," solicited "READY and WILLING" declarations, and disclosed further information to eleven entities.

409. Defendant WCBDD is responsible because the conduct was its official policy and practice, was directed and authorized by Defendants Manuel and Hidy as final policymakers, and was carried out by WCBDD personnel acting within the scope of their duties.

410. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiffs suffered the nonconsensual publication of M.S.'s intimate personal information, the conditioning of her essential services on submission to the search, the loss of the opportunity to prevent the posting through emergency relief, the burdening and chilling of their protected activity, and humiliation, mental anguish, and emotional distress.

411. Plaintiffs further face ongoing and prospective harm, including the threat that Defendants will again condition M.S.'s services on, and again post her information in connection with, any future provider search in response to Plaintiffs' continued prosecution of this action, for which Plaintiffs are entitled to injunctive relief.

412. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

68

**COUNT THREE**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
**Parent Replacement Searches**
**Against All Defendants**

413. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

414. A benefit recipient possesses a property interest protected by the Due Process Clause where statutes and regulations create a legitimate claim of entitlement to the benefit rather than a mere expectation of it.

415. M.S. has such an interest in her Medicaid Individual Options Waiver services. The governing provisions of the CMS-approved IO Waiver and its implementing regulations, including 42 C.F.R. § 441.301(c), are mandatory: once a participant is determined eligible and her services are authorized in a person-centered service plan, those services must continue as written, delivered by the qualified and willing providers the participant chooses, and may be modified only through a defined process supported by an assessed change in need. Defendants retain no discretion to discontinue, reduce, or condition authorized services outside that process.

416. M.S. accordingly holds a legitimate claim of entitlement, protected as property, in the continued receipt of her authorized waiver services, in their delivery by her freely chosen providers as reflected in her service plan, and in their continuation without reduction or interruption pending resolution of any appeal.

417. M.S. also holds a constitutionally protected interest in the confidentiality of the personal and medical information contained in her county board records, an interest confirmed by R.C. 5126.044(B)'s written-consent requirement, R.C. 5123.62(T), and WCBDD's own privacy policy.

69

418. Plaintiffs invoke the waiver terms, Medicaid regulations, and Ohio statutes cited in this Count solely as the sources that create and define M.S.'s protected interests, and not as independent federal rights enforced through this Count.

419. Defendants deprived Plaintiffs of those interests through the recurring parent replacement search policy: they repeatedly sought replacements for M.S.'s chosen providers, compelled Plaintiff Lindsey Sodano to perform uncompensated recruitment labor, conditioned implementation of M.S.'s 2026 service plan on completion of a search, disseminated M.S.'s personal information to OnSeen, Inc. and hundreds of third parties over Plaintiffs' written objection, and maintained a standing threat that rejection of any self-declared "willing and able" or "READY and WILLING" applicant will end the parents' service and most of M.S.'s authorized care hours.

420. The Due Process Clause required, before any of these deprivations, prior written notice identifying the proposed action and the legal authority and standards on which it rested, a statement of the right to appeal and the procedure for exercising it, a meaningful opportunity to be heard before a neutral decisionmaker, and continuation of M.S.'s authorized services pending any appeal.

421. The process the State itself extends confirms what was due: Appendix F of the IO Waiver provides that enrollees affected by any decision to deny the choice of a qualified and willing provider, or to change enrollment, services, or the service plan, shall be afforded Medicaid due process, including prior written notice and the right to a state hearing, and OAC 5123-9-11 provides hearing rights to any individual denied the choice of a qualified and willing provider.

422. Defendants provided none of it, at any point, to any Plaintiff, in connection with any provider search.

70

423. The absence of process is structural. Before and during a search, Defendants contend no process is due because, in their words, "WCBDD has taken no adverse action" and "there are no services being denied to provide appeal rights for"; after a search, OAC 5160-44-32(J) provides that the resulting qualification determination "is not subject to notice and appeal rights."

424. At no point before, during, or after a parent replacement search, including the disclosure of M.S.'s records that the 2026 search entailed, could Plaintiffs obtain notice, a hearing, or review by any neutral decisionmaker.

425. Plaintiffs asked anyway, repeatedly and in writing, including Plaintiff Lindsey Sodano's November 18 and 24, 2025 emails to Defendants Hathaway, Lindeen, Hidy, and Manuel, and counsel's December 4, 2025 request to Defendant Horvath: "[P]lease provide the due process appeal forms, so that M.S. can appeal this demand from the Board." No Defendant responded with any process.

426. Defendant WCBDD has confirmed the totality of the denial in a sworn discovery response: asked to produce all documents reflecting any written notice of appeal rights, hearing rights, or any mechanism to challenge the search and disclosure, WCBDD answered, "None. There was no reduction, alteration, or change in services."

427. The only opportunity to object Defendants ever afforded was an email from their own litigation counsel setting a same-day deadline; Plaintiffs objected in writing the next morning, and Defendants proceeded that same day. An objection channel that runs to opposing counsel in the objector's own lawsuit, on a one-day deadline, with no power to affect the outcome, is not process.

71

428. Under Defendants' sworn position that a document compelled from Plaintiff Lindsey Sodano in 2024 constitutes consent overriding the family's 2026 written objection, even the objection itself was a nullity, and no future objection can ever prevent the next disclosure.

429. The denial of process is itself a completed constitutional injury, independent of the outcome of any provider search and independent of the lawfulness of the underlying information disclosure.

430. The right to prior written notice and a meaningful opportunity to be heard before a neutral decisionmaker, before the government deprives a person of an established property interest in continued benefits or of the confidentiality of protected records, was clearly established at all relevant times, and it was equally clearly established that a government actor may not evade those requirements by declining to characterize its action as adverse.

431. At all relevant times, Defendants acted under color of state law.

432. Each Defendant is responsible for the deprivation in the respects set forth in the factual allegations above.

433. Defendant Manuel held final decision-making authority over the policy, which by Defendants' own account "went above Tony" so that "Megan" would "make this decision," and maintained it without providing or authorizing any process.

434. Defendant Hidy directed the searches, stating in writing that the process was conducted "at [his] direction," directed the 2026 search to proceed over Plaintiffs' written objection, and provided no process.

435. Defendant Horvath conditioned M.S.'s service plan on the search, asserted a mandatory requirement while identifying no legal authority.

436. Defendant Hathaway conducted Parent Replacement Search 2, received Plaintiffs' written objection and requests for appeal rights before Search 3, told Plaintiffs, "these are not decisions that I can make," and provided no appeal rights.

437. Defendant Lindeen supervised the SSAs who conducted the searches and personally received and considered Plaintiffs' requests for appeal rights; Defendant Hathaway's case notes record that "Supervisor [Lindeen] has reached out for guidance, as there are no services being denied to provide appeal rights for," and no process was ever provided.

438. Defendant Poteet conducted the 2026 search over Plaintiffs' written objection, disseminated M.S.'s information online, and afforded no notice, hearing, or appeal before or after doing so.

439. Defendant WCBDD is responsible because the conduct was its official policy and practice, was directed and authorized by Defendants Manuel and Hidy as final policymakers, and was carried out by WCBDD personnel acting within the scope of their duties; WCBDD provided no process at any point, as its own sworn answer confirms.

440. M.S. was separately deprived of her confidentiality interest without process: her records were disclosed to OnSeen, Inc. and hundreds of third parties without prior notice, without any opportunity to be heard before a neutral decisionmaker, and without any appeal mechanism, notwithstanding Plaintiffs' written objections. The absence of any process to contest that disclosure is itself a completed procedural due process injury, independent of the unlawfulness of the disclosure itself.

441. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered the deprivations described above with no meaningful opportunity to contest them, including compelled and uncompensated recruitment labor, the conditioning of M.S.'s essential

services, the disclosure of her private information, and loss of authority over intimate caregiving decisions.

442. As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

443. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT FOUR**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Substantive Due Process**
**Against All Defendants**

444. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

445. M.S., a child with profound disabilities, has a fundamental liberty interest in bodily integrity and personal security, including the right to be free from government action compelling intimate physical contact, bathing, diapering, menstrual care, undressing, and hands-on assistance by unfamiliar persons not of her or her parents' choosing.

446. The care at issue is among the most intimate that can be provided to a person, performed on a nonverbal child who cannot consent to, refuse, or report what is done to her body.

447. Defendants conducted recurring parent replacement searches for the purpose of replacing M.S.'s long-standing, fully trained caregivers with unfamiliar "willing and able" or "ready and willing" persons to perform these intimate tasks, knowing that M.S. is nonverbal, incontinent, medically fragile, unable to communicate pain or fear with specificity, unable to report mistreatment, and uniquely vulnerable to harm when handled by persons who do not know her seizure patterns, behavioral cues, or communication signals.

74

448. Defendants knew from their own assessment of M.S. that "temporary providers/volunteers with only brief training do not understand [M.S.'s] risk profile."

449. Plaintiffs Lindsey and Justin Sodano have a fundamental liberty interest in directing the care, custody, and control of their minor child, including the right to decide who may provide intimate personal care to their medically fragile daughter.

450. That right belongs to fit parents, and there has never been any finding, allegation, or suggestion that Lindsey or Justin Sodano is unfit; to the contrary, WCBDD's own planning record states that "the best thing that ever happened" to M.S. is "[h]aving her parents be her provider."

451. The parents exercised that right unmistakably: they selected M.S.'s providers, they declined to authorize a replacement search, and on January 27, 2026, they communicated their decision in writing that M.S.'s information was not to be disclosed to third parties.

452. Defendants have admitted in sworn discovery responses that they possessed that written parental decision and overrode it: Defendant Hidy directed Defendant Poteet to proceed with the search using the summary of needs Plaintiff Lindsey Sodano had written in 2024.

453. Defendants' sworn position is that the 2024 document, written under Defendants' assertion that the search was legally required and under threat that refusal would end the parents' ability to serve, constitutes parental consent that overrides the parents' express contrary decision in 2026.

454. The State thus claims the power to extract a decision from fit parents by compulsion, treat it as irrevocable, and substitute it for every contrary decision those parents ever make about their own child, without any finding of unfitness and without any process.

75

455.    Nothing reveals the substitution of the State's judgment for the parents' more starkly than the alternative Defendants kept in reserve: in 2022, after M.S.'s funding score increased, WCBDD personnel compiled a list of institutions "that take children" for M.S., an institutional placement her parents never requested and would never approve, and never told them.

456.    Defendants enforced the parent replacement requirement as though it were mandatory law; in fact it rests on an online FAQ page never promulgated through rulemaking, which DODD itself told the Supreme Court of Ohio is "aspirational rather than mandatory."

457.    Defendant Manuel imposed and maintained the requirement while acknowledging to DODD in writing that she did not know what would happen if a parent refused; Defendants thus wielded coercive governmental power against a disabled child and her family pursuant to a requirement they could not ground in law and did not know how to enforce.

458.    Defendants conditioned M.S.'s 2026 service plan going into effect, and thus her continued receipt of essential Medicaid waiver services, on the family's submission to the search, leveraging M.S.'s dependence on those services to coerce the surrender of the parents' right to direct her care and M.S.'s right to bodily integrity.

459.    Defendants' own stated position is that the requirement ends when M.S. turns eighteen in November 2026; the forced transition Defendants sought would have placed M.S. in the hands of untrained replacement caregivers for a matter of months before the requirement expired by its own terms, making it not only dangerous but arbitrary and self-defeating.

460.    Defendants' conduct infringed the fundamental liberty interests of M.S. and her parents, was not narrowly tailored to any compelling governmental interest, and served no legitimate governmental interest.

76

461. In the alternative, Defendants' conduct was arbitrary, conscience-shocking, and oppressive in the constitutional sense: it disregarded Defendants' own documented warnings about untrained caregivers, advanced applicants Defendants knew or should have known to be unsafe toward intimate access to a child who cannot report mistreatment, overrode the written decision of fit parents that Defendants admit they held in hand, rested on a requirement without force of law that Defendants could not explain how to enforce, and leveraged a medically fragile child's dependence on essential services to coerce her family.

462. In the further alternative, Defendants' affirmative conduct created or increased a specific, known, and foreseeable danger to M.S. by soliciting and advancing unscreened or unsuitable individuals, including an applicant with documented citations for failing to run background checks on its care workers, toward unsupervised intimate access to a nonverbal child unable to report abuse, exposing her to a danger she would not otherwise have faced.

463. The fundamental right of fit parents to direct the care, custody, and control of their minor child, and a profoundly disabled child's fundamental liberty interest in bodily integrity and freedom from compelled intimate physical contact by unfamiliar persons, were each clearly established at all relevant times, as was the principle that the government may not override the decisions of parents whom it has never found to be unfit.

464. At all relevant times, Defendants acted under color of state law.

465. Each Defendant is responsible in the respects set forth in the factual allegations above.

466. Defendant Manuel held final decision-making authority over the policy, which by Defendants' own account "went above Tony" so that "Megan" would "make this decision," and caused the coercive conditions to be imposed and maintained.

77

467. Defendant Hidy directed the searches, stated in writing that the process was conducted "at [his] direction," and, by Defendants' sworn account, responded to the parents' written objection by directing that the search proceed.

468. Defendant Horvath conditioned M.S.'s service plan on the search and directed that Plaintiffs' objections "cannot continue" and that Mrs. Sodano "may not dictate" who enters the family home.

469. Defendant Lindeen, informed in 2022 that M.S.'s assessed needs had increased, participated in the internal effort to reduce M.S.'s standardized test score during the same period Ms. Carr compiled institutional-placement lists for M.S., and later supervised the SSAs who conducted the 2025 and 2026 replacement searches; her conduct reflects a recurring pattern of responding to M.S.'s increasing needs with measures directed away from sustaining her care in her family home.

470. Defendant Hathaway conducted Search 2 while describing applicants as having "a sketchy past" and acknowledging that it takes "five years" for abusers to be added to the registry meant to protect individuals like M.S.

471. Defendant Poteet conducted the 2026 search and posted M.S.'s information over her parents' express written objection.

472. Defendant WCBDD is responsible because the conduct was its official policy and practice, was directed and authorized by Defendants Manuel and Hidy as final policymakers, and was carried out by WCBDD personnel acting within the scope of their duties.

473. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered completed injuries, including the override of the parents' written decision regarding their child's care and

78

information, the conditioning of M.S.'s essential services on the family's submission, compelled and uncompensated recruitment labor, and loss of authority over intimate caregiving decisions.

474.    M.S. further faces ongoing and prospective harm, including the risk of physical injury, abuse, mismanaged seizures, elopement, hospitalization, and institutionalization should Defendants resume or complete the forced replacement of her caregivers, for which Plaintiffs are entitled to injunctive relief.

475.    As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

476.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT FIVE**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Equal Protection**
**Process Denied to Minor Recipients with Parent Providers**
**Against All Defendants**

477.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

478.    The Equal Protection Clause prohibits state actors from intentionally subjecting a class of similarly situated individuals to different treatment without a rational basis for the difference.

479.    M.S. belongs to a class of IO Waiver recipients consisting of minor recipients whose chosen qualified and willing providers are their parents. The parent replacement policy applies by its own terms only to that class: adult recipients with parent providers, adult recipients with non-parent providers, and minor recipients with non-parent providers are not subjected to recurring searches to replace their chosen providers.

480.     When WCBDD proposes to reduce, deny, terminate, or otherwise change any IO Waiver participant's services, it affords the participant fair hearing process: prior written notice, the right to request a state hearing, and continuation of services pending appeal. Appendix F of the CMS-approved IO Waiver reflects the State's own articulation of that process, and Plaintiffs invoke it solely to establish the process the State extends to other recipients, not as an independent federal right enforced through this Count.

481.     Defendants subjected M.S. and her class to actions adversely affecting their waiver services — recurring parent replacement searches, the conditioning of M.S.'s service plan on completion of a search, the disclosure of her records incident to the search, and the threatened removal of her chosen providers — while withholding the notice, hearing, and continuation-pending-appeal process the State affords every other recipient.

482.     The denial of process to M.S.'s class is no longer a matter of inference: Defendants have confirmed it in a discovery response, answering that the documents reflecting any notice of appeal rights, hearing rights, or challenge mechanism provided to Plaintiffs are "None."

483.     The differential treatment is intentional: it follows from the express age-and-relationship terms of the policy Defendants adopted and enforced, and from Defendants' refusal to provide the requested process notwithstanding Plaintiffs' repeated written requests.

484.     Defendant Hathaway described the class-defining line in Defendants' own words: "We're gonna do it every six months until she turns 18, and check the box."

485.     No rational basis supports affording due process to every recipient whose services the State attempts to change while denying that same process to minor recipients whose providers are their parents; any interest in administering the waiver is served identically as to both groups,

80

and neither administrative preference nor the adoption of a non-binding online FAQ as though it were law supplies a rational basis.

486.    At all relevant times, Defendants acted under color of state law.

487.    Each Defendant is responsible in the respects set forth in the factual allegations above.

488.    Defendant Manuel held final decision-making authority over the policy, which by Defendants' own account "went above Tony" so that "Megan" would "make this decision," and maintained both the policy and the denial of process.

489.    Defendant Hidy directed the searches imposed on the class, received Plaintiffs' written requests for appeal rights, and provided none.

490.    Defendant Horvath conditioned implementation of M.S.'s service plan on the search and communicated the class-specific requirements without identifying any notice, hearing, or appeal process.

491.    Defendant Hathaway conducted a search affecting M.S.'s services and, upon receiving Plaintiffs' written requests for appeal rights, provided none.

492.    Defendant Lindeen received and considered Plaintiffs' requests for appeal rights, as recorded in Defendant Hathaway's case notes, and provided none.

493.    Defendant Poteet applied the class-specific actions to M.S., conducting the 2026 search and listing her on the OnSeen LiveCARE Marketplace, and afforded Plaintiffs no means to contest those actions before, during, or after carrying them out.

494.    Defendant WCBDD is responsible because the conduct was its official policy and practice, was directed and authorized by Defendants Manuel and Hidy as final policymakers, and was carried out by WCBDD personnel acting within the scope of their duties.

81

495. As a direct and proximate result of Defendants' intentional disparate treatment, Plaintiffs suffered the denial of the notice, hearing, and appeal process afforded all other recipients, and were left without any means to contest the actions affecting M.S.'s services; M.S. further faces ongoing and prospective harm, including the threatened loss of her medically necessary services with no process to contest it, for which Plaintiffs are entitled to injunctive relief.

496. As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

497. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT SIX**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Equal Protection Clause**
**Burdens Imposed Only on Minor Recipients with Parent Providers**
**Against All Defendants**

498. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

499. The Equal Protection Clause prohibits state actors from intentionally treating a class of similarly situated individuals differently from others without a rational basis.

500. With respect to the selection and retention of her qualified and willing providers, M.S. is similarly situated to all other IO Waiver recipients.

501. The State extends to IO Waiver recipients a uniform provider selection process: a participant selects providers from the qualified providers available through the ordinary DODD process, which requires no participant to be advertised online or listed on any marketplace. (OAC 5123-9-11; IO Waiver, Appendix D-1.) Plaintiffs invoke these provisions solely to

82

establish the baseline process the State affords other participants, not as independent federal rights enforced through this Count.

502.    Defendants impose on one classification of participants, and only that classification, burdens no other participant bears. By its own terms, the policy applies solely to minor participants whose chosen qualified and willing providers are their parents; it is not imposed on adult participants served by parent providers, minor participants served by non-parent providers, or adult participants served by non-parent providers.

503.    The burdens imposed on M.S.'s classification alone are: recurring mandatory provider replacement searches; mandatory advertisement of the participant on an online portal or marketplace, with or without consent; and the threatened removal of the participant's chosen providers, and loss of her authorized services, if the family declines any self-declared "willing and able" or "ready and willing" replacement.

504.    A recipient in M.S.'s classification who declines to be advertised faces one of two consequences: her parent providers will no longer be authorized, or Defendants will post her online without consent and against objection, as Defendants did to M.S. on January 27, 2026.

505.    No participant outside the classification is subjected to any of these conditions; every other recipient selects and retains providers through the ordinary process without being advertised online and without forfeiting services for declining an unwanted replacement.

506.    Defendants applied the classification's burdens to M.S. in full: three replacement searches, the OnSeen LiveCARE Marketplace posting over written objection, and the conditioning of her 2026 service plan, all because she is under eighteen and her chosen providers are her parents.

507.     The differential treatment is intentional, following directly from the express age-and-relationship terms of the policy Defendants adopted and enforced; Defendant Hathaway stated the classification's operative rule in Defendants' own words: "We're gonna do it every six months until she turns 18, and check the box."

508.     The classification bears no rational relation to any legitimate governmental purpose. Any interest in identifying providers is fully served for every other participant through the ordinary DODD process, and Defendants can articulate no legitimate interest in forcing only this group onto an online marketplace or into destabilizing caregiver turnover.

509.     Defendants' own sworn answers confirm the absence of any external mandate: no response was ever received to Defendant Manuel's question to DODD asking if WCBDD should "proceed without them", and DODD represented to the Supreme Court of Ohio that boards conducting the searches are "exercising their own discretion."

510.     The classification is overinclusive, stripping minor participants of safe, qualified, willing parent providers regardless of the providers' performance or the participant's preference, and underinclusive, leaving untouched every other group to which any asserted justification would apply with equal force.

511.     The arbitrariness of the line is confirmed by Defendants' own position that the policy ends at eighteen: Defendants would force a participant to surrender safe, chosen providers and accept unfamiliar replacements for only the brief period before the requirement expires, after which the same participant could choose the same parent providers without restriction.

512.     The age- and relationship-based classification thus fails even the most deferential rational basis review.

513.     At all relevant times, Defendants acted under color of state law.

84

514. Each Defendant is responsible in the respects set forth in the factual allegations above.

515. Defendant Manuel held final decision-making authority over the policy, which by Defendants' own account "went above Tony" so that "Megan" would "make this decision."

516. Defendant Hidy directed the searches imposed on the classification and stated in writing that the process was conducted "at [his] direction."

517. Defendant Horvath conditioned implementation of M.S.'s service plan on the search.

518. Defendant Hathaway conducted Parent Replacement Search 2, applying the classification's burdens to M.S.

519. Defendant Lindeen supervised the SSAs who conducted the searches and participated in the determinations applying the classification's burdens, as recorded in Defendant Hathaway's case notes.

520. Defendant Poteet conducted the 2026 search and caused M.S.'s listing on the OnSeen LiveCARE Marketplace, applying the classification's burdens to M.S.

521. Defendant WCBDD is responsible because the classification and its burdens were its official policy and practice, directed and authorized by Defendants Manuel and Hidy as final policymakers, and carried out by WCBDD personnel acting within the scope of their duties; per Defendant Hathaway, approximately 10 to 12 minor recipients in Warren County are subject to the classification, and the extent of its application is within Defendants' knowledge and will be established through discovery, including Plaintiffs' pending comparator discovery.

522. As a direct and proximate result of Defendants' intentional disparate treatment, Plaintiffs suffered completed injuries no other recipient bears: compelled replacement searches, the online advertisement of M.S., compelled and uncompensated recruitment labor, and coercive threats to M.S.'s chosen providers and services; M.S. further faces ongoing and prospective harm,

85

including loss of continuity of care and elevated risk of institutionalization should Defendants resume the forced replacement of her caregivers, for which Plaintiffs are entitled to injunctive relief.

523. As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

524. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT SEVEN**
**42 U.S.C. § 1983**
**First and Fourteenth Amendments**
**Denial of Access to Courts — Altered Evidence and the Forgone TRO**
**Against Defendants Manuel and WCBDD**

525. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

526. The First Amendment's Petition Clause and the Due Process Clause of the Fourteenth Amendment guarantee meaningful access to the courts. A state actor who, by concealing or misrepresenting material facts, causes a litigant to forgo judicial relief that is thereafter permanently unavailable denies that litigant access to the courts.

527. In December 2025, Plaintiffs possessed a nonfrivolous claim for emergency injunctive relief: a drafted temporary restraining order to prevent the impending disclosure of M.S.'s confidential information through the parent replacement search, grounded in the privacy and consent rights described in this Complaint.

528. That claim was nonfrivolous on its face and is confirmed by what followed: the disclosure Plaintiffs sought to prevent occurred on January 27, 2026, over their express written objection, as described above.

529.    On December 19, 2025, Plaintiffs informed Defendants' counsel that they were preparing to seek the TRO and proposed holding the provider search in abeyance; that same day, Defendants' privilege log shows Defendant Horvath forwarding Plaintiffs' email to Defendant Manuel.

530.    Four days later, on December 23, 2025, Defendant Manuel altered the WCBDD-DODD email chain in the three respects she has admitted to, as described above; Defendant Manuel marked none of the deletions, and the altered document appeared facially continuous and complete.

531.    The altered document concealed the facts most material to the TRO decision: that DODD had characterized the search as a recommendation rather than a requirement, that Defendant Manuel possessed Plaintiffs' written objection and DODD's admissions to the Supreme Court of Ohio, and that Defendant Manuel's inquiry to DODD had been made in express contemplation of this litigation.

532.    On December 26, 2025, Defendants' attorney Abshier told Plaintiffs' counsel that he possessed an email from DODD stating that the provider searches were required; he sent the altered document on December 29, stating, "The only thing redacted is their e-mail forwarding the e-mail chain to me."

533.    That representation of completeness was false: Defendant Manuel had removed three emails and multiple sentences without noting the deletions.

534.    Plaintiffs reasonably believed the document was complete and authentic, and, relying in part on it, did not file the TRO they had drafted.

535.    Had Plaintiffs received the complete document, or no document at all, Plaintiffs would have filed the TRO.

87

536. Because the TRO was never filed, no court ever had the opportunity to determine whether emergency relief should issue before Defendants posted M.S.'s confidential information to the OnSeen LiveCARE Marketplace on January 27, 2026.

537. Defendant Manuel's conduct was intentional, or at minimum undertaken with reckless disregard for whether the altered document would mislead Plaintiffs and this Court: she made the alterations four days after learning a TRO was imminent, in a manner that concealed the alterations, and neither she nor any Defendant disclosed the alteration at any time in the six months that followed, including while the altered document sat in the record of this case as Exhibit J to Plaintiffs' Motion to Disqualify.

538. The unaltered chain was produced only on June 29, 2026, and only after Plaintiffs identified an anomaly themselves and demanded the complete chain in a discovery deficiency letter.

539. The remedy Plaintiffs lost cannot be obtained through any other claim in this action. The opportunity to prevent the disclosure before it occurred was the remedy; prevention is now permanently unavailable. M.S.'s information cannot be retrieved from OnSeen, Inc.'s systems or from the 392 entities that received access to it, and no award of damages on Plaintiffs' remaining claims restores the lost opportunity to have kept that information private in the first place. Plaintiffs seek through this Count the value of that lost opportunity and the harms flowing from the forgone emergency relief, remedies not available through any other count.

540. At all relevant times, Defendant Manuel acted under color of state law.

541. Defendant Manuel is personally liable because she personally performed the alterations, as she has admitted, and transmitted the altered chain to counsel for use in addressing Plaintiffs' threatened emergency motion.

542. Defendant WCBDD is liable because Defendant Manuel is its Superintendent and final policymaker, and the conduct alleged in this Count was her own act as final policymaker, not the act of a subordinate.

543. As a direct and proximate result of Defendants' conduct, Plaintiffs lost the opportunity to obtain judicial review before the disclosure of M.S.'s confidential information, suffered the disclosure that emergency relief could have prevented, litigated this action for six months on a materially false record, incurred fees and effort researching, drafting, and filing documents in reliance on the altered document, and suffered humiliation, mental anguish, and emotional distress.

544. Plaintiffs are entitled to declaratory relief, compensatory and punitive damages against Defendant Manuel, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT EIGHT**
**42 U.S.C. § 1983**
**Municipal Liability - Monell**
**On Counts One through Seven**
**Against Defendant WCBDD**

545. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

546. The constitutional violations alleged in Counts One through Seven were undertaken pursuant to the official policies, practices, and customs of WCBDD, and were caused by the decisions and acts of WCBDD's final policymakers. Plaintiffs plead the following theories of municipal liability in the alternative and cumulatively.

547. **Official policy:** The parent replacement search requirement underlying Counts One through Six is itself an official policy and practice of WCBDD. WCBDD applied it to M.S. by conducting and threatening recurring replacement searches, conditioning her service plan on the search, posting her information to the OnSeen LiveCARE Marketplace over written objection,

89

discussing her with unauthorized third parties, and withholding the notice and hearing process afforded other recipients.

548. The deprivations alleged in Counts One through Six were the direct result of that policy, not of isolated or unauthorized acts.

549. **Final policymaker:** Within WCBDD, Defendant Manuel, as Superintendent, and Defendant Hidy, as Director of Service and Support Administration, held final authority over the administration of M.S.'s waiver services and over the parent replacement requirement and its application to her; their decisions on these matters were not subject to meaningful review within WCBDD and therefore represent the official policy of WCBDD.

550. Defendant Hidy directed the searches, stating in writing that the process was conducted "at [his] direction," and Defendants' sworn answers identify him as the sole person who directed the 2026 search and as the person who directed Defendant Poteet to proceed after receiving Plaintiffs' written objection.

551. The conduct alleged in Count Seven was likewise the act of a final policymaker: Defendant Manuel, WCBDD's Superintendent, personally altered the WCBDD-DODD email chain and transmitted it to counsel, as she has admitted in response to Plaintiffs' Requests for Admission. Because the act was the final policymaker's own, and not a subordinate's, it is the act of WCBDD itself, and no separate showing of policy or custom is required as to Count Seven.

552. **Ratification**: Defendant Manuel held final decision-making authority over the parent replacement policy; by Defendants' own account, the decision to continue the requirement after DODD represented to the Supreme Court of Ohio that it was not mandatory "went above Tony" so that "Megan" would "make this decision."

90

553. Defendant Manuel, with knowledge of the conduct and its claimed basis — including Plaintiffs' September 23, 2025 written objection and DODD's October 8, 2025 "recommend" email, both of which she received — approved and maintained the requirement under which the challenged conduct proceeded, thereby ratifying it.

554. **Custom**: By Defendants' own account, the parent replacement policy is a "protocol" applied uniformly to all minors with parent providers served by WCBDD — "everyone gets the same" — affecting approximately 10 to 12 children; the practice is persistent, widespread, and so settled as to constitute a custom of WCBDD with the force of official policy, and its full extent is within WCBDD's knowledge and will be established through discovery.

555. The policies, practices, customs, and final policymaker decisions and acts described above were the moving force behind the violations alleged in Counts One through Seven.

556. As a direct and proximate result, Plaintiffs suffered the harms alleged in Counts One through Seven, including the disclosure of M.S.'s intimate personal information, the denial of all process, the loss of the opportunity to obtain judicial review before an irreversible disclosure, coercive threats to M.S.'s services, and loss of authority over intimate caregiving decisions.

557. As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

558. Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT NINE
## 42 U.S.C. § 12203
## Americans with Disabilities Act - Retaliation
## Against Defendant WCBDD

559. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

91

560. Section 12203(a) of Title 42 prohibits retaliation against any individual because that individual has opposed an act or practice made unlawful by the ADA, or has made a charge or participated in any manner in a proceeding under the ADA, and § 12203(b) prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of ADA-protected rights.

561. Plaintiffs engaged in protected activity: on December 10, 2025, they filed and have since prosecuted this action, which asserts that Defendants' parent replacement policy discriminates against M.S. by reason of her disability in violation of Title II and Section 504, and on January 26, 2026, Plaintiffs through counsel opposed the policy in writing as "violative of the ADA."

562. Defendant WCBDD knew of that protected activity: the action was filed and served, WCBDD's counsel corresponded with Plaintiffs' counsel about it, and WCBDD attributed new requirements to "pending litigation matters" within two days of the filing.

563. After Plaintiffs engaged in protected activity, WCBDD took adverse action: it conditioned the continuation of M.S.'s service plan on submission to a provider replacement search, posted M.S.'s intimate personal information to the OnSeen LiveCARE Marketplace over Plaintiffs' express written objection, and disclosed further information to unauthorized third parties after receiving that objection.

564. The adverse action would deter a reasonable person from engaging in protected activity: no reasonable parent would continue prosecuting an ADA claim, or opposing a policy as disability discrimination, knowing the price is the conditioning of her disabled child's essential services and the publication of the child's intimate information to hundreds of strangers.

565. A causal connection exists between the protected activity and the adverse action, established by the sequence of WCBDD's own statements and sworn admissions.

92

566.    Before Plaintiffs filed suit, the only consequence WCBDD identified for declining the annual provider search was that the parents could not bill; six days after suit, WCBDD conditioned M.S.'s service plan on the search while stating it did not anticipate any willing provider would result.

567.    WCBDD then carried out a different consequence: it posted M.S.'s information to an online marketplace over written objection, soliciting "READY and WILLING" replacement care workers.

568.    Upon the search's predicted failure, WCBDD's counsel asserted that no "able and willing care worker was found and asked Plaintiffs' counsel: "Are you going to be dismissing the case given the above?"

569.    WCBDD's asserted justification, that DODD required this search, is contradicted by DODD's representations to the Supreme Court of Ohio that the guidance is "advisory on their face" and "aspirational rather than mandatory," by the "recommend" email WCBDD's Superintendent received on October 8, 2025, and by WCBDD's own sworn answer that no response was ever received to its question whether to proceed without Plaintiffs, and by WCBDD's search for "READY and WILLING" caregivers, a term not used anywhere by DODD.

570.    These facts establish that WCBDD posted M.S.'s information and made the further disclosures at least in part to retaliate for, and to pressure Plaintiffs to abandon, their protected activity, and that WCBDD's conduct coerced, intimidated, threatened, and interfered with Plaintiffs' exercise of ADA-protected rights.

571.    As a direct and proximate result of WCBDD's retaliatory conduct, Plaintiffs suffered the nonconsensual posting and disclosure of M.S.'s private information, humiliation, loss of privacy

93

and autonomy over intimate caregiving decisions, coercive threats to M.S.'s services, and the burdening and chilling of their protected activity.

572. Plaintiffs further face ongoing and prospective harm, including the threat that WCBDD will again condition M.S.'s services on, and again post her information in connection with, a future search in response to Plaintiffs' continued prosecution of this action, for which Plaintiffs are entitled to injunctive relief.

573. Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs pursuant to 42 U.S.C. §§ 12133 and 12203(c).

**COUNT TEN**
**42 U.S.C. § 12132; 29 U.S.C. § 794**
**ADA Title II and Section 504 — Disability Discrimination and the Integration Mandate**
**Against Defendant WCBDD**

574. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

575. Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. Section 504 of the Rehabilitation Act provides the same as to programs receiving federal financial assistance.

576. M.S. is a qualified individual with a disability: her neurogenetic disorder and traumatic brain injury substantially limit major life activities including communication, self-care, walking, and learning, and she meets the eligibility requirements for the IO Waiver services she receives. Defendant WCBDD is a public entity and a recipient of federal financial assistance.

577. Plaintiffs Lindsey and Justin Sodano are protected by both statutes' association provisions as persons with a known relationship and association with M.S.

94

578. The burdens of the parent replacement policy fall exclusively on children whose disabilities are most profound. Under the policy as Defendants administer it, only participants requiring "extraordinary care," those whose needs are so extensive that a parent qualifies as provider only when no other willing and able provider exists, are subjected to recurring replacement searches, online advertisement, and the threatened removal of chosen providers.

579. Severity of disability is the trigger: a minor participant with less extensive needs, served by non-parent providers, faces none of these conditions, while M.S., precisely because the extent of her disabilities places her in the extraordinary care category, is advertised, searched, and threatened with caregiver replacement on a recurring basis.

580. Defendants thus imposed conditions on M.S.'s receipt of waiver services by reason of her disability, denied her the equal opportunity to select and retain providers that less severely disabled participants enjoy, and administered the waiver through methods that subject the most severely disabled participants to burdens others do not bear.

581. The discrimination extends to the family caregiving on which M.S.'s community placement depends. DODD's FAQ, which Defendants enforced as law, provides that services a family does not want an outside provider to perform are deemed "natural supports", such that a family's very unwillingness to hand a severely disabled child's intimate care to strangers becomes the basis for withdrawing payment for that care.

582. The policy therefore presents families of the most profoundly disabled children with a choice no other family faces: surrender the child's intimate care to unfamiliar replacement providers, or provide the care without compensation.

583. Integration mandate: Title II's regulations require public entities to administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities, and

the unjustified institutionalization of persons with disabilities, or placement of them at serious risk of institutionalization, is discrimination by reason of disability.

584. M.S.'s family home is the most integrated setting appropriate to her needs, and her continued placement there depends on the paid family caregiving the policy targets: she qualifies at an ICF level of care, and the loss of her authorized care hours would place her at serious risk of institutionalization.

585. That risk is concrete and documented: in 2022, after M.S.'s funding score increased, WCBDD personnel compiled a list of ICFs "that take children" for M.S., an institutional placement her parents never requested and learned of only through discovery in this case.

586. By recurring attempts to strip M.S. of the caregiving arrangement that keeps her in her home and conditioning her service plan on submission to those attempts, WCBDD administered its services in a manner that places M.S. at serious risk of unnecessary institutionalization.

587. No fundamental alteration or other defense applies: continuing M.S.'s existing, funded, functioning caregiving arrangement requires no modification of WCBDD's programs at all, and by WCBDD's own sworn account no external authority ever directed the conduct.

588. Failure to make a reasonable modification: Title II and Section 504 require a public entity to make reasonable modifications to its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability, unless the entity demonstrates that the modification would fundamentally alter the nature of its service, program, or activity.

589. Plaintiffs requested such modifications. Plaintiffs asked Defendants to continue M.S.'s existing, functioning caregiving arrangement without subjecting her to a recurring replacement search, to refrain from advertising her online, and to refrain from disclosing her information to third parties over the family's objection. Plaintiffs made these requests repeatedly and in writing,

96

including Plaintiff Lindsey Sodano's September 23, 2025 written objection, counsel's November 24, 2025 pre-litigation notice invoking the ADA and Section 504 by name, and counsel's January 26, 2026 correspondence opposing the policy as "violative of the ADA."

590. Each requested modification was reasonable and necessary to avoid discrimination against M.S. by reason of her disability, and none would have fundamentally altered WCBDD's waiver program: continuing an arrangement WCBDD had already authorized, and forgoing an online advertisement that no statute or properly promulgated rule requires, imposed no new cost, function, or administrative burden on Defendants. Defendants refused each requested modification without conducting or documenting any individualized assessment of M.S.'s needs and without identifying any fundamental alteration the modifications would cause.

591. WCBDD acted intentionally and with deliberate indifference to the strong likelihood that its conduct would violate federally protected rights: it maintained and enforced the policy after Plaintiffs' written objections invoking M.S.'s rights, after DODD's admissions to the Supreme Court of Ohio, after receiving DODD's October 8, 2025 "recommend" email, and after Plaintiffs' counsel opposed the search in writing as "violative of the ADA," and it proceeded with the January 27, 2026 posting over Plaintiffs' express written objection delivered that morning.

592. As a direct and proximate result of WCBDD's discrimination, Plaintiffs suffered the recurring searches, the online advertisement of M.S., the conditioning of her essential services, coercive pressure to surrender her care to strangers, and the loss of equal opportunity to participate in and benefit from WCBDD's services.

593. M.S. further faces ongoing and prospective harm, including serious risk of institutionalization should Defendants resume or complete the forced replacement of her caregivers, for which Plaintiffs are entitled to injunctive relief.

97

594. Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 42 U.S.C. § 12205.

**COUNT ELEVEN**
**42 U.S.C. §§ 3604(f), 3617**
**Fair Housing Act — Discrimination and Interference**
**Parent Replacement Search Track**
**Against Defendant WCBDD**

595. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

596. The Fair Housing Act makes it unlawful to discriminate against any person in the provision of services or facilities in connection with a dwelling because of a handicap of that person, a person residing in the dwelling, or any person associated with that person, 42 U.S.C. § 3604(f)(2), and makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, rights granted or protected by § 3604, 42 U.S.C. § 3617.

597. M.S. has a handicap within the meaning of the Act, and Plaintiffs Lindsey and Justin Sodano are persons residing with and associated with her; the Sodano family home is a dwelling within the meaning of the Act.

598. M.S.'s in-home Medicaid waiver services are services provided in connection with her dwelling: they are delivered inside her home, and they are what makes her continued residence in that home possible. Defendant WCBDD, which administers those services, is subject to the Act; the Act contains no exemption for governmental entities.

599. WCBDD discriminated in the provision of those services because of M.S.'s handicap. Because of her handicap, M.S. requires hands-on assistance with every activity of daily living, delivered in her home; and by reason of that handicap and the care it requires, WCBDD

subjected her to conditions that attach only because of disability-related care needs: recurring searches to replace her chosen in-home caregivers, the advertisement of her person and needs on an online marketplace over her parents' written objection, the conditioning of her service plan on submission to the search, and the threatened removal of the caregivers on whom her ability to remain in her home depends.

600. The discrimination struck at M.S.'s housing itself. The threatened removal of her trained caregivers threatened the caregiving arrangement on which her ability to live in her family home, rather than an institution, depends.

601. The threat to M.S.'s housing was not conjectural: she qualifies at an ICF level of care, and in 2022 WCBDD personnel compiled a list of ICF beds "throughout the state" for her, an institutional placement her parents never requested and learned of only through discovery in this case.

602. WCBDD also interfered with, coerced, and intimidated Plaintiffs in the exercise and enjoyment of their fair housing rights, in violation of § 3617: it conditioned the continuation of M.S.'s in-home services on the family's submission to the search; it posted M.S.'s information, including the days and hours she is home, to an online marketplace over her parents' express written objection; it disclosed further information about her home-based care to unauthorized third parties; and it maintained a standing threat that declining any self-declared replacement will end the in-home caregiving arrangement on which M.S.'s ability to live at home depends.

603. This conduct followed and responded to Plaintiffs' exercise of protected rights, including their objections to the policy and their prosecution of this action asserting their fair housing and disability rights, and would deter a reasonable family from exercising those rights.

99

604. WCBDD acted intentionally and with reckless or callous indifference to Plaintiffs' federally protected rights: it maintained and enforced the policy after Plaintiffs' written objections, after DODD's admissions to the Supreme Court of Ohio, and after receiving DODD's October 8, 2025 "recommend" email, and it proceeded with the January 27, 2026 posting over the written objection it had received that morning.

605. To the extent Defendants contend that OAC 5160-44-32 or any other state enactment required or permitted the discriminatory and interfering conduct alleged in this Count, any such enactment is, to that extent and only to that extent, invalid under 42 U.S.C. § 3615, which invalidates state law "that purports to require or permit any action that would be a discriminatory housing practice." Plaintiffs do not seek the invalidation of OAC 5160-44-32(E)'s provisions permitting parents to serve as their children's paid providers, and nothing in this Count challenges them; Plaintiffs seek only a declaration that no state enactment required or permitted the conduct alleged herein.

606. As a direct and proximate result of WCBDD's violations, Plaintiffs suffered discrimination in services connected to their dwelling, coercive threats to the caregiving that sustains M.S.'s home placement, the publication of information about their home and its occupancy patterns, interference with the exercise of their fair housing rights, and emotional distress, humiliation, and mental anguish.

607. M.S. further faces ongoing and prospective harm, including serious risk of losing her home placement should Defendants resume the forced replacement of her caregivers, for which Plaintiffs are entitled to injunctive relief.

608. Plaintiffs are entitled to declaratory and injunctive relief, actual damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

100

**COUNT TWELVE**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(1)(a)**

609.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

610.    OAC 5160-44-32(E)(1)(a) provides that a parent of a minor child may provide waiver services to that child only if "there is no other willing and able provider or direct care worker available."

611.    Defendants have stated that their provider replacement policy is based upon OAC 5160-44-32(E)(1)(a). When asked to defend his statement that "Once provider interviews are concluded… the provider must state if they are able and willing to provide [M.S.]'s care," Defendant Hidy stated, "My statement is in reference to the following section of OAC 5160-44-32… A parent of a minor child… may only provide HCBS waiver services to an individual if… There is no other willing and able provider or direct care worker available to provide the HCBS waiver services to the individual."

612.    A law is void for vagueness if its enactment is impermissibly vague in all or virtually all of its applications. A law is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is required or prohibited, or if it is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement.

613.    Ohio Administrative Code Section 5160-44-32(E)(1)(a) is unconstitutionally vague on its face because it has no standards or definitions as to what "willing and able" means, and there are no set of facts by which "willing and able" would not be vague.

614. Ohio Administrative Code Section 5160-44-32(E)(1)(a) fails to provide a person of ordinary intelligence fair notice of what is required or prohibited, and it provides no standards governing its administration.

615. Specifically, it fails to define: (a) Who makes the "willing and able" determination; (b) What provider search process must be used; (c) What constitutes "willing" or "able"; (d) The duration or scope of any required search; (e) The consequences of refusal to perform recruitment-related labor; (f) Whether and how often the determination must be repeated.

616. OAC 5160-44-32(E)(1)(a) is impermissibly vague in all of its applications because, in every instance in which it is enforced, eligibility depends upon an undefined and standardless determination of whether another provider is "willing and able." As a result, every child subjected to the provision is exposed to a standardless decision-making process in which the county board may deem a provider "willing and able" without articulated benchmarks or limiting principles.

617. The absence of standards permits unfettered administrative discretion and creates a substantial risk of arbitrary, inconsistent, and discriminatory enforcement.

618. Because the "willing and able" provision is undefined and has no standards related thereto, OAC 5160-44-32(E)(1)(a) is unconstitutionally vague.

619. As applied to Plaintiffs, Defendants administered the rule in a standardless manner in which no person of ordinary intelligence, not even Defendant Superintendent Manuel herself, could determine what was required or what consequences would follow noncompliance. Defendants imposed obligations not derived from the rule's text and failed to provide written notice identifying governing standards or appeal rights.

102

620.    A law is also unconstitutionally void when its enactment reaches a substantial amount of constitutionally protected conduct.

621.    Ohio Administrative Code Section 5160-44-32(E)(1)(a) is also unconstitutional on its face because it reaches a substantial amount of constitutionally protected conduct.

622.    One of the ways in which it reaches constitutionally protected conduct is that it deprives Plaintiffs of the ability to contest the WCBDD's board's determination that a replacement provider is "willing and able", in a meaningful time and manner under the due process clause of the Fourteenth Amendment.

623.    The enforcement by WCBDD of the parent replacement policy, including repeated provider searches, purported expiration of prior determinations, compelled recruitment efforts, attempted displacement of freely chosen providers, and conditioning implementation of a child's person-centered service plan on repetition of the parent replacement search all reaches various constitutional protected conduct as set forth in the various causes of action in this amended complaint.

624.    OAC 5160-44-32 (E)(1)(a) implicates constitutionally protected property interests in continued Medicaid waiver services. The rule operates as a gateway condition affecting eligibility and continuation of essential public benefits, thereby affecting interests protected by the Fourteenth Amendment.

625.    The "willing and able" determination functions as a gateway condition affecting continued provision of Medicaid waiver services. By failing to articulate objective criteria or procedural safeguards, the rule creates a substantial risk of erroneous deprivation of protected property interests in ongoing Medicaid services.

103

626. OAC 5160-44-32 (E)(1)(a), facially and as applied, violates the Fourteenth Amendment's guarantee of due process of law.

627. To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32 (E)(1)(a), such enforcement was undertaken pursuant to WCBDD's official policy and were expressly directed, authorized, and ratified by Defendant Tony Hidy, who stated that the parent replacement search was conducted "at [his] direction," rendering WCBDD liable.

628. The forced replacement searches and implementation measures challenged in this Count were expressly directed, authorized, and ratified by Defendant Manuel and Defendant Tony Hidy, who stated that the parent replacement search was conducted "at [his] direction."

629. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

630. As a proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs have also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

631. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT THIRTEEN**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(1)(a)**

104

632.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

633.    OAC 5160-44-32(E)(1)(a) provides that a parent of a minor child may provide waiver services to that child only if "there is no other willing and able provider or direct care worker available."

634.    Defendants have stated that their provider replacement policy is based upon OAC 5160-44-32(E)(1)(a).

635.    The Equal Protection Clause prohibits intentional differential treatment of similarly situated individuals unless the classification is rationally related to a legitimate governmental interest.

636.    OAC 5160-44-32(E)(1)(a) imposes a free choice of provider restriction solely on minor waiver recipients whose providers are their parents and waiver recipients whose providers are their spouses.

637.    These recipients are similarly situated to: (a) Adult waiver recipients who use parent providers; (b) Adult waiver recipients who use non-parent providers; (c) Minor recipients who use non-parent providers; with respect to eligibility for Medicaid waiver services, free choice of provider rights, and health and safety requirements.

638.    The rule contains no individualized safety trigger, performance deficiency finding, fraud determination, or clinical assessment justifying the differential treatment of children who choose parent providers. Instead, it categorically subjects children with parent providers to caregiver displacement efforts solely because of familial status and age.

639.    If health and safety were the legitimate governmental interest, the rule would condition displacement on evidence of incompetence or risk. If program integrity were the interest, it

105

would rely on objective fraud or compliance findings. If continuity of care were the concern, it would evaluate individual service plans. OAC 5160-44-32(E)(1)(a) does none of these things.

640. By targeting only children whose parents are their providers, while permitting all other waiver recipients to continue using their freely chosen providers without comparable provider replacement efforts, the rule draws a line that has no relation to provider qualification, performance, or health and safety.

641. The classification is therefore arbitrary, overinclusive as to qualified parent providers, and underinclusive as to other similarly situated waiver recipients' providers, and fails rational basis review.

642. The classification is irrational because it: (a) Targets qualified, willing, approved providers for removal solely due to familial status; (b) Is overinclusive in subjecting qualified parent providers to forced displacement efforts regardless of performance; (c) Is underinclusive in exempting adults using parent providers and minors using unrelated providers from identical displacement requirements; and (d) Bears no rational relationship to health, safety, fiscal integrity, or continuity of care.

643. Accordingly, OAC 5160-44-32(E)(1)(a) fails rational basis review and is unconstitutional on its face.

644. As applied to M.S., Defendants subjected her to repeated provider replacement searches solely because she is a minor whose care workers are her parents.

645. Similarly situated adult recipients with parent providers, adult recipients with non-parent providers, and minor recipients with non-parent providers were not subjected to equivalent forced provider replacement efforts.

106

646. This disparate treatment was intentional and directly caused by Defendants' enforcement of OAC 5160-44-32(E)(1)(a).

647. Accordingly, OAC 5160-44-32(E)(1)(a), facially and as applied, violates the Equal Protection Clause.

648. To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32 (E)(1)(a), such enforcement was undertaken pursuant to WCBDD's official policy and were expressly directed, authorized, and ratified by Defendant Tony Hidy, who stated that the parent replacement search was conducted "at [his] direction," rendering WCBDD liable.

649. The forced replacement searches and implementation measures challenged in this Count were expressly directed, authorized, and ratified by Defendant Tony Hidy, who stated that the parent replacement search was conducted "at [his] direction."

650. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

651. As a direct and proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs have also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

652. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

### COUNT FOURTEEN
### 42 U.S.C. § 1983
### Fourteenth Amendment
### Due Process - Void for Vagueness

107

**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(2)(c)**

653.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

654.    OAC 5160-44-32(E)(2)(c) states: "a parent of a minor child… may serve as a direct care worker, within the following parameters: … (c) Unless otherwise permitted in HCBS waiver program rules, or determined by ODM, DODD or their designee, as necessary to ensure the health and safety of the individual and authorized on the PCSP, an individual who is a minor child may receive a maximum of forty hours per week of paid care from a parent or combination of parents and may not exceed the amount of service the individual is assessed to need. ODM, ODA, DODD or their designee may grant an exception to this limitation, in accordance with departmental program operational processes."

655.    Defendants used OAC 5160-44-32(E)(2)(c) to justify the purported need for another parent replacement search, with Defendant APA Horvath stating that a repeated parent replacement search is a prerequisite for renewing approval of an exception under OAC 5160-44-32(E)(2)(c).

656.    A law is void for vagueness if its enactment is impermissibly vague in all or virtually all of its applications. A law is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is required or prohibited, or if it is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement.

657.    Ohio Administrative Code Section 5160-44-32(E)(2)(c) is unconstitutionally vague on its face because it has no standards or definitions as to what "departmental program operational processes" govern the 40-hour exception process, and there are no set of facts by which "departmental program operation processes" would not be vague.

108

658. Ohio Administrative Code Section 5160-44-32(E)(2)(c) fails to provide a person of ordinary intelligence fair notice of: (a) The criteria required to obtain an exception above forty hours; (b) The evidentiary burden applicable to such a request; (c) The timeframe for approval or denial; (d) The duration of an exception once granted; (e) Whether renewal is required and under what standards; (f) What constitutes "departmental program operational processes"; and (g) What substantive limits constrain state-level discretion.

659. OAC 5160-44-32(E)(2)(c) is impermissibly vague in all of its applications because, in every instance in which it is enforced, eligibility depends upon an undefined and standardless "departmental program operational process." As a result, every child subjected to the provision is exposed to a standardless decision-making process in which DODD or its designee may grant or deny a 40-hour exception without articulated standards or the opportunity to appeal a denial.

660. The absence of standards permits unfettered administrative discretion and creates a substantial risk of arbitrary, inconsistent, and discriminatory enforcement.

661. Because the "departmental program operational processes" provision for receiving an exception to the 40-hour care limit is undefined and has no standards related thereto, OAC 5160-44-32(E)(2)(c) is unconstitutionally vague.

662. As applied to Plaintiffs, WCBDD, through Defendant APA Horvath, asserted that M.S.'s previously approved 40-hour exception had expired and required renewal, despite the absence of any expiration provision in OAC 5160-44-32 (E)(2)(c). Defendant APA Horvath further asserted that renewal was contingent upon completion of a parent replacement search, even though the regulation does not identify such a prerequisite. Defendant APA Horvath also conditioned implementation of M.S.'s February 2026 person-centered service plan on completion of these requirements, although no such condition appears in the rule.

663.    The standardless structure of OAC 5160-44-32(E)(2)(c) enabled discretionary enforcement and imposed a substantial risk that M.S. would lose medically necessary, already-approved care hours without adequate procedural safeguards.

664.    A law is also unconstitutionally void when its enactment reaches a substantial amount of constitutionally protected conduct.

665.    Ohio Administrative Code Section 5160-44-32(E)(2)(c) is also unconstitutional on its face because it reaches a substantial amount of constitutionally protected conduct.

666.    One of the ways in which it reaches constitutionally protected conduct is that it deprives Plaintiffs of the ability to contest the WCBDD's board's determination that the previous 40-hour exception expires and needs to be renewed in a meaningful time and manner under the due process clause of the Fourteenth Amendment.

667.    OAC 5160-44-32 (E)(2)(c) implicates constitutionally protected property interests in continued Medicaid waiver care hours in excess of 40 per week. The rule provides an opportunity for DODD or its designee to effectively reduce a child's authorized service hours above forty – which had already approved by the county board – to a cap of forty hours, simply by denying the 40-hour exception. This affects interests protected by the Fourteenth Amendment.

668.    By failing to articulate objective criteria for granting or denying the 40-hour exception and for when or whether a previously granted exception expires, the rule creates a substantial risk of erroneous deprivation of protected property interests in ongoing Medicaid waiver care hours in excess of forty per week.

669.    OAC 5160-44-32 (E)(2)(c), facially and as applied, violates the Fourteenth Amendment's guarantee of due process of law.

110

670. To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32(E)(2)(c), such enforcement was undertaken pursuant to the direction of Defendant APA Horvath, who exercised final policymaking authority for WCBDD with respect to interpretation and enforcement of the rule in Plaintiffs' case, and whose interpretation and enforcement were ratified by Policymakers Manuel and Hidy, rendering WCBDD liable.

671. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

672. As a direct and proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs have also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

673. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT FIFTEEN**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(2)(c)**

674. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

675. OAC 5160-44-32(E)(2)(c) states: "a parent of a minor child… may serve as a direct care worker, within the following parameters: … (c) Unless otherwise permitted in HCBS waiver program rules, or determined by ODM, DODD or their designee, as necessary to ensure the

111

health and safety of the individual and authorized on the PCSP, an individual who is a minor child may receive a maximum of forty hours per week of paid care from a parent or combination of parents and may not exceed the amount of service the individual is assessed to need. ODM, ODA, DODD or their designee may grant an exception to this limitation, in accordance with departmental program operational processes."

676. Defendants used OAC 5160-44-32(E)(2)(c) to justify the purported need for another parent replacement search, with Defendant APA Horvath stating that a repeated parent replacement search is a prerequisite for renewing approval of an exception under OAC 5160-44-32(E)(2)(c).

677. The Equal Protection Clause prohibits intentional differential treatment of similarly situated individuals unless the classification is rationally related to a legitimate governmental interest.

678. OAC 5160-44-32(E)(2)(c) imposes a categorical forty-hour cap and discretionary exception regime solely on minor waiver recipients whose caregivers are parents and who have been assessed to need more than forty hours per week of care.

679. These recipients are similarly situated to: (a) Adult waiver recipients who use any combination of parent caregivers for more than forty hours; (b) Adult recipients who use any combination of non-parent caregivers for more than forty hours; (c) Minor recipients who use any combination of non-parent caregivers for more than forty hours; with respect to eligibility for waiver services and assessment of medical need.

680. The classification is based solely on age and familial relationship.

681. The rule contains no individualized safety finding, performance deficiency, fraud determination, or clinical trigger justifying the cap or the discretionary exception regime.

112

682. If health and safety were the State's objective, the rule would condition limitation on demonstrated risk or incompetence. If fiscal integrity were the objective, it would rely on objective cost or fraud metrics applied uniformly across providers. If continuity of care were the objective, it would evaluate individualized service plans.

683. Instead, OAC 5160-44-32(E)(2)(c) categorically subjects medically fragile children to a standardless state-level veto over authorized care hours exceeding forty per week while permitting similarly situated recipients outside that class to access their care hours over forty per week without comparable restrictions.

684. The classification is overinclusive as to qualified parent providers and underinclusive as to other providers delivering identical services.

685. Accordingly, OAC 5160-44-32(E)(2)(c) fails rational-basis review and is unconstitutional on its face.

686. Defendant APA Horvath, asserted that M.S.'s previously approved 40-hour exception had expired and required renewal, despite the absence of any expiration provision in OAC 5160-44-32 (E)(2)(c).

687. Defendant APA Horvath further asserted that renewal was contingent upon completion of a parent replacement search, even though the regulation does not identify such a prerequisite.

688. Defendant APA Horvath also conditioned implementation of M.S.'s February 2026 person-centered service plan on completion of these requirements, although no such condition appears in the rule.

689. Similarly situated waiver recipients were not required to complete a provider replacement search as a condition of implementing their approved service hours.

690.    This disparate treatment was intentional and directly caused by enforcement of OAC 5160-44-32(E)(2)(c).

691.    Accordingly, OAC 5160-44-32(E)(2)(c), facially and as applied, violates the Equal Protection Clause.

692.    To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32(E)(2)(c), such enforcement was undertaken pursuant to the direction of Defendant APA Horvath, who exercised final policymaking authority for WCBDD with respect to interpretation and enforcement of the rule in Plaintiffs' case, and whose interpretation and enforcement were ratified by Policymakers Manuel and Hidy, rendering WCBDD liable.

693.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

694.    As a direct and proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs have also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

695.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT SIXTEEN**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Procedural Due Process**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(J)**

114

696. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

697. OAC 5160-44-32(J) states: "A decision by ODM, ODA, DODD, or their designee related to whether someone qualifies under this rule to serve as a provider or a direct care worker for an individual is not subject to notice and appeal rights under division 5101:6 of the Administrative Code."

698. The Fourteenth Amendment requires that the State provide notice and a meaningful opportunity to be heard before depriving an individual of protected liberty or property interests.

699. Where a governmental determination foreseeably affects continued receipt of authorized Medicaid services, continuity of chosen providers, or caregiver employment, procedural safeguards are constitutionally required.

700. Subsection (J) categorically eliminates notice and appeal rights for "qualification" determinations under OAC 5160-44-32.

701. Provider qualification determinations under this rule directly affect: (a) Whether a participant may receive services from a qualified and willing caregiver of their choice; (b) Whether currently authorized services may continue as structured; and (c) Whether willing and qualified providers may continue their employment.

702. By precluding notice and hearing rights for decisions that foreseeably alter or jeopardize protected interests, subsection (J) attempts to define away procedural protections through labeling them as provider qualification decisions.

703. The Constitution does not permit the State to avoid due process obligations by characterizing Medicaid service-affecting determinations as mere provider qualification decisions.

704. Because subsection (J) categorically denies procedural safeguards in a context where protected interests are at stake, it is facially unconstitutional.

705. As applied to M.S., Policymakers Manuel and Hidy refused to provide notice of appeal rights or identify any hearing mechanism through which Plaintiffs could challenge determinations affecting care worker continuation, qualification status, or service stability.

706. This absence of a neutral review mechanism created a substantial risk of erroneous deprivation.

707. By operating within the no-appeal framework authorized by subsection (J), Defendants deprived Plaintiffs of meaningful procedural protections.

708. Accordingly, subsection (J), facially and as applied, violates procedural due process.

709. To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32 (J), such enforcement was undertaken pursuant to the direction of Policymakers Manuel and Hidy, who repeatedly failed to provide due process, rendering WCBDD liable.

710. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

711. As a proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

712. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

116

**COUNT SEVENTEEN**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(J)**

713.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

714.    OAC 5160-44-32(J) states: "A decision by ODM, ODA, DODD, or their designee related to whether someone qualifies under this rule to serve as a provider or a direct care worker for an individual is not subject to notice and appeal rights under division 5101:6 of the Administrative Code."

715.    Subsection (J) eliminates notice and appeal rights only for qualification determinations made under OAC 5160-44-32.

716.    OAC 5160-44-32 (J) applies uniquely to waiver participants whose care workers are family members with legal powers (including natural guardianship, legal guardianship, power of attorney, inter alia).

717.    Participants receiving services from non-family providers are not subject to the same categorical elimination of appeal rights when service-affecting determinations are made.

718.    Thus, subsection (J) creates a procedural classification between: (a) Participants affected by family caregiver qualification determinations with no appeal protections; and (b) Participants affected by other provider related determinations who retain ordinary appeal protections.

719.    This classification is based solely on familial relationship.

720.    The rule contains no individualized justification for denying procedural protections to one subclass of waiver participants while preserving them for others.

117

721. By selectively stripping procedural safeguards from participants who have family caregivers, OAC 5160-44-32 (J) draws an irrational and arbitrary line.

722. Accordingly, OAC 5160-44-32 (J) fails rational basis review and is unconstitutional on its face.

723. As applied to M.S., policymakers Manuel and Hidy refused to provide notice of appeal rights or identify any hearing mechanism for determinations affecting caregiver qualification and service stability under the rule.

724. Similarly situated waiver participants outside the scope of OAC 5160-44-32 (J) are not subject to the same categorical elimination of appeal protections when service-affecting determinations are made.

725. The denial of procedural protections to M.S. operated pursuant to the framework established by subsection (J).

726. Accordingly, subsection (J), facially and as applied, violates the Equal Protection Clause.

727. To the extent the unconstitutional enforcement described herein constitutes an as-applied challenge to WCBDD's implementation of OAC 5160-44-32 (J), such enforcement was undertaken pursuant to the direction of Policymakers Manuel and Hidy, who repeatedly failed to provide due process, rendering WCBDD liable.

728. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered harm including loss of authority over intimate caregiving decisions, coercive threats to their child's Medicaid services, and the destabilizing intrusion of the State into core parental decision-making.

729. As a direct and proximate result of Defendants' illegal and unconstitutional acts as alleged, Plaintiffs have also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

730. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT EIGHTEEN**
**42 U.S.C. § 1983**
**First Amendment**
**Litigation Witness Requirement**
**Against Defendants WCBDD, Manuel, Hidy, Horvath, and Poteet**

731. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

732. The First Amendment, including its Petition Clause, protects the right to file and prosecute a lawsuit against government officials and to object in writing to government conduct.

733. Plaintiffs engaged in protected activity by filing this action on December 10, 2025, by prosecuting it, and by objecting in writing to the witness requirement itself.

734. Defendants took adverse action: they required litigation personnel to enter Plaintiffs' home as a condition of M.S.'s Medicaid services, conditioned her service plan going into effect on a witness in-home monitoring visit, and, when Plaintiffs declined the witness, refused to conduct the in-person visits M.S.'s services require, a refusal that continues to this day.

735. The retaliatory character of the requirement is established by Defendants' own words and sworn admissions.

736. The requirement was born with this lawsuit: on December 12, 2025, two days after filing, Defendant Hidy announced that "due to pending litigation matters" Lori Carr would accompany the SSA into Plaintiffs' home; in the years before this lawsuit, WCBDD conducted M.S.'s in-home visits without ever sending a witness.

119

737.   Defendants have admitted in briefing to this Court that the requirement exists because of the litigation: "Because the conflict had at that point escalated to litigation, the Board's attorney advised the Board to always include a witness when having direct contact with Plaintiffs." (ECF No. 23 at PageID 390.)

738.   The witness performed no service function: Ms. Roberts's own contemporaneous record of the January 16, 2026 entry states, "I did not serve the role as an SSA at this time, and was there as a witness."

739.   The requirement was imposed on this family alone: asked in discovery about any other waiver recipient or guardian ever told they may not dictate who enters their home, Defendants answered, "none other than Plaintiffs."

740.   No law required it: Defendants' sworn answer, asked to identify the basis for the requirement, stated only that "WCBDD is not aware of any statute or regulation that limits the number of individuals who may attend any in-person meetings."

741.   When Plaintiffs objected, Defendant Horvath, copying Plaintiff Lindsey Sodano personally, directed that the objection "cannot continue," announced that "Ms. Sodano may not dictate who attends on behalf of WCBDD," and conditioned M.S.'s service plan going into effect on the witness attending the visit at Plaintiffs' home.

742.   When Plaintiffs continued to object, Defendants escalated: by Defendants' sworn admissions, Defendants Manuel and Hidy issued the directive requiring the witness for all in-person visits, and Defendant Hidy personally decided that the March 2026 visit "will not take place" because Plaintiffs declined the witness; the May 2026 visit was likewise cancelled, and M.S.'s required 60-day visits remain uncompleted.

743. A directive imposed two days after suit, justified in Defendants' own filings by the litigation, serving no service function by the witness's own account, applied to no other family by Defendants' own sworn answer, resting on no identified legal authority, and enforced by withholding a disabled child's required visits, is retaliation for protected activity.

744. Defendants imposed and maintained the witness requirement, and cancelled M.S.'s required visits, at least in part in response to and to retaliate for Plaintiffs' protected activity.

745. Defendants' conduct would deter a person of ordinary firmness from filing or prosecuting a lawsuit: no parent of ordinary firmness would petition the courts knowing the price is the forfeiture of the right to decide who enters her home, the installation of litigation personnel at her child's Medicaid service coordination, and the suspension of her child's required Medicaid visits until she submits.

746. The right to be free from government retaliation for filing and prosecuting a lawsuit, including the imposition of new conditions on an established benefit and the withholding of that benefit in response to protected activity, was clearly established at all relevant times, as was the principle that a government actor may not condition a person's receipt of an established benefit on the surrender of her First Amendment rights or on her ceasing to object to the government's conduct.

747. At all relevant times, Defendants acted under color of state law.

748. Each Defendant is responsible in the respects set forth in the factual allegations above.

749. Defendant Manuel, with Defendant Hidy, issued the directive requiring the witness for all in-person visits, as Defendants' sworn answers admit.

750. Defendant Hidy announced the requirement two days after filing, attributed it in writing to "pending litigation matters," refused to proceed without the witness, and personally decided that required visits would not take place.

751. Defendant Horvath advised and announced the requirement "[o]n my advice," directed that Plaintiffs' objection "cannot continue" and that Mrs. Sodano "may not dictate" who enters her home, and conditioned M.S.'s service plan on submission.

752. Defendant Poteet enforced the requirement, arriving with the witness on December 18, 2025, communicating that visits would not occur without one, and failing to perform his statutory visit duties because Plaintiffs would not comply with the litigation witness requirement.

753. Defendant WCBDD is responsible because the requirement was its official directive, issued and maintained by Defendants Manuel and Hidy as final policymakers and carried out by WCBDD personnel within the scope of their duties.

754. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiffs suffered the coerced entry of litigation personnel into their home, the conditioning of M.S.'s essential services on submission, the suspension of M.S.'s required in-person visits, the burdening and chilling of their protected activity, and humiliation, mental anguish, and emotional distress.

755. Plaintiffs further face ongoing harm, as the requirement remains in force with no stated end and M.S.'s required visits remain uncompleted, for which Plaintiffs are entitled to injunctive relief.

756. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT NINETEEN**
**42 U.S.C. § 1983**

122

**Fourth Amendment**
**Coerced Entry Into Plaintiffs' Home**
**Litigation Witness Requirement**
**Against Defendants WCBDD, Manuel, Hidy, Horvath, and Poteet**

757.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

758.    The Fourth Amendment protects the right of the people to be secure in their houses against unreasonable searches and governmental intrusions. The home is first among equals under the Fourth Amendment, and its protections apply to civil and administrative intrusions by government officials, including entries to observe, monitor, and gather information.

759.    Government entry into a home requires a warrant, valid consent, or a recognized exception. Consent extracted by threatening the loss of essential government benefits is not voluntary, and a benefit may not be conditioned on the surrender of a constitutional right.

760.    Defendants demanded entry into Plaintiffs' home by litigation personnel, first Lori Carr, then Brittany Roberts, as a condition of M.S.'s Medicaid waiver services, over Plaintiffs' repeated written objections.

761.    The demanded entries served a litigation purpose, not a service purpose: Defendant Hidy attributed the requirement to "pending litigation matters," Defendants' own briefing states the witness was added "[b]ecause the conflict had at that point escalated to litigation," and Ms. Roberts's own record of her entry states, "I did not serve the role as an SSA at this time, and was there as a witness."

762.    Plaintiffs do not challenge the home visits or the SSA's home entry; they challenge only the warrantless entry of litigation personnel serving no administrative purpose.

763.    No warrant authorized any entry; no statute, regulation, or waiver provision required the presence of litigation personnel at any in-person visit, and no exigency existed.

123

764. Plaintiffs never gave voluntary consent. On December 17, 2025, Plaintiffs' counsel wrote to Defendant Horvath that "under protest and under duress," Plaintiffs would permit the witness, stating their understanding that refusal meant M.S. "will lose [her] waiver services"; Defendant Horvath did not dispute or correct that understanding, and proceeded to schedule the visit.

765. On December 18, 2025, Plaintiffs' counsel revoked even that coerced consent in writing before the visit; Defendant Poteet and Ms. Carr arrived at Plaintiffs' home that afternoon anyway.

766. On January 16, 2026, Plaintiffs admitted Ms. Roberts into their home for M.S.'s annual service planning meeting only because completing the person-centered service planning meeting was necessary to maintain M.S.'s Medicaid services; Plaintiffs understood, based on Defendants' statements, that refusing the witness meant the meeting would not occur and M.S.'s service plan (and thus, her Medicaid waiver services) would lapse.

767. Consent given to preserve a disabled child's essential Medicaid services, after the government has announced that objection "cannot continue" and that the objecting parent "may not dictate" who enters her home, is not voluntary consent; it is submission to asserted lawful authority.

768. The January 16, 2026 entry by Ms. Roberts was accordingly a warrantless, nonconsensual governmental intrusion into Plaintiffs' home for litigation purposes, in violation of the Fourth Amendment.

769. Defendants' continued conditioning of M.S.'s required visits on future warrantless entries by litigation personnel, enforced by cancelling the March and May 2026 visits when Plaintiffs declined home entry to the witness, is a continuing constitutional violation and an ongoing unconstitutional condition on M.S.'s Medicaid services.

124

770. The right to be free from warrantless, nonconsensual governmental entry into the home, absent a warrant, a recognized exception, or voluntary consent, was clearly established at all relevant times, as was the principle that consent extracted by threatening the loss of an essential government benefit is not voluntary and that a benefit may not be conditioned on the surrender of Fourth Amendment protection of the home.

771. At all relevant times, Defendants acted under color of state law.

772. Each Defendant is responsible in the respects set forth in the factual allegations above.

773. Defendant Manuel, with Defendant Hidy, issued the directive requiring litigation personnel at all in-person visits, as Defendants' sworn answers admit.

774. Defendant Hidy announced the requirement, refused to substitute any other arrangement, and personally decided that required visits would not occur without the witness.

775. Defendant Horvath advised and announced the requirement "[o]n my advice," scheduled the December 18, 2025 visit after receiving Plaintiffs' protest-and-duress letter, directed that Plaintiffs' objection "cannot continue," and informed Plaintiffs that "Mrs. Sodano may not dictate" who attends a meeting in her own home.

776. Defendant Poteet, whose statutory responsibility is to ensure M.S.'s right to select the participants in her person-centered service planning, carried out the litigation witness requirement, arriving with Ms. Carr on December 18, 2025 after consent was revoked and attending the January 16, 2026 entry with Ms. Roberts.

777. Defendant WCBDD is responsible because the entries and the condition were carried out pursuant to its official directive, issued and maintained by Defendants Manuel and Hidy as final policymakers.

125

778. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered the invasion of the sanctity and privacy of their home, coerced submission to governmental entry as the price of their child's essential services, the loss of authority over who enters their residence, and humiliation, mental anguish, and emotional distress.

779. Plaintiffs further face ongoing harm, as Defendants continue to condition M.S.'s required visits on litigation personnel entering Plaintiffs' home, for which Plaintiffs are entitled to injunctive relief.

780. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
**Litigation Witness Requirement**
**Against Defendants WCBDD, Manuel, Hidy, Horvath, and Poteet**

781. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

782. M.S. holds a property interest, protected by the Due Process Clause, in the continued receipt of her authorized Medicaid waiver services and in their delivery according to her person-centered service plan, as set forth in Count Three. Plaintiffs additionally hold liberty interests protected by the Due Process Clause in the sanctity and privacy of their home and in familial autonomy over who enters it.

783. Defendants deprived and continue to deprive Plaintiffs of those interests: they conditioned M.S.'s service plan going into effect on submission to home entry of a litigation-driven witness, conditioned her required in-person visits on the admission of litigation personnel

126

into Plaintiffs' home, and, when Plaintiffs declined, cancelled the visits her services require, a deprivation ongoing since March 2026.

784.    Before imposing those conditions, the Due Process Clause required prior written notice identifying the requirement and the legal authority and standards on which it rested, a statement of any right to contest it and the procedure for doing so, and a meaningful opportunity to be heard before a neutral decisionmaker.

785.    Defendants provided none of it. The requirement was announced by email two days after this lawsuit was filed, attributed to "pending litigation matters," and imposed without notice of any governing standard, without identification of any authority, and without any opportunity to contest it, because no authority exists.

786.    When Plaintiffs objected, the government's response was not process but prohibition: Defendant Horvath, the county's Assistant Prosecuting Attorney, directed that Plaintiffs' objection "cannot continue" and that "Ms. Sodano may not dictate who attends on behalf of WCBDD."

787.    A directive that objection "cannot continue" is the denial of the opportunity to be heard in its purest form: the government did not reject Plaintiffs' objection after considering it; it forbade the objection itself.

788.    No avenue to contest the requirement existed then or exists now. Asked in discovery for all documents setting forth any process to challenge the witness requirement, Defendants produced only WCBDD's Administrative Resolution of Complaints/Due Process policy (AGP 2.07), which states on its face that it "is not applicable to" "Medicaid services, including home and community-based waiver services."

127

789.    The only document Defendants could identify as process excludes, by its own terms, the entire category of services at issue.

790.    Nor has the deprivation any endpoint subject to review: Defendants admitted in response to Request for Admission No. 2 that "WCBDD has not stated anything this specifically" regarding any means by which the requirement could end.

791.    The deprivations were not emergencies: the requirement has been maintained for more than seven months, through repeated written objections, with ample time for any form of notice or hearing, and none has been offered.

792.    The denial of process is itself a completed constitutional injury, independent of the lawfulness of the underlying witness requirement.

793.    The right to prior written notice and a meaningful opportunity to be heard before a neutral decisionmaker, before the government conditions or withholds an established benefit and before it burdens the liberty interest in the privacy of the home and in familial autonomy over who enters it, was clearly established at all relevant times, and it was equally clearly established that forbidding a person's objection outright is the denial, not the provision, of that opportunity.

794.    At all relevant times, Defendants acted under color of state law.

795.    Each Defendant is responsible in the respects set forth in the factual allegations above.

796.    Defendant Manuel, with Defendant Hidy, issued the directive imposing the requirement without notice, standards, or any opportunity to be heard, as Defendants' sworn answers admit.

797.    Defendant Hidy announced the requirement, refused alternatives, personally decided that required visits would not take place, and provided no process.

128

798. Defendant Horvath directed that Plaintiffs' objection "cannot continue," told Plaintiff Lindsey Sodano that she "may not dictate" who attends a meeting in her home, and asserted the requirement without identifying authority or process.

799. Defendant Poteet enforced the requirement and communicated the cancellations, affording Plaintiffs no means to contest either.

800. Defendant WCBDD is responsible because the requirement was its official directive, issued and maintained by Defendants Manuel and Hidy as final policymakers, and because WCBDD itself identified no process, as its own discovery responses confirm.

801. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered the conditioning of M.S.'s services, the suspension of her required visits, and the coerced surrender of their home's privacy with no notice, no standards, no hearing, and no review, and humiliation, mental anguish, and emotional distress.

802. Plaintiffs further face ongoing harm, as the requirement and the suspension of M.S.'s required visits continue with no available process to contest them, for which Plaintiffs are entitled to injunctive relief.

803. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY-ONE**
**42 U.S.C. § 1983**
**Fourteenth Amendment - Equal Protection**
**Differential Treatment of Litigants**
**Against Defendants WCBDD, Manuel, Hidy, Horvath, and Poteet**

804. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

129

805. The Equal Protection Clause prohibits state actors from intentionally treating a person differently from others similarly situated without a rational basis for the difference, and prohibits classifications that burden the exercise of fundamental rights, including the First Amendment right to petition the government through litigation.

806. With respect to service and support administration, including in-person visits, service planning, and service monitoring, Plaintiffs are similarly situated in all material respects to every other family receiving IO Waiver services from WCBDD. The rules governing those functions apply identically to all recipients, and nothing about M.S.'s services, needs, or history distinguishes how those functions are to be performed for her.

807. One characteristic, and only one, distinguishes Plaintiffs from every other WCBDD family: they filed and are prosecuting this lawsuit.

808. On the basis of that characteristic alone, Defendants subjected Plaintiffs to conditions imposed on no other family: litigation personnel required at every in-person visit, entry into the family home as a condition of the child's services, a directive that the family "may not dictate" who enters their home, and the cancellation of required visits when the family declined.

809. The singularity of the treatment is established by Defendants' own sworn answer: asked in discovery for documents concerning any other waiver recipient or guardian ever told they may not dictate who enters their home, Defendants answered, "none other than Plaintiffs."

810. The classification is intentional and expressly so: Defendant Hidy announced it "due to pending litigation matters," Defendants' briefing attributes it to the conflict having "escalated to litigation," and Defendant Poteet's communications confirm it continues "due to current litigation matters."

130

811. The classification burdens the exercise of a fundamental right, because the trait defining it, having sued the government, is itself constitutionally protected activity, and the burdens fall on Plaintiffs precisely because they exercised it.

812. No rational basis supports the classification. Litigation does not alter how a monitoring visit is conducted, what a service plan requires, or who is qualified to perform SSA functions; Defendants identified no incident, complaint, safety concern, or service-related justification for treating this family differently; and Defendants' sworn answer identifies no authority for the differential treatment.

813. A desire to gain advantage in litigation against the very family being regulated, or to retaliate against or deter that family's protected activity, is not a legitimate governmental interest.

814. At all relevant times, Defendants acted under color of state law.

815. Each Defendant is responsible in the respects set forth in the factual allegations above.

816. Defendant Manuel, with Defendant Hidy, issued the directive establishing the litigation-based classification, as Defendants' sworn answers admit.

817. Defendant Hidy announced the classification two days after filing, attributed it in writing to the litigation, and enforced it by cancelling required visits.

818. Defendant Horvath created the requirement "on my advice," directed its terms, including that Plaintiffs "may not dictate" who enters their home and that their objections "cannot continue."

819. Defendant Poteet applied the classification at each visit and communicated its continuing enforcement.

131

820.    Defendant WCBDD is responsible because the classification was its official directive, issued and maintained by Defendants Manuel and Hidy as final policymakers and carried out by WCBDD personnel within the scope of their duties.

821.    As a direct and proximate result of Defendants' intentional differential treatment, Plaintiffs suffered conditions on M.S.'s services imposed on no other family, the coerced surrender of their home's privacy, the suspension of M.S.'s required visits, the burdening of their protected activity, and humiliation, mental anguish, and emotional distress.

822.    Plaintiffs further face ongoing harm, as the classification remains in force and M.S.'s required visits remain suspended, for which Plaintiffs are entitled to injunctive relief.

823.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages against the individual Defendants, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY-TWO**
**42 U.S.C. § 1983**
**Municipal Liability - Monell**
**Counts Eighteen to Twenty-One**
**Against Defendant WCBDD**

824.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

825.    The constitutional violations alleged in Counts Eighteen through Twenty-One were undertaken pursuant to the official directive and policy of WCBDD and were caused by the decisions of WCBDD's final policymakers. Plaintiffs plead the following theories of municipal liability in the alternative and cumulatively.

826.    **Official policy and directive:** The litigation witness requirement is an official directive of WCBDD. Defendant Poteet described it in writing as "our county directive" and "the previous directive that I received," Defendants' counsel described it in briefing as the Board's practice "to

132

always include a witness when having direct contact with Plaintiffs," and it has been applied uniformly to every in-person visit and planning meeting since December 12, 2025.

827. The requirement is not an isolated act but a standing rule of conduct, announced two days after this lawsuit was filed, enforced continuously for more than seven months, and maintained through the cancellation of M.S.'s required visits in March and May 2026.

828. **Final policymaker:** Defendants have admitted in sworn interrogatory answers that Defendants Manuel and Hidy, WCBDD's Superintendent and its Director of Service and Support Administration, made the decision that a witness would attend Plaintiffs' in-person visits, were the source of the directive requiring the witness at all visits, and were the persons responsible for conditioning M.S.'s service plan on a witnessed monitoring visit.

829. Defendants have further admitted in sworn answers that Defendant Hidy personally decided that the March 2026 visit "will not take place" when Plaintiffs declined the witness.

830. Within WCBDD, Defendants Manuel and Hidy held final authority over these matters; their decisions were not subject to meaningful review within WCBDD and therefore constitute the official policy of WCBDD. The violations alleged in Counts Eighteen through Twenty-One flow directly from their admitted decisions.

831. **Ratification:** In briefing to this Court, WCBDD has defended the requirement as its considered practice rather than disavowing it, and it has maintained and enforced the requirement through the present with full knowledge of Plaintiffs' objections, of the absence of any legal authority, and of the ongoing suspension of M.S.'s required visits, thereby ratifying the conduct and its basis.

832. The official directive, final policymaker decisions, and ratification described above were the moving force behind the violations alleged in Counts Eighteen through Twenty-One: the

133

retaliatory imposition of the requirement, the coerced entries into Plaintiffs' home, the denial of all process, and the singling out of Plaintiffs among all WCBDD families.

833. As a direct and proximate result, Plaintiffs suffered the harms alleged in Counts Eighteen through Twenty-One, including the coerced entry of litigation personnel into their home, the conditioning and suspension of M.S.'s essential services, the denial of any process to contest the requirement, and the burdening and chilling of their protected activity.

834. As a further direct and proximate result, Plaintiffs suffered mental and emotional injury, mental anguish, humiliation, and embarrassment.

835. Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY-THREE**
**42 U.S.C. § 12203**
**Title II of the Americans with Disabilities Act - Retaliation, Coercion, and Interference**
**Litigation Witness Requirement**
**Against Defendant WCBDD**

836. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

837. Section 12203(a) prohibits retaliation against any individual because that individual has opposed an act or practice made unlawful by the ADA or participated in any manner in a proceeding under the ADA, and § 12203(b) prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of ADA-protected rights or on account of having aided or encouraged another in their exercise.

838. M.S. is an individual with a disability within the meaning of the ADA, and Plaintiffs Lindsey and Justin Sodano are protected under both subsections as persons who advocate for and assist M.S. in the exercise of her federally protected rights.

134

839. Plaintiffs engaged in protected activity by objecting to policies threatening M.S.'s medically necessary supports, by opposing the parent replacement policy in writing through counsel as "violative of the ADA," and by filing and prosecuting this action, which asserts claims under Title II and Section 504.

840. WCBDD knew of that protected activity: it was served with this action, and within two days it announced new conditions expressly attributed to "pending litigation matters."

841. After Plaintiffs engaged in protected activity, WCBDD imposed adverse and coercive conditions it had never imposed before: it required litigation personnel to enter Plaintiffs' home at every in-person visit, conditioned the finalization and implementation of M.S.'s service plan on a witness home monitoring visit, told Plaintiff Lindsey Sodano she "may not dictate" who enters her home, directed that Plaintiffs' objections "cannot continue," and, when Plaintiffs declined the witness, cancelled M.S.'s required visits, a suspension of services ongoing since March 2026.

842. The causal connection is established by WCBDD's own words and admissions: the requirement was announced two days after filing and attributed in writing to the litigation; WCBDD's briefing to this Court states the witness was added "[b]ecause the conflict had at that point escalated to litigation"; WCBDD's sworn answers identify no statute, regulation, or authority for the requirement; and WCBDD's sworn answer confirms the treatment was applied to no family other than Plaintiffs.

843. Conditioning a disabled child's essential services on her family's submission to litigation-driven demands, forbidding the family's objections, and suspending the child's required visits when the family declines is coercion, intimidation, threat, and interference within the meaning of § 12203(b), and retaliation within the meaning of § 12203(a).

135

844.    WCBDD's conduct would deter a reasonable parent of a child with significant disabilities from continuing to advocate for that child's federally protected rights: no reasonable parent would press an ADA claim knowing the price is the surrender of her home's privacy and the suspension of her child's services.

845.    As a direct and proximate result of WCBDD's conduct, Plaintiffs suffered coercive governmental pressure, the invasion of the sanctity and privacy of their home, the loss of authority over who enters their residence, the conditioning and suspension of M.S.'s essential services, interference with their ability to advocate freely for M.S.'s rights, and the chilling of their protected activity.

846.    Plaintiffs further face ongoing harm, as the requirement remains in force and M.S.'s required visits remain suspended, for which Plaintiffs are entitled to injunctive relief.

847.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs pursuant to 42 U.S.C. §§ 12133, 12203(c), and 12205.

## COUNT TWENTY-FOUR
### 42 U.S.C. § 3617 and § 3615
### Fair Housing Act - Interference, Coercion, and Retaliation
### Against Defendant WCBDD

848.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

849.    The Fair Housing Act makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, any right granted or protected by 42 U.S.C. § 3604. 42 U.S.C. § 3617.

850.    M.S. has a handicap within the meaning of the Act, her family home is a dwelling, and Plaintiffs Lindsey and Justin Sodano reside with and are associated with her. Under § 3604(f), M.S. has the right to be free from discrimination in the terms, conditions, and privileges of her

136

occupancy and in the provision of services in connection with her dwelling because of her handicap.

851. Because of her handicap, M.S.'s ability to live in her home depends on the in-home waiver services WCBDD administers; the administration of those services is a service in connection with her dwelling, and its conduct directly affects her use and enjoyment of her home.

852. Plaintiffs exercised rights protected by the Act by asserting M.S.'s right to nondiscriminatory in-home services, objecting to conditions on those services, and filing and prosecuting this action.

853. After Plaintiffs exercised those rights, WCBDD imposed intrusion into the dwelling itself as the price of the services that sustain M.S.'s occupancy of it: it required litigation personnel to enter the home at every in-person visit, conditioned finalization and implementation of M.S.'s service plan on a witnessed visit inside the home, told Plaintiff Lindsey Sodano she "may not dictate" who enters her home, and directed that Plaintiffs' objections "cannot continue."

854. When Plaintiffs declined the intrusion, WCBDD suspended the services: it cancelled M.S.'s required in-person visits in March and May 2026, and the suspension continues.

855. Conditioning the disability-related supports necessary for safe occupancy of a dwelling on submission to governmental intrusion into that dwelling, and suspending those supports when the intrusion is refused, is coercion, intimidation, and interference within the meaning of § 3617.

856. WCBDD's conduct was taken on account of Plaintiffs' exercise of protected rights, as its own words and admissions establish: the requirement was announced two days after this action was filed and attributed in writing to "pending litigation matters"; WCBDD's briefing to this Court states the witness was added "[b]ecause the conflict had at that point escalated to

137

litigation"; its sworn answers identify no authority for the requirement; and its sworn answer confirms the treatment was applied to no family other than Plaintiffs.

857.    A reasonable family in Plaintiffs' position would understand that refusing the litigation-driven intrusion jeopardizes the services required for M.S. to remain safely housed, as WCBDD's cancellation of her visits confirmed.

858.    To the extent Defendants contend that OAC 5160-44-32 or any other state enactment required or permitted the conduct alleged in this Count, any such enactment is, to that extent and only to that extent, invalid under 42 U.S.C. § 3615, which invalidates state law "that purports to require or permit any action that would be a discriminatory housing practice." Plaintiffs do not seek the invalidation of OAC 5160-44-32(E)'s provisions permitting parents to serve as their children's paid providers, and nothing in this Count challenges them.

859.    As a direct and proximate result of WCBDD's violations, Plaintiffs suffered the invasion of the sanctity and privacy of their home, coercive pressure to permit entry by litigation personnel as the price of M.S.'s services, the loss of authority over who enters their residence, the suspension of the in-home services on which M.S.'s occupancy depends, insecurity in their home environment, and emotional distress, humiliation, and mental anguish.

860.    Plaintiffs further face ongoing harm, as the requirement remains in force and M.S.'s required in-home visits remain suspended, for which Plaintiffs are entitled to injunctive relief.

861.    Plaintiffs are entitled to declaratory and injunctive relief, actual damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

**COUNT TWENTY-FIVE**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Procedural Due Process**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(2)(g)**

138

862. Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

863. OAC 5160-44-32(E)(2)(g) requires that individuals "agree to and cooperate with" recurring contacts, with no more than sixty calendar days between in-person visits.

864. Defendants, through Defendant APA Horvath, refer to the in-person visits required by OAC 5160-44-32(E)(2)(g) as "60-day monitoring" and require a "witness" to enter Plaintiffs' home "due to pending litigation," and further state that Plaintiffs' objections to the witness requirement "cannot continue" and that "Mrs. Sodano may not dictate" who enters her home to conduct the in-person visit. Defendant SSA Poteet told Plaintiffs on March 4, 2026, that the "witness" requirement will remain in place "for any in-person discussions."

865. A law is void for vagueness if its enactment is impermissibly vague in all or virtually all of its applications. A law is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is required or prohibited, or if it is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement.

866. Ohio Administrative Code Section 5160-44-32(E)(2)(g) is unconstitutionally vague on its face because it has no standards or definitions as to what "agree to and cooperate with" means, and there are no set of facts by which "agree to and cooperate with" would not be vague.

867. Ohio Administrative Code Section 5160-44-32(E)(2)(g) fails to provide a person of ordinary intelligence fair notice of what is required or prohibited, and it provides no standards governing its administration.

868. Specifically, it fails to define: (a) What constitutes "agree" or "cooperate"; (b) What conduct qualifies as non-cooperation and who makes this determination; (c) What consequences follow if an individual is found to have not cooperated; (d) Whether an in-person visit must occur inside the disabled child's private residence; (e) Who besides the SSA may attend such

139

visits; (f) The permissible purpose, scope, or duration of the visit; (g) Whether the visit must be scheduled in advance; (h) What limits constrain governmental authority during the visit.

869.    OAC 5160-44-32(E)(2)(g) is impermissibly vague in all of its applications because, in every instance in which it is enforced, the child is subjected to an in-person contact visit whose purpose, duration, attendees, location, and consequences for any purported non-cooperation depend upon an undefined and standardless regulation. As a result, every child subjected to the provision is exposed to in-person contacts which the county board may enforce without any articulated benchmarks or limiting principles.

870.    The absence of standards permits unfettered administrative discretion and creates a substantial risk of arbitrary, inconsistent, and discriminatory enforcement.

871.    Because the 60-day in person contact requirement is undefined and has no standards related thereto, OAC 5160-44-32(E)(2)(g) is unconstitutionally vague.

872.    As applied to Plaintiffs, Defendants administered and continue to administer the rule in a standardless manner in which no person of ordinary intelligence could determine what was required or allowable. Specifically, Policymakers Horvath and Hidy interpreted OAC 5160-44-32(E)(2)(g) to allow WCBDD to compel Plaintiffs to allow a "witness" expressly "due to pending litigation" to enter Plaintiffs' home, with Defendant APA Horvath stating that Plaintiffs' objections "cannot continue," and that "Mrs. Sodano may not dictate" who enters her home. Defendants imposed obligations not derived from the rule's text and failed to provide written notice identifying governing standards or appeal rights.

873.    A law is also unconstitutionally void when its enactment reaches a substantial amount of constitutionally protected conduct.

140

874. Ohio Administrative Code Section 5160-44-32(E)(2)(g) is also unconstitutional on its face because it reaches a substantial amount of constitutionally protected conduct.

875. One of the ways in which it reaches constitutionally protected conduct is that it deprives Plaintiffs of the ability to contest the WCBDD's determination that a litigation-related "witness" must enter Plaintiffs' home in a meaningful time and manner under the due process clause of the Fourteenth Amendment. In fact, Defendant APA Horvath did the opposite: she stated that Plaintiffs' objection to the witness "cannot continue."

876. The enforcement by WCBDD of the 60-day in person visit rule reaches various constitutional protected conduct as set forth in the various causes of action in this amended complaint.

877. The rule delegates to county boards complete discretion to determine the nature, location, and intrusiveness of recurring in-person encounters. Because the rule operates in the context of home-based services, the absence of standards creates a substantial risk of arbitrary enforcement affecting residential privacy and service stability.

878. OAC 5160-44-32 (E)(2)(g), facially and as applied, violates the Fourteenth Amendment's guarantee of due process of law.

879. To the extent the unconstitutional application of the "litigation witness" requirement described herein was carried out by WCBDD, such enforcement was undertaken pursuant to the direction of Policymakers Horvath and Hidy and the ratification of Policymaker Manuel, rendering WCBDD liable.

880. As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's unconstitutional conduct, Plaintiffs suffered invasion of the sanctity and privacy of their home, coercive governmental pressure to permit entry by an unauthorized

141

litigation-related witness, interference with their ability to control who enters their residence, humiliation and emotional distress, and the chilling effect of government retaliation connected to the filing of this lawsuit.

881.    As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's illegal and unconstitutional acts as alleged, Plaintiffs also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

882.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY-SIX**
**42 U.S.C. § 1983**
**Fourth Amendment**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(2)(g)**

883.    Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

884.    OAC 5160-44-32(E)(2)(g) requires that individuals "agree to and cooperate with" recurring contacts, with no more than sixty calendar days between in-person visits.

885.    Defendants, through Defendant APA Horvath, refer to the in-person visits required by OAC 5160-44-32(E)(2)(g) as "60-day monitoring" and require a "witness" to enter Plaintiffs' home "due to pending litigation," and further state that Plaintiffs' objections to the witness requirement "cannot continue" and that "Mrs. Sodano may not dictate" who enters her home to conduct the in-person visit. Defendant SSA Poteet told Plaintiffs on March 3, 2026, that the witness requirement will remain in place for these 60-day visits.

886.    The Fourth Amendment guarantees the right to be secure in one's home against unreasonable governmental intrusion.

887. Warrantless entry into the home is presumptively unconstitutional absent voluntary consent or a recognized exception.

888. Consent obtained through coercion or conditioning of public benefits is not voluntary.

889. OAC 5160-44-32 (E)(2)(g) conditions disabled children's continued ability to use their willing and qualified Medicaid providers on advance agreement to recurring in-person visits, without defining the permissible scope or location of the visits.

890. The rule authorizes suspicionless recurring governmental presence and does not require individualized cause, articulable safety concerns, or judicial oversight.

891. By conditioning continued access to essential Medicaid benefits on acquiescence to undefined recurring home visits, OAC 5160-44-32 (E)(2)(g) creates structural coercion incompatible with the Fourth Amendment.

892. Accordingly, the rule is facially unconstitutional.

893. As applied to M.S., Policymakers Horvath and Hidy interpreted OAC 5160-44-32 (E)(2)(g) to require in-home entry and to permit a "witness" to enter and monitor Plaintiffs' home "due to pending litigation." Defendant APA Horvath stated that Plaintiff Lindsey Sodano's objections "cannot continue" and "Mrs. Sodano may not dictate" who enters the home for "monitoring" purposes.

894. Defendants linked compliance with this litigation witness home entry requirement to the implementation of M.S.'s person-centered service plan.

895. This conditioning placed Plaintiffs in the position of either admitting a litigation-related witness into their home or risking disruption of medically necessary supports.

896. Consent extracted under threat to essential public benefits is not voluntary.

897.    As applied, OAC 5160-44-32 (E)(2)(g) functioned as a mechanism for compelled governmental entry into a private residence absent warrant, individualized suspicion, or lawful exception, and expressly "due to pending litigation."

898.    To the extent the unconstitutional application of the "litigation witness" requirement described herein was carried out by WCBDD, such enforcement was undertaken pursuant to the direction of Policymakers Horvath and Hidy and the ratification of Policymaker Manuel, rendering WCBDD liable.

899.    Accordingly, subsection (E)(2)(g), facially and as applied, violates the Fourth Amendment.

900.    As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's unconstitutional conduct, Plaintiffs suffered invasion of the sanctity and privacy of their home, coercive governmental pressure to permit entry by an unauthorized litigation-related witness, interference with their ability to control who enters their residence, humiliation and emotional distress, and the chilling effect of government retaliation connected to the filing of this lawsuit.

901.    As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's illegal and unconstitutional acts as alleged, Plaintiffs also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

902.    Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT TWENTY-SEVEN**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Equal Protection**
**Facial and As-Applied Challenge**
**OAC 5160-44-32(E)(2)(g)**

144

903.   Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

904.   OAC 5160-44-32(E)(2)(g) requires that individuals "agree to and cooperate with" recurring contacts, with no more than sixty calendar days between in-person visits.

905.   Defendants, through Defendant APA Horvath, refer to the in-person visits required by OAC 5160-44-32(E)(2)(g) as "60-day monitoring" and require a "witness" to enter Plaintiffs' home "due to pending litigation," and further state that Plaintiffs' objections to the witness requirement "cannot continue" and that "Mrs. Sodano may not dictate" who enters her home to conduct the in-person visit. Defendant SSA Poteet told Plaintiffs on March 3, 2026, that the witness requirement will remain in place for these 60-day visits.

906.   The Equal Protection Clause prohibits intentional differential treatment of similarly situated individuals unless the classification is rationally related to a legitimate governmental interest.

907.   OAC 5160-44-32 (E)(2)(g), as written and implemented within Rule 5160-44-32, imposes mandatory sixty-day in-person contact requirements on minor child waiver recipients whose care workers are their parents.

908.   These recipients are similarly situated to: (a) Adult waiver recipients with parent care workers; (b) Adult recipients with non-parent care workers; and (c) Minor waiver recipients with non-parent care workers with respect to eligibility for Medicaid waiver services, privacy and autonomy rights, and health and safety requirements.

909.   The rule contains no individualized safety trigger, performance deficiency requirement, fraud finding, or clinical determination justifying heightened recurring in-person surveillance of minor children who have parent care workers. Instead, it categorically subjects children with parent providers to heightened government surveillance solely because of familial status and age.

145

910. If health and safety were the objective, monitoring frequency would be tied to assessed risk rather than care worker identity and recipient's age.

911. By targeting only children whose parents are their providers, while permitting all other waiver recipients to experience in-person visits as needed and at a time and place convenient to the individual, OAC 5160-44-32 (E)(2)(g) draws a line that has no relation to provider qualification, performance, or the child's health and safety.

912. The classification is therefore arbitrary, overinclusive as to qualified parent providers, and underinclusive as to other similarly situated waiver recipients' providers, and fails rational basis review.

913. The classification is irrational because it: (a) Requires heightened government surveillance of children's homes solely due to familial status and age; (b) Is overinclusive in subjecting healthy, safe children to forced government monitoring; (c) Is underinclusive in exempting all other waiver recipients from identical home monitoring requirements; and (d) Bears no rational relationship to health, safety, fiscal integrity, or continuity of care.

914. Accordingly, OAC 5160-44-32(E)(2)(g) fails rational basis review and is unconstitutional on its face.

915. As applied to Plaintiffs, Defendants required recurring in-person "monitoring" visits inside the home because her care workers are her parents. Through Defendant APA Horvath, Defendants further required home entry by a litigation-related "witness," stated that Plaintiff Lindsey Sodano's objections "cannot continue," and stated "Mrs. Sodano may not dictate" who enters the home.

916. Similarly situated waiver recipients were not subjected to equivalent recurring home entry and monitoring.

146

917. This disparate treatment was intentional and directly caused by Defendants' enforcement of OAC 5160-44-32(E)(2)(g).

918. Accordingly, OAC 5160-44-32(E)(2)(g), facially and as applied, violates the Equal Protection Clause.

919. To the extent the unconstitutional application of the "litigation witness" requirement described herein was carried out by WCBDD, such enforcement was undertaken pursuant to the direction of Policymakers Horvath and Hidy and the ratification of Policymaker Manuel, rendering WCBDD liable.

920. As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's unconstitutional conduct, Plaintiffs suffered invasion of the sanctity and privacy of their home, coercive governmental pressure to permit entry by an unauthorized litigation-related witness, interference with their ability to control who enters their residence, humiliation and emotional distress, and the chilling effect of government retaliation connected to the filing of this lawsuit.

921. As a direct and proximate result of Defendant APA Horvath's, Defendant Manuel's, and Defendant Hidy's illegal and unconstitutional acts as alleged, Plaintiffs also suffered mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

922. Plaintiffs are entitled to declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

147

A.  Declare that Defendants' parent replacement search policy, as administered, violates the First, Fourth, and Fourteenth Amendments, the ADA, Section 504, and the Fair Housing Act;

B.  Declare OAC 5160-44-32(E)(1)(a), (E)(2)(c), (J), and (E)(2)(g) unconstitutional, facially and as applied, as set forth in the Counts above, and declare, pursuant to 42 U.S.C. § 3615, that no state enactment required or permitted the discriminatory housing practices alleged herein;

C.  Declare that the litigation witness requirement violates the First, Fourth, and Fourteenth Amendments, the ADA, and the Fair Housing Act;

D.  Permanently enjoin Defendants from conducting any provider replacement search for M.S., and from disclosing, publishing, or transmitting M.S.'s identity, records, or information to any third party, absent her parents' express written approval of the specific disclosure, given in advance of that disclosure, and not revoked; and declare that no document or communication predating this action, including the 2024 summary of needs, constitutes such approval;

E.  Order Defendants to take all reasonable steps to retrieve, and to secure the deletion of, M.S.'s information from OnSeen, Inc., the LiveCARE Marketplace, and every entity that received it through Defendants' disclosures, and to certify their efforts and results to the Court;

F.  Order Defendant WCBDD to arrange for M.S.'s service and support administration to be performed by a qualified entity other than WCBDD, through contract with another county board or other lawful arrangement, and to cooperate fully in any transfer of her service coordination, including by promptly providing all records and approvals required;

G.  In the alternative, or pending any transfer under the preceding paragraph: permanently enjoin Defendants from requiring the presence of litigation personnel, or any person other than M.S.'s assigned SSA and persons selected by M.S. and her guardians, at any visit, meeting, or service function; enjoin Defendants from conditioning M.S.'s services, service plan, or provider authorizations on Plaintiffs' litigation conduct; and order Defendants to complete M.S.'s required in-person visits with her assigned SSA and without litigation personnel;

H.  Award Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

148

I.   Award Plaintiffs nominal damages for each completed constitutional violation;

J.   Award Plaintiffs punitive damages against the individual Defendants only, in an amount to be determined at trial;

K.  Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. §§ 12133 and 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 3613(c)(2);

L.   Award pre- and post-judgment interest as permitted by law; and

M. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38.

Respectfully Submitted,

/s/ Michela Huth
MICHELA HUTH
(Reg. No. 0091353)
257 Canal Street, SE
Bolivar, OH 44612
Ph: 330-440-4027
michelahuth.esq@gmail.com

/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL
*Pro Hac Vice*
545 E. Jericho Turnpike
Huntington Station, NY 11746
(631) 629-8111 (telephone)
(631) 961-8789 (facsimile)
richard@thedoglawyer.com

**CERTIFICATE OF SERVICE**

On _____ a copy of the above Second Amended Complaint was served

upon the opposing counsels for Defendants by operation of this Court's electronic filing system.

/s/ Michela Huth
MICHELA HUTH
(Reg. No. 0091353)

149